*2:22-cv-02095-JAD-EJY – February 9, 2026*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

SIGNIFY NORTH AMERICA                )
CORPORATION and SIGNIFY              )
HOLDING B.V.,                        )
                                     ) Case No. 2:22-cv-02095-JAD-EJY
            Plaintiffs,              )
                                     ) Las Vegas, Nevada
vs.                                  ) February 9, 2026
                                     ) 8:26 a.m. - 3:38 p.m.
LEPRO INNOVATION INC., LE            ) Courtroom 6D
INNOVATION INC., INNOVATION          )
RULES INC., HOME EVER INC.,          ) JURY TRIAL, DAY 6
and LETIANLIGHTING INC.,             )
                                     )
            Defendants.              )
_____ ) ***CERTIFIED COPY***

REPORTER'S TRANSCRIPT OF JURY TRIAL, DAY 6
BEFORE THE HONORABLE JENNIFER A. DORSEY
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiffs:   **ADAM D. SWAIN, ESQ.**
                      *ALSTON & BIRD LLP*
                      *950 F Street NW*
                      *Washington, D.C. 20004*
                      *(202) 239-3622*

(Appearances continued on page 2.)

Court Reporter:   Amber McClane, RPR, CRR
                  United States District Court
                  333 Las Vegas Boulevard South, Room 1334
                  Las Vegas, Nevada 89101
                  Amber_McClane@nvd.uscourts.gov

Proceedings reported by machine shorthand.  Transcript
produced by computer-aided transcription.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

APPEARANCES CONTINUED:

For the Plaintiffs (Cont.):

**NATALIE C. CLAYTON, ESQ.**
*ALSTON & BIRD LLP*
*900 Park Avenue*
*New York, New York 10016*
*(212) 210-9573*

-AND-

**J. RAVINDRA FERNANDO, ESQ.**
*ALSTON & BIRD LLP*
*1120 South Tyron Street, Suite 300*
*Charlotte, North Carolina 28203*
*(704) 444-1136*

-AND-

**F. CHRISTOPHER AUSTIN, ESQ.**
*LEX TECHNICA, LTD.*
*10161 Park Run Drive, Suite 150*
*Las Vegas, Nevada 89145*
*(702) 610-9094*

For the Defendants:

**NICHOLAS A. BROWN, ESQ.**
**PATRICK T. MICHAEL, ESQ.**
*GREENBERG TRAURIG, LLP*
*101 Second Street, Suite 2200*
*San Francisco, California 94105*
*(415) 655-1300*

-AND-

**AIMEE HOUSINGER, ESQ.**
*GREENBERG TRAURIG, LLP*
*1000 Louisiana, Suite 6700*
*Houston, Texas 77002*
*(713) 374-3570*

* * * * *

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*2:22-cv-02095-JAD-EJY - February 9, 2026*

*I N D E X*

Plaintiffs' Witness:                                              Page

**ZHIKANG HUANG**

    *Further Recross-Examination by Ms. Housinger*     98

    *Further Redirect Examination by Ms. Clayton*     105


Defense' Witnesses:

**JOHN CURRAN**

    *Cont. Direct Examination by Mr. Brown*            30

    *Cross-Examination by Mr. Swain*                   37

    *Redirect Examination by Mr. Brown*                86

    *Recross-Examination by Mr. Swain*                 96

**DAVID DUSKI**

    *Direct Examination by Ms. Housinger*             137

    *Cross-Examination by Ms. Clayton*                166


Plaintiffs' Rebuttal Witnesses:

**MICHAEL KRAMES**

    *Direct Examination by Mr. Fernando*              183

**AARON RUGH**

    *Direct Examination by Ms. Clayton*               197

    *Cross-Examination by Mr. Brown*                  201

* * * * *

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*I N D E X   C O N T.*

*E X H I B I T S*

| EXHIBIT NO.: | OFFERED | RECEIVED | REJECTED |
|---|---|---|---|
| 697 & 699 | 22 | 22 | |
| 490 | 65 | 65 | |
| 485 | 107 | | 108 |

\* \* \* \* \*

LAS VEGAS, NEVADA; MONDAY, FEBRUARY 9, 2026; 8:26 A.M.

--o0o--

P R O C E E D I N G S

**COURTROOM ADMINISTRATOR:**  This is the time set for a jury trial, day 6, in Case 2:22-cv-2095-JAD-EJY, Signify North America Corporation vs. Lepro Innovation, Inc.

Please make your appearances.

**MR. SWAIN:**  Good morning, Your Honor.  Adam Swain from the law firm of Alston & Bird on behalf of the plaintiff Signify.  I'm joined by the same team you've enjoyed all week -- last week.

**THE COURT:**  All last week.

**MR. SWAIN:**  And this week.

**MR. BROWN:**  Good morning, Your Honor.  Nick Brown, GT, for Lepro.  And with me the same team that has been here.

**THE COURT:**  Okay.  A lot has happened over the weekend, it seems.  Who wants to catch me up?  I'll start -- Mr. Swain, I'll start with you.

**MR. SWAIN:**  Sure, Your Honor.  I was going to have my colleague Natalie kick us off this morning, if that's okay, Ms. Clayton.

**THE COURT:**  Ms. Clayton.

**MS. CLAYTON:**  Good morning, Your Honor.  Two main issues to raise with Your Honor before we start this morning's proceedings.  The first is that we filed a renewed request to

exclude Exhibit 695, which is the Wu e-mail, as we refer to it. And that was docket 2... 267 and '66, I believe. The motion to seal was '68.

And then we have some objections to some exhibits that defendants are seeking to use with Mr. Duski today that were not disclosed in his expert report.

**THE COURT:** Okay. Any other developments over the weekend?

**MS. CLAYTON:** We did get some new sales data from defendants indicating that they have sold at Walmart, Home Depot, Macy's, Best Buy, and there are some others that I can't remember off the top of my head. So they did disclose those sales to us, Your Honor. I think that we would like some guidance as to how to handle that at this point. My thought is that we would -- you know, if there is a verdict in plaintiffs' favor, we would handle that after the fact through an accounting with the Court to ask for an adjustment to the damages award -- any damages award in light of the new sales that have been disclosed.

**THE COURT:** Okay. Anything else, Ms. Clayton?

**MS. CLAYTON:** We did submit -- the parties tried to narrow the issues on the jury instructions. I guess the other development for the Court is that they informed us that they are no longer challenging the validity of some of the other patents, which also affected the jury instructions to some

extent, as well as the verdict form.  The parties have tried to narrow the issues that exist with respect to both, however.

**THE COURT:**  Great.  So that should cut down on the fights we have this afternoon at the charge conference.

**MS. CLAYTON:**  Yes.  Hopefully, Your Honor.

**THE COURT:**  So I'll deal with verdict form and jury instructions later this afternoon.

So just getting -- putting together my list of things I need to resolve before we bring a jury in this morning, it's going to be the fight over Exhibit 695, which I think -- what are we calling the Wu e-mail?

**MS. CLAYTON:**  The Wu e-mail, yes, Your Honor.

**THE COURT:**  And I just finished reading your brief on that.

And then you said there are some other exhibits?

**MS. CLAYTON:**  With Mr. Duski, their damages expert, every e-mail -- I'm sorry, every exhibit that they identified that they would like to use with him today was never cited in his expert report.  And in addition, the reasons that we understand that they would be offering those exhibits for those opinions are not disclosed in his report either.

And if you would like the exhibit numbers, I have them, Your Honor.

**THE COURT:**  Yep.

**MS. CLAYTON:**  Exhibit 60, Exhibit 62, Exhibit 64,

Exhibit 67, Exhibit 84, and Exhibit 461.  The first handful are the notice letters that Mr. Rugh went through.  It appears that Mr. Duski is now going to try to come up and talk about what the proper notice dates are and how that would affect any damages calculations when no such opinions exist anywhere in his report, other than a footnote to say, "I understand that there is a dispute about notice.  If plaintiffs' notice dates turn out to be wrong, I reserve the right to update my calculations," which he has never done at any point during the course of this case.

Exhibit 461 is the brochure that Lepro put out recently at the Las Vegas conference --

**THE COURT:**  2026 brochure from the conference or convention?

**MS. CLAYTON:**  Correct, Your Honor.  And I'm not -- and I'm not really sure how they're extending to use that, but that certainly was not in any of his -- in his report either.

**MS. HOUSINGER:**  Your Honor, if I can address just 461.  That should not have been on that column, so we don't need to discuss that one.

**THE COURT:**  Thank you.  All right.  So 60, 62, 64, 67, 84.

**MS. CLAYTON:**  Yes.  And then there are two other documents that are not exhibits.  They are exhibits to Mr. Schoettelkotte's report that never came into evidence.

They identified those as well.  And so, again, they're not -- they're not evidence in this case, and Mr. Duski's report that responded to those exhibits was -- was stricken by the Court, and so he should not be able to respond to those exhibits either.

**THE COURT:**  I'm lost.

**MS. CLAYTON:**  Yeah.

**THE COURT:**  Exhibits that were stricken by the Court?

**MS. CLAYTON:**  So sorry, no.  So we have Mr. Schoettelkotte's supplemental report that had exhibits attached to it.  With their disclosure last night, they identified two of his exhibits that they intend to have Mr. Duski testify to.  Mr. Duski's report and response to those calculations was the one that the Court struck in connection with excluding their affirmative defense.

And so we would -- he has no opinions in this -- you know, standing in this case responsive to those exhibits attached to Mr. Schoettelkotte's report.  They're not exhibits that are evidence in this case, Your Honor.

**THE COURT:**  Okay.  Have you addressed everything for me, Ms. Clayton?

**MS. CLAYTON:**  Yes, Your Honor.

**THE COURT:**  All right.

**MS. HOUSINGER:**  Your Honor, with respect to Exhibits 60, 62, 64, 67, and 84, those are the notice letters

that have already been admitted.  Mr. Duski is not intending to -- or I am not intending to ask Mr. Duski questions about whether those notices are valid, anything along those lines. It's just for the date on the notice, which I think, at this point, he has them memorized from hearing the testimony anyway.  I don't need to use those documents with him.

THE COURT:  Okay.

MS. HOUSINGER:  For -- for the -- the tables in Mr. Schoettelkotte's report, those tables -- and it may help if I can show Your Honor to which I'm referring --

THE COURT:  Please.

MS. HOUSINGER:  -- if I approach the podium and use the ELMO?

THE COURT:  Sure.

MS. HOUSINGER:  Oh goodness.  I have never actually learned how to zoom in and out.  I apologize.  Okay.

THE COURT:  You just learned.

MS. HOUSINGER:  There we go.  So these are the calculations of the royalty base from Mr. Schoettelkotte's report.  And so this is for the 336.  You'll see he's got just annual net sales for the accused products, and then he's got a total.  You'll see these totals again in Mr. Schoettelkotte's number.  He applies the royalty rate to these royalty bases.

I'm not seeking admission of these documents.  All I want to do is show Mr. Duski these tables and say, "Okay, if

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

sales before 2018 aren't included in the royalty base, what's the math?  What's 2,300 subtracted from 314,000?"  Just simple, basic math.  Nothing -- nothing complicated.  And certainly not having him opine on whether the notices are valid.  It's just the impact on the royalty base.

And then, with respect to the issue of whether that's in Mr. Duski's report, he reserves the right.  In a footnote, he says:  "I understand there's a notice issue.  I reserve the right to update my calculations."

These aren't complicated calculations.  This isn't something that needed advance notice.  It's -- he's going to be up there with a ten-key calculator and a table and do some simple subtraction or addition.

**THE COURT:**  So he won't be supplying new -- so what -- sorry.  When you say he's going to do simple math with respect to this Exhibit 7.1, the '336 patent royalty base, for example --

**MS. HOUSINGER:**  Sure.

**THE COURT:**  -- he -- he would literally just be subtracting or adding numbers on this document, or he'll be applying -- does he have a -- an opinion about the royalty rate that he would be applying to this?  Is that what you're saying?

**MS. HOUSINGER:**  He's -- with respect to this testimony and these tables from Mr. Schoettelkotte's report,

he's not talking about a royalty rate at all.  All he's doing is updating the royalty base.

The '336 patent is a -- is not a perfect example for this because of when the patent expired and the expiration, but if I could just show you for the '604.  There's a dispute on notice for the '604.

**THE COURT:**  Okay.

**MS. HOUSINGER:**  If -- if it turns out that the proper notice date was 2021 --

**THE COURT:**  Uh-huh.

**MS. HOUSINGER:**  -- we've got sales from 2021 --

**MS. CLAYTON:**  That's the '399.

**MS. HOUSINGER:**  I'm sorry.  Thank you, Ms. Clayton.  Seven.  I need table 7.3.  I apologize.

Here we go.  So if the first notice from Signify that is a proper notice to Lepro of the infringement is 2021, Mr. Duski's testimony will be:  Okay, we include sales from 2021, '22, '23, '24, and the first three-quarters of '25, add up that number, and give that number to the jury.  That's it.  That's all he's doing.

And I'm going to, with Your Honor's permission, give him a ten-key calculator so he can do the math for them.

**THE COURT:**  And had -- has it -- had it been disclosed that he would opine on notice dates?

**MS. HOUSINGER:**  Not on the specific dates that he was

going to provide dates.  What he said was, "I understand there's a dispute."  He also testified in his deposition that he knows there's the dispute with respect to when notice was provided, and so he does take an issue with the royalty base.

THE COURT:  Okay.  Any other discussion with respect to the exhibits you want to use with Mr. Duski?

MS. HOUSINGER:  I do not believe so.  I think we've covered all the ones to which Signify had objections.

THE COURT:  Okay.  Let me finish this part of the conversation, and then we'll get to Exhibit 695.

MS. CLAYTON:  Your Honor, may I respond briefly?

THE COURT:  Yes.

MS. CLAYTON:  So Rule 26 says that the expert must provide a complete statement of all opinions the witness will express and the basis and reasons for them.  Mr. Duski did not do any of the math in his report that defendants just said he will do on the stand.  And there are two footnotes in his report where he addresses this issue.  It's footnote 160 in his report, and all that he states there is that -- let me find it:  "If it is determined that Signify did not provide sufficient notice of one or more patents-in-suit to the defendants, I understand this may impact or alter the hypothetical negotiation and damages start date for the affected patents."

The other footnote is footnote 191, and there, he

states:  "I understand he" -- I think that's a typo -- "the trier of fact can make its own decision about the relative contribution of the '320 patent compared to other Signify patents that contribute to smart functionality" -- or actually, that's the wrong footnote.  Sorry.  One second.

It's 198.  Sorry.  Exhibit 3:  "I understand from counsel that the claim notice date for the '604 patent may be inadequate with respect to certain categories of accused products.  If it is determined that the notice date for certain categories of the products accused of infringing the '604 patent is later than Signify contends, I will be prepared to update my opinions about its impact on the damages figure and revise my damages calculation based on the new notice date or dates."

So, again, just saying that he may do it.  And then, in his deposition, it's the same.  He is asked:  "Do you take any issue with regard to the royalty base?"

And he says:  "I don't.  I will caveat that I -- as I understand it, there's a dispute around proper notice."  But, again, he never actually does any of these calculations, and it's a violation of Rule 26 and improper for him to do these calculations on the fly sitting on the stand, Your Honor.

**THE COURT:**  All right.  Thank you.

I'm going to let Mr. Duski do this math.  I would let counsel do this math in closing argument, and I think that

*2:22-cv-02095-JAD-EJY - February 9, 2026*

it's essentially the same to have him do it on the stand.

You-all can follow along and do the math as he does and cross-examine him on it if there's a problem.  So I will allow that.

My understanding with respect to these notice letters -- 60, 62, 64, 67, 84 -- is that the defense is saying you were just going to use those for the date, but you don't even think you're going to need that because he has these mostly memorized at this point?

**MS. HOUSINGER:**  Yes, Your Honor, I have them on my list just in case he needs to reference the date, but I don't think he will need to do that.

**THE COURT:**  Okay.  So I'm going to go with the assumption that he is not going -- you aren't going to be putting these in evidence -- trying to get these in evidence with him.  At most, you will be refreshing his recollection with them, which would be appropriate.  So you can do that.

**MS. HOUSINGER:**  Thank you.

**THE COURT:**  Let's turn to Exhibit 695 now.  I have -- I've read the filing by Signify so I've got Signify's motion to exclude Exhibit 695 as prejudicial and inadmissible hearsay.  It's at Document Number 267.

I also have Document Number 268, which is the motion to seal.  Yeah, I'm -- I'm going to deny the motion to seal. I don't think it's an appropriate document to seal from the

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

record of this case under the *Kamakana* case.  So I'm denying 268.

Let's talk now about the motion to exclude.  I've read everything, so I feel that I have Signify's position.  I think a lot of this were -- was concerns that I had in mind when we were here on Friday, and I think just because of the amount of things that were happening on Friday in this case and the fact that you-all had not had enough time yet to really explore what that document was, perhaps that was why these didn't get raised then.  But nevertheless, we had sort of preserved everything for today for further conversation.

Who's going to argue about Exhibit 695?

**MS. HOUSINGER:**  Me again, Judge.

**THE COURT:**  All right, Ms. Housinger.

**MS. HOUSINGER:**  So, Your Honor, I -- maybe starting with the easier thing, which is the 403 issue.  Of course, Signify thinks this e-mail is prejudicial; right?  Of course they do.  That's not the issue.  The issue is it more prejudicial than probative, and that's not what we have here.  Willfulness is an issue in this case.  They've put in plenty of evidence trying to show that we're willful infringers over here.

When you've got the founder and the person who is in charge of Lepro reaching out to Signify to communicate why we haven't settled and this -- the nature of this litigation,

that is relevant to Sig- -- or excuse me, to Lepro's state of mind, and it shows a complete lack of willfulness on the part of Lepro.  So I think -- I think that issue is the easy one to set aside.

With respect to hearsay, I note, Your Honor, that there was only one case that was actually binding authority in Signify's brief from the Ninth -- binding authority from the Ninth Circuit in Signify's brief.  And that was the... the *NLRB* case.  And that's the one talking about the -- kind of the reliability -- the special indicia of reliability.  And I think that one's really easy to take care of, too, because this wasn't a document that we produced.  This was a document that Signify produced.

And so all of the kind of fears about e-mails and they're easy to manipulate and things of that nature, that's taken care of because it came from their records, forwarded to counsel in this case with a Signify Bates number.  It was on their exhibit list so they've reviewed it.  They knew it well enough to put it as Exhibit 441.  Before trial, they decided they didn't want to use it; they withdrew it.

So I think those issues, too, are very simple.  And, Your Honor, we -- we lay the foundation for the business records, and I think that one is pretty well satisfied as well.

**THE COURT:**  Last word, Ms. Clayton.

**MS. CLAYTON:**  Yes, Your Honor.  So defendants referenced the *NLRB* case related to trustworthiness and the issue here isn't whether this was an e-mail that was actually sent.  Obviously, it was actually sent.  It's the actual trustworthiness of the underlying statements, and that's where the problem lies here.  This is clearly a litigation-motivated summary of what is happening.  And in addition, to the extent that they claim that this was related to willfulness, this e-mail was sent in December, three years after the litigation started.

**THE COURT:**  December 2025.

**MS. CLAYTON:**  Correct, Your Honor.  And any statements about early communications regarding the case are not contemporaneous, which is what the business record exception requires for, you know, e-mail statements like this to fit within the business record exception.

Additionally, the -- you know, there's untold prejudicial statements in here from, you know, their client saying that, you know, American policy towards China is incorrect, disparaging Signify's lawyers at every turn, and also talking about legal spend in the case, none of which are relevant to any issues here.

And finally, you know, just for the record, Signify added this document when they thought Mr. Wu might be coming to testify at trial.  It was almost simultaneously when they

added this to the exhibit list that they realized he was not coming to testify and so realized they would not need it to potentially impeach him, Your Honor.

So -- so for all the reasons outlined in the brief, we believe that this is not subject -- does not satisfy the business rule exception to hearsay, and the remainder of it is extraordinarily prejudicial. And for that reason, the document should be excluded, Your Honor.

**MS. HOUSINGER:** If I may, Your Honor? We would be happy to have a limiting instruction. Some of the things that -- with which Signify is taking issue about the spend and things like that or -- or even Mr. Wu's understanding or Mr. Wu's belief that the patents aren't valid, that's -- that's not what we are presenting this -- we are presenting it for his belief, not for the fact that the patents are not valid.

And so these are the types of issues that can easily be cured with a limiting instruction for the jury: Do not take this -- Mr. Wu's statements for the truth of the matter asserted. It goes to his state of mind. It goes to the issue of willfulness and his intentions.

**MS. CLAYTON:** And, Your Honor, if Mr. Wu wanted to provide his state of mind, he could be here testifying. We have a different witness here, and so I think that is part of the problem, Your Honor.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

**THE COURT:** All right. Thank you, everyone. Ms. Housinger, I think you have made a valiant effort to get this document in. It is, however, a highly inflammatory historical perspective, and I find that it is inadmissible.

First, it's inadmissible hearsay, and Signify has now shown that it doesn't meet the business records exception of FRE 803(6). I think that the biggest problem with it -- while I think that it -- I think it fails on a number of the elements of 803(6), I think the number one thing that it fails for is trustworthiness. Yes, we know it came from Signify, so I -- there's -- there is no question that it is a true and accurate copy of this e-mail that Mr. Wu sent. Absolutely.

But it's not the chain of custody I'm concerned with here for trustworthiness. It is the contents of this document, and this is not a -- an invoice or a billing record or something that we would typically see in the course of business that we would admit under the business records exception it -- that would give it a special indicia of -- give its contents a special indicia of reliability.

What this is, is a -- it's spin, really. It's spin, and it's not just spin on state of mind now, it's spin on the entire history of these negotiations. So it talks about a lot of things that didn't happen at or about the time this document was -- was crafted or e-mailed. But even if I were to find that the business records exception was satisfied, I

would exclude this document under FRE 403 because it is substantially more prejudicial than probative.

I think the characterization that Signify gives it on page 7 of the -- their recent brief of Document 267, it is a bald attempt to persuade and engages in both flattering the recipient and disparaging Signify's legal team and tactics. There's no question that's what is happening here. It calls Signify's counsel disgusting, characterizes the deposition of Mr. Wu's mother, claims that Signify's tactics are designed solely to harass and offend, references Signify's alleged legal spend, implies that Signify's lawyers are looking to get rich, refers to threats and intimidation as techniques used by Signify's legal team, as well as suggesting that those that Mr. Wu has dealt with are not smart.

So if Lepro wanted to bring in this post-deposition, post-discovery, crafted narrative into trial, Mr. Wu should have come here and taken the stand and provided his historical account with testimony that was subject to cross-examination. If it comes in this way, there's no ability for Signify to address what it claims as false statements about the history between these parties. And I don't think that any of these problems can be cured with a limiting instruction.

So for those reasons, I am excluding Document 695.

**MS. HOUSINGER:** Understand your ruling, Your Honor. Just for the record, we did not know this e-mail existed until

Signify produced it in this case --

THE COURT:  I know, but your client made it.  So if anybody should have known about it, it should have been y'all.

MS. HOUSINGER:  Understand, Your Honor.  And that is something that we will address with them.

THE COURT:  Yep.  Okay.  Thank you.

Anything else that we need to address, then, before we can let the jury stop enjoying their breakfast and head in here?

MS. CLAYTON:  Nothing from plaintiffs, Your Honor.

THE COURT:  Mr. Brown.

MR. BROWN:  Two things, Your Honor.  One of them is, I think, very simple and that is we had moved to admit Exhibit 697 and 699.  I believe Mr. Swain inspected them.

MR. SWAIN:  All set, Your Honor.  No objection.

THE COURT:  Great.

So hold on.  So the numbers are?

MR. BROWN:  697 and 699.

THE COURT:  And you move them into evidence?

MR. BROWN:  Yes, Your Honor.

*(Exhibit Nos. 697 & 699, offered.)*

THE COURT:  They will come in.

*(Exhibit Nos. 697 & 699, received.)*

MR. BROWN:  Thank you, Your Honor.

The other issue is on the missing sales data which we

investigated over the weekend. With your permission, I'll give the Court a brief explanation of what we learned over the weekend.

THE COURT: Please. Bring me up to speed.

MR. BROWN: Okay. So the short of -- there are two parts, Your Honor. The first is Walmart. So our sales to Walmart -- or through Walmart began in 2021. This was not included in any of the sales data that we produced until the sales -- until the final quarter of 2025, when it was included. We understand that the reason this happened is that the person who was -- there was a difference in who collected the data. So the final quarter of 2025 was collected by Mr. Huang, who was testifying here. He collected the Walmart data when he was providing that data and produced it.

The prior data was collected by a different person who did not collect it. My understanding is that it was a mistake. That it was a small amount of data, and it didn't occur to him that accused products were being sold on Walmart. I apologize for this mistake. It should have been discovered and corrected during discovery.

The total amount, though, is under one percent of the sales data. It's all related to smart bulbs, so it relates to a single patent in this case, the '320 patent. The amount at 6.5 percent -- Signify's royalty rate -- would adjustment the damages up by $2,200, per my calculations. I agree with

Signify that this is an appropriate thing for the Court to do in an accounting post-trial, if that is how the Court is inclined to handle it.

I do have a concern about that approach, though, because there's been testimony about how we were hiding the Walmart sales data, et cetera, et cetera.  So if we're going to handle it through the Court, we would request that the Court instruct the jury that this is a discovery issue that the Court is aware of and that the Court is going to take care of it and the jury does not take care of it.

In the absence of such an instruction, we need to be able to provide an explanation.  My understanding from Mr. Huang is that his testimony will be he did not notice that this data was missing because it's a small amount of data.  He received the collection of sales data from his -- well, first of all, he was not even at the company when the first round of sales data was collected.  The subsequent rounds of collection were done under his supervision by the same person who did them before and who had already, it appears in his mind, excluded Walmart for whatever reason.

Mr. Huang did not notice, but when he did it himself, he included the Walmart sales.  And so his testimony was that he didn't know and that was because he needed to go check to see what the person who had actually collected the data before him had done.  And so we would put him on the stand to explain

what had happened and to apologize for the mistake.

Or in the alternative, we're perfectly happy to have the Court handle it. I think at that point, he doesn't need to get back on the stand. The Court could just instruct the jury that the Court is going to handle this separately.

**THE COURT:** Thank you.

Ms. Clayton.

**MS. CLAYTON:** Your Honor, with regard to the instruction to the jury, I think it would be perfectly fine for the Court to let the jury know that you'll handle any math aspect of any missing sales but the fact that they did not -- were not forthcoming in the retailers in which they are selling I believe is an issue that the jury is entitled to weigh in deciding whether the testimony of defendants is credible or not.

In fact, I'm -- defendant submitted a declaration under penalty of perjury from a -- and I'm not sure if it's a Ms. or a Mr. Zhou -- to the Court in December of 2023. I have a copy here if Your Honor would like to see it. And I'm not sure if this is the person who previously collected the data, but it identifies the channels that they claim they sell through, and it only mentions Amazon and their own websites.

And so the fact that they have withheld this information for so long, including submitting a declaration under penalty of perjury to the Court saying that those are

the only channels, Your Honor, that is -- that is relevant to the credibility of the defendants in this case. And so if the Court wants to instruct the jury that you will handle the math, that's fine. But I don't think that there should be any instruction related to dismissing the fact that the sales were missing in their entirety because I do believe the jury should be permitted to weigh that fact when it comes to credibility of witnesses, Your Honor.

**THE COURT:** Okay. So I think both things need to happen. I think that I agree that it's a credibility issue, but I agree that also the defense should get to address that credibility issue, and you can cross-examine on that. So I think that's going to happen. That's piece one.

Piece two is I do think that the jury needs to be instructed that they should not -- because you haven't put into evidence the amount of these sales, and I'm not going to have you do that. Numbers got solidified a while ago, and it makes no sense to be doing that additional math on the fly right now. So I -- I think I need to let the jury know that I will handle any math related to these alleged missing sales. So I think I would say: I want to let the jury know that the Court will handle any math related to these alleged missing sales, so when deliberating and considering your verdict in this case, you should not -- should I say include or calculate? Give me a proposal. I'm going to start Mr. Brown.

**MR. BROWN:** I'm fine with either include or calculate, Your Honor. I think -- with respect to what you just said, I think it needs to be identified with the word "Walmart" in order for it to be clear. So, in other words --

**THE COURT:** Yeah.

**MR. BROWN:** -- "the jury should not" -- I defer either "include" or "calculate" or "assess damages on the allegedly missing Walmart sales. That will be handled by the Court."

**THE COURT:** Allegedly missing Walmart sales, so when deliberating and considering your verdict in this case, you should not --

Ms. Clayton, what is your proposal?

**MS. CLAYTON:** I -- you do not need to calculate any damages related to the missing Walmart sales. The Court will handle that if necessary. Or something like that.

**MR. BROWN:** I have no objection to those words from Ms. Clayton, Your Honor.

**THE COURT:** Okay. Let me read it now. I want to instruct the jury that the Court will handle any math related to these allegedly missing Walmart sales. So when deliberating and considering your verdict in this case, you should not calculate any damages related to the missing Walmart sales. The Court will handle that later, if necessary.

**MS. CLAYTON:** The only word maybe is alleged because they've admitted that they -- their -- I would suggest we take that out because they've admitted that there are missing Walmart sales.

**THE COURT:** Mr. Brown.

**MR. BROWN:** That's fine.

**THE COURT:** Okay. Okay. So when we ended on Friday, we -- let's see. Where were we when we ended on Friday?

**MS. CLAYTON:** I believe Mr. Curran was testifying, Your Honor.

**THE COURT:** Um-hum.

**MS. CLAYTON:** Dr. Curran. Sorry.

**THE COURT:** There we go. Dr. Curran.

All right. So we're still in direct of Dr. Curran.

How much longer do we have for direct of Dr. Curran?

**MR. BROWN:** Not long, Your Honor.

**THE COURT:** Okay. And how long do you think you're going to go on cross?

**MR. SWAIN:** Your Honor, I believe that would between 30 and 45 minutes, hopefully.

**THE COURT:** Okay. And then we'll go back to our witness and put him back up on the stand?

**MR. BROWN:** That is my understanding.

**THE COURT:** Okay. And I think it might make sense for defense to start with him --

**MS. HOUSINGER:**  Yes, Your Honor.

**THE COURT:**  -- to address these -- the Walmart sales issue, and then we get cross and then redirect.

**MS. HOUSINGER:**  Yes, Your Honor.

**THE COURT:**  Okay.  All right.  That's what we'll do.  All right.

**MR. MICHAEL:**  Should I go get Dr. Curran, Your Honor?

**THE COURT:**  Yes, let's bring Dr. Curran back up.  Go ahead and pop him on the stand so we'll be ready.

Summer, do we have all of our people?

**COURTROOM ADMINISTRATOR:**  We do.

**THE COURT:**  Welcome back, sir.

**THE WITNESS:**  Good morning.

**THE COURT:**  Good morning.  You understand you're still under oath?

**THE WITNESS:**  Yes.

**THE COURT:**  Great.

*(Pause in proceedings.)*

**COURTROOM ADMINISTRATOR:**  All rise.

*(Jury in at 9:15 a.m.)*

**THE COURT:**  All right.  Welcome back.  All seven jurors have returned from the weekend.  Everyone, have a seat.

And, Mr. Brown, please continue with your direct examination of Dr. Curran.

**MR. BROWN:**  Your Honor, may I approach the witness

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*John Curran - Cont. Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

with binders?

THE COURT:  Yes.

**CONT. DIRECT EXAMINATION**

BY MR. BROWN:

Q.  Dr. Curran, welcome back and good morning.

A.  Good morning.

Q.  I want to refresh everyone about where we were.  Finish up the one small remaining issue.

Dr. Curran, if you can turn in your binder to tab 4, which should have Exhibit 260.  Let me know when you're there.

A.  Okay.

Q.  All right.  Just to orient, I've put on the screen the first page of Exhibit 2, the '604 patent.  You recall discussing this patent, Dr. Curran?

A.  Yes, I do.

Q.  And --

THE COURT:  Do you all have it on your screen?

THE JURY:  (Negative responses.)

THE COURT:  No.  There we go.

MR. BROWN:  Thank you, Your Honor.

THE COURT:  You're welcome.

JUROR NO. 4:  Our monitor here is not coming on.

COURTROOM ADMINISTRATOR:  It might take a minute to come on.

THE COURT:  It's up here, too, on the big screen.

*John Curran - Cont. Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

Is it on the next one over?

**JUROR NO. 4:**  Yeah.

**THE COURT:**  You're welcome to scoot over.

**JUROR NO. 4:**  Okay.

**THE COURT:**  Anybody is welcome to scoot over.  Move to another seat if you would prefer to -- or you can look on the big screen.

You can -- you can continue.

**MR. BROWN:**  Thank you, Your Honor.

**BY MR. BROWN:**

Q.   Dr. Curran, do you recall that on Friday we discussed your opinions about whether Exhibit 2, the '604 patent, was valid?

A.   Yes.

Q.   And if you can look at Exhibit 260, which is an annotated copy of the Stimac patent that issued in 2004.  Do you have that in front of you?

A.   Yes.

Q.   And will you remind the jury what your opinion was about the Stimac patent and claim 1 of the '604 patent, Exhibit 2?

A.   My opinion was that the elements in the Stimac patent -- that the three elements of the '604 patent, claim 1, are shown in the Stimac patent.

Q.   Dr. Curran, do you have an opinion about whether the Stimac patent renders obvious the claims -- excuse me, claim 1

*John Curran - Cont. Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

of the '604 patent?

**A.** Yes, I do.

Q. And what is your opinion?

**A.** That it does render it obvious.

Q. Now, Dr. Curran, I don't know if you remember, but we haven't yet talked about claim 12, the other claim that is asserted in the '604 patent. And so I am going to put claim 12 up on the screen. Actually, first, I'm just going to put up claim 1 from the '604 patent, Exhibit 2. This is what we had -- is this the claim that we had already discussed and you just opined about?

**A.** Yes.

Q. And if we flip the page, we get to claim 12 (indicating).

Can you see claim 12 on the screen?

**A.** Yes, I can.

Q. And can you read that claim to the jury, please.

**A.** Yeah. The light-emitting module, according to claim 1, wherein a sealant substance is positioned between the housing element and the heat dissipation element for environmental sealing between the housing element and the heat dissipation element.

Q. I'm now going to turn you back to the Stimac reference, which you should also have in front of you, and direct you to column seven of the Stimac reference. And in particular, I'd like to direct you to the part here (indicating) at around

line 40 where it refers to weatherproofing and a sealant.  Do you see that?

**A.**    Yes.

Q.    Dr. Curran, do you have an opinion about whether the Stimac reference discloses the requirements of claim 12?

**A.**    Yes.

Q.    And what is your opinion?

**A.**    That it does disclose the claim 12 from the '604 patent.

Q.    And, Dr. Curran, do you recall that -- well, we were discussing in general the differences between indoor lighting and outdoor lighting and what you might need to change if you took an indoor light outside?

**A.**    Yes.

Q.    And can you remind the jury of what you might need to do if you took an indoor light outside?

**A.**    Depending on what type of light you're talking about. For example, a streetlight is a good example.  There's usually a -- some type of rubber gasket that fits in a groove, and the rubber gasket, as you close the -- say, the housing on to the heat sink squishes it, which basically makes it -- nothing is perfectly watertight, but it makes it water resistant so that you don't get water leaking into the -- the streetlight.

Same for a wall pack.  Anything you're going to use outdoors, if you're doing it where you don't intend to take it apart again, you might use some kind of sealant that -- that's

going to just be permanent.  But normally, when it's a product that you might want to open it, even if the LEDs are fine, you might want to be cleaning the lens, and so you've got to open it up.  So in those cases, you usually want some kind of rubber gasket like a long, elongated O ring.  It usually fits in a groove, and when you fit the two pieces together, it squashes it and keeps water from leaking in.

Q.  Dr. Curran, I remember that you talked about your experience with Dialight with traffic lights.  Do you -- is that right?  Did you work on traffic lights at Dialight?

A.  Yes.

Q.  Is this notion of using some way of keeping water out of an outdoor light something that is new with LEDs?

A.  No.  In terms of traffic lights, I mean, they -- when Dialight started using LEDs in the traffic lights, they basically replaced the incandescent light bulb that was in it. There were other things we had to put in.  You put in a heat sink.  You put in the -- the substrate with the LEDs on it. But the housing itself still had a lens, still had material to be able to make it water resistant, and you put it together the same way.

Q.  Dr. Curran, coming back to claim 12 of the '604 patent, do you believe -- or in your opinion, did Signify when it filed this patent in 2005 invent anything when it described using a sealant substance for environmental sealing between

*John Curran - Cont. Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

the housing element and the heat dissipation element?

**A.**   No, I don't believe they did.

**Q.**   All right.  One last thing, Dr. Curran.  If you could turn to May -- all right.  Turn back to Exhibit 260, the annotated version of the Stimac reference.  And for the record, you should also have the nonannotated version of the Stimac reference as Exhibit 504 in the binder in front of you, if you need to refer to that.

**A.**   Yes.

**Q.**   But I recall that you testified on Friday that the housing that you've marked here in red (indicating) --

**A.**   I'm sorry?  You said Exhibit 504?

**Q.**   Right.  It's -- so if you need a copy that's not annotated, it's Exhibit 504, which I think is tab 4 in your binder.

**A.**   I don't think I -- it bothers me that it's annotated, if that's okay.

**Q.**   Then we'll just keep using Exhibit 260.

Do you recall that on Friday you explained how you could have this housing attach and then detach again?

**A.**   Yes.

**Q.**   And can you -- is there anything about this reference that leads you to reach that conclusion?

**A.**   The reference describes using the -- that you attach the part what I'm calling the housing that's circled in red.  You

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*John Curran – Cont. Direct*
*2:22-cv-02095-JAD-EJY – February 9, 2026*

push that down, and there are slots in the substrate, and then you can see there are little grooves in the plate of the heat sink, kind of at 3:00, 6:00, 9:00, and 12:00 o'clock.  And if you push the -- the piece down, the tabs that are on the left of the green element will snap into the heat sink the same way -- a similar way to the tabs in the '604, attaching the housing to the heat dissipation element in '604.

Q.   And can you then remove the housing that you've circled in red again?

A.   Yes.  You need to -- depending on how tight they are and depending on the shape of the -- the tab.  In other words, if the tab was made to stay there permanently, you'd have one part rounded and one part flat.  If you wanted to be able to pull it back off without using anything, you'd make it a slightly different shape.  But the -- to answer the question, you could either pull it off, or if it's too tight for that, you could maybe get your finger under it depending on what space you have.

        But it's -- all you're basically trying to do is flex the thing so that the tabs swing out, and then you just pull it off the heat sink.

Q.   Thank you, Dr. Curran.

        MR. BROWN:  Your Honor, I pass the witness.

        THE COURT:  Thank you.

        MR. SWAIN:  Your Honor, we need just one minute to

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

get some cross binders up to the witness.

THE COURT:  No problem.

MR. SWAIN:  Thank you.

Your Honor, may I proceed?

THE COURT:  Please.

**CROSS-EXAMINATION**

BY MR. SWAIN:

Q.   Dr. Curran, how are you?

A.   Good.  How are you?

Q.   Do you remember me?

A.   Yes.

Q.   Okay.  Because I remember you, sir.  We had a deposition that we did over almost three days in Savannah, Georgia.  Do you remember that?

A.   Yes, I do.

Q.   Okay.  So when you said you vaguely remembered it before, my feelings got a little bit hurt.  But you do remember the deposition; right?

A.   Yes.

Q.   Okay.

A.   I was being sarcastic.

Q.   Okay.  I appreciate that, sir.

And that deposition was lot like this courtroom.  There was attorneys, such as myself; right?

A.   Yes.

*John Curran - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

Q.   There was you, Dr. Curran; correct?

A.   Yes.

Q.   And critically, you were under oath there as you are today; correct?

A.   Yes.

Q.   And there was a court reporter?

A.   Yes.

Q.   Like Ms. McClane here.  Not as good as Ms. McClane but almost as good; right?

A.   Yes.

Q.   Good answer.

Now, I have a copy of your deposition here, Dr. Curran.  And I want to make things easy on us this morning.  I'm going to just ask you questions, and most, if not all, of them are ones that I've already asked you over the three days in Savannah together.  And so if you recall those correctly, this should go pretty quickly.  Does that work for you, Dr. Curran?

A.   Yes.

Q.   Okay.  Now I do want to ask:  Did you have a good weekend?

A.   Yes.

Q.   Okay.  Did you talk to any of your lawyers over the weekend?

A.   Never saw them.  Didn't see them once we left here.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

Q.   Sounds like a great weekend.

I want to make this easy on us, the judge, the jury, and make this a streamlined presentation, but I want to commend you, Dr. Curran, because I think you've made the first move.

Now your expert report, if you recall, your rebuttal report -- actually, both reports -- you claim the '399 and '138 patent was invalid.  Do you remember that?

A.   Yes.

Q.   Okay.  And you didn't talk about that at all in your testimony; correct?

A.   Correct.

Q.   And you do not have an opinion now that the '399 or '138 patent is invalid; correct?

A.   Correct.

Q.   Same question for the '577 patent.  You had an opinion in your expert report that the '577 patent was invalid; correct?

A.   Yes.

Q.   And now you no longer have that opinion; is that correct?

A.   Correct.

Q.   Okay.  And you had an opinion that the '336 patent was not infringed because of some background noise issues; is that right?

A.   Yes.

Q.   And you no longer have that opinion; correct?

*John Curran - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

**A.**   I still have a little confusion on the testing.

Q.   Okay.  Okay.  I didn't hear anything about the '336 patent, though, in your testimony before this Court; correct?

**A.**   No.

Q.   Okay.  And that confusion on testing is -- is -- well, you didn't test any of those bulbs yourself; correct, Dr. Curran?

**A.**   Correct.

Q.   Okay.  Thanks for clearing that up.

I want to start with the smart bulb patent, the '320 patent.  Are you familiar with that one, Dr. Curran?

**A.**   Yes.

Q.   Okay.  This is the smart bulb patent.  This is the one with the antenna, and it can communicate with other bulbs and change colors.  Do you remember that?

**A.**   Yes.

Q.   And you were here for Dr. Lankhorst; right?

**A.**   Yes.

Q.   Dr. Martijn Lankhorst, the inventor of the '320 patent?

**A.**   Yes.

Q.   Dutch guy.  He had a colored bulb with him.  Very excited.  Wanted to be a farmer.  Do you remember that?

**A.**   Yes.

Q.   Okay.  And he designed -- if you remember, he designed the idea of placing the antenna in a smart bulb in a very

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

particular place in relation to other metallic components of the bulb.  Do you recall that?

**A.**   Yes.

Q.   Okay.  He designed that smart LED bulb and the heat sink within it and used the little brick Nokia phone to control it.  Do you remember that?

**A.**   Yes.

Q.   Okay.  And now, Dr. Curran, you understand the products accused of infringement are A19 smart bulbs from Lepro, the basic shape; right?

**A.**   Yes.

Q.   Okay.  And just to check in, Dr. Curran, you've never designed a smart bulb; correct?

**A.**   Correct.

Q.   You've never designed, actually, any A19 LED bulb; correct?

**A.**   Correct.

Q.   All right.  And smart bulbs, I believe you agree with me that they require an antenna, some sort of communication device?

**A.**   Yes.

Q.   Okay.  And you've never designed a lighting product with an antenna; right?

**A.**   No lighting product, correct.

Q.   All right.  Let's keep with theme, Dr. Curran, of keeping

*John Curran - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

things easy.  I want to bring up, please, the jury instructions at the '320 patent, which is also in the jurors' notebook.  There we go.  There's a list of six products here.

Do you see that, Dr. Curran?

A.   Yes.

Q.   Okay.  These are all A19 smart bulbs?

A.   Yes.

Q.   Okay.

THE COURT:  Just to set the record, so this is just the accused products list in the juror notebook?

MR. SWAIN:  Quite correct, Your Honor.  Yes, this is just the accused products list in the juror notebook, yes.

THE COURT:  Got it.

BY MR. SWAIN:

Q.   And the accused product list in the juror notebook, those are all A19 bulbs?

A.   Yes.

Q.   Okay.  Pardon me one second.  Just to orient everyone what A19 is -- I realize I've used that terms for years; I'm sure you much longer than me -- this is an A19 bulb?

A.   Correct.

Q.   Okay.  Now --

THE COURT:  And, for the record, is there something you could refer to so that the record will show what it was you held up?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

MR. SWAIN:  The record will refer to that I'm holding up Lepro model B1, which is one of the accused products in that list.

THE COURT:  Okay.

MR. SWAIN:  Thank you.

BY MR. SWAIN:

Q.   All right.  And your contention is -- if I understood your testimony, your contention is the same for all of them, that they lack the heat sink limitation?

A.   Yes.

Q.   Okay.  And so let's just continue to make it easy.

MR. SWAIN:  Can I have claim 1 of the '320 patent up, Mr. Cliff.

BY MR. SWAIN:

Q.   Okay.  So here's claim 1 of the '320 patent; right?

A.   Yes.

Q.   Okay.  We're going to make this easy.  The only limitation you dispute here is -- is 1B, a heat sink comprising of metal.  Do you see that?

A.   Yes.

Q.   And that's your contention, is that all these products listed in the jurors' notebook lacks a heat sink comprising of metal; correct?

A.   That's part of it.  Then it continues on.

Q.   Right.  But for -- my question, though, is:  For the

preamble and 1A and C, D, E, you don't dispute those limitations at all; correct?

A.   No.

Q.   Okay.  Thank you.  So let's focus in on B, then.

The hue... on 1B, I do also want to narrow down the dispute here.  I don't think your contention, though, is that the products lack a heat sink; right?  They all have a heat sink?

A.   They have a -- an ability to dissipate the heat.

Q.   I'm going to ask you just again to make sure you hear my question.

Do you agree that the accused products -- each of the '320 accused products have a heat sink?

A.   A heat sink covered in plastic.

Q.   And the metal -- and this -- and this is the metal heat sink is covered in plastic?  Is that your testimony -- coated in plastic?

A.   The metal lining is covered in plastic.

Q.   Okay.  And that metal that is part of the heat sink, Dr. Curran, that at least has this electrical resistivity being less than 0.1 ohmmeters.  Do you see that?

A.   Yes.

Q.   No dispute that that metal meets that limitation?

A.   Yes.

Q.   Okay.  Thank you.

So let's talk about heat sinks, Dr. Curran.  As I understand, there's two requirements for a heat sink.  It's receiving heat from somewhere at a higher temperature, number one.  And then, number two, it's causing that heat to be dissipated to outside air; is that correct?

**A.**   It's causing it to be dissipated using a particular type of dissipation convection.

Q.   The purpose of the heat sink in an LED light fixture, Dr. Curran, is to dissipate heat; correct?

**A.**   Yes.

Q.   Okay.  And we heard again, earlier, you're here to dispute the testimony of Dr. Ricketts.  Do you remember Dr. Ricketts?

**A.**   Yes.

Q.   Okay.  And this is the gentleman --

**MR. SWAIN:**  If we could have his demonstrative up, Mr. Cliff.

**BY MR. SWAIN:**

Q.   Do you remember Dr. Ricketts?  Here he is.  Professor David Ricketts.  Were you here for Dr. Ricketts' testimony, Dr. Curran?

**A.**   Yes.

Q.   And Dr. David Ricketts, I believe he has a Ph.D., a BS in -- at least a master's and a Ph.D. in electrical engineering; correct?

**A.**   Yeah, I believe so.

Q.   Okay.  And you, sir, don't have an electrical engineering degree, do you?

**A.**   No, I don't.

Q.   Okay.  And you heard from Dr. Ricketts -- and this is almost a week ago now, so apologies, but I want to hopefully refresh your recollection.  He teaches electrical engineering, power management, and about heat sinks at NC State.  You heard that testimony?

**A.**   Yes.

Q.   Okay.  Just to be -- and he designs heat sinks.  Did you hear that testimony, Dr. Curran?

**A.**   Yes.

Q.   Okay.  And you, sir, Dr. Curran, you've never designed a heat sink for an LED product; correct?

**A.**   Correct.

Q.   And you'll recall, Dr. Curran, that Dr. Ricketts on Tuesday and Wednesday of last week examined the accused products, cut them open, and showed the jury.  Do you remember that?

**A.**   Yes.

Q.   Okay.  Let's just take a look at one of the demonstratives Dr. Ricketts had.  If I could have his slide at 20.

You see that -- the six accused products on slide

20 -- on 452, slide 20, Dr. Curran?

A.   Yes.

Q.   Okay.  He cut them open.  You remember, he even turned them on.  He showed the jury how they worked and all the insides.

A.   Yes.

Q.   Okay.  He even talked about how hot the products were on that outside of each of the collars of the accused products.  Do you remember that?

A.   Yes.

Q.   He talked about how the heat traveled to the LEDs to the circuit board to the metal to the -- to the metal heat sink and through the plastic and out.  Do you remember that?

A.   Yes.

Q.   And how the surface of these accused products -- they're pretty darn hot, aren't they, Dr. Curran?

A.   They can be, yes, after they're on for a while.

Q.   Okay.  We're talking 150, 160 degrees Fahrenheit.  I've done it.  I've turned it.  It hurt my hand.

     Any reason to disagree with that?

A.   No.

Q.   Okay.  You were here for Dr. Ricketts' -- actually -- actually, before I move on, Dr. Curran, isn't it true that you haven't -- at the time you rendered your opinion in this case, you -- you hadn't even physically examined an accused product?

**A.**   No, I looked at the pictures of them that Dr. Ricketts had provided.

Q.   Okay.  You looked at pictures; right?

**A.**   Yes.

Q.   You didn't cut them open?

**A.**   No.

Q.   Didn't turn on the products?

**A.**   No.

Q.   Didn't see how the heat moved through the product by turning it on?

**A.**   When you say see how the heat moves through it, you mean by touching it?

Q.   Yeah.  By examining the actual product that's accused, yes.

**A.**   No.

Q.   Okay.  And you were here for Dr. Ricketts.  He had a heat diagram, I believe, of the accused products, if you'll recall.

        **MR. SWAIN:**  Could I have Exhibit 452, slide 22 up. Thank you.

**BY MR. SWAIN:**

Q.   Do you see Dr. Ricketts' demonstrative, his explanation of how the heat flows from the LEDs through the circuit board and out?  Do you see that, Dr. Curran?

**A.**   Yes.

Q.   Okay.  You agree with me, sir, when you turn the accused

products on, those LEDs start to get very hot; right?

A.    Correct.

Q.    Okay.  And you want to try and keep them as cool as possible, you know, below 100 -- or maybe below 200 degrees Fahrenheit; right?

A.    Correct.

Q.    Because what -- what would happen if we don't do that, Dr. Curran?

A.    When you exceed the critical junction temperature, the LEDs basically destroy -- are destroyed.

Q.    Right.  There's something along the lines of a meltdown; right?

A.    Well, they don't melt down.  They just stop working.

Q.    Okay.  And just if we can just walk through this diagram.  Again, you have the LEDs pointed to on the top.  They're firing at possibly -- hopefully, under 200 degrees Fahrenheit.

A.    Yes.

Q.    Okay.  And the heat travels, sir, does it not, along that circuit board, these -- these -- the four arrows at the top underneath the LEDs?  It travels along that circuit board; correct?

A.    Yes.

Q.    Okay.  Until it contacts that outer collar.  Do you see that?

A.    Yes.

Q.   And that outer collar is the metal coated in plastic; correct?

A.   Correct.

Q.   And that heat goes from the LEDs to the circuit board, dropping temperature as we go along; correct?

A.   Correct.

Q.   And then, as it hits the heat sink coated in plastic, that heat is dissipated to the air; correct?

A.   It's a metal lining that is covered in plastic.

Q.   That wasn't exactly my question.  Maybe I can ask it a little different.

You agree with me that this plastic coating on the heat sink, the heat is dissipated to the air through that plastic?

A.   The heat reaches the metal lining.  Then the heat -- there is -- then you've got the plastic coating on it.  So the heat is conducted from the metal lining to the plastic.

Q.   Dr. Curran, I want you to focus on, if you can, just the question I asked.  I understand your ideas of the accused products.  I'm just going to ask again so it's clear.

The -- the plastic coating of the heat sink, the heat is dissipated to the air through that plastic; is that correct?

A.   The heat that's dissipated, the final step is from the plastic, correct.

Q.   Okay.  So, again, the heat from the LEDs traveling through the circuit board and into the heat sink is dissipated to the air through the plastic?

A.   There's a stage in there between how the heat dissipates from the metal to the plastic.

Q.   Sir, does heat dissipate from the plastic outer surface of the A19 bulb into the air when the A19 bulb is operated under steady state?

A.   Yes.

Q.   Thank you.

And that is -- and that is heat that's transferred through the plastic that is dissipated into the ambient air; correct?

A.   Correct.

Q.   And it has to transfer through that plastic on the outer enclosure; correct?

A.   Correct.

Q.   Or else the bulb will melt down -- or else the bulb will fail to work; right?  It will reach a critical temperature and the bulb will -- you'll lose lighting output or, worse, the LEDs will break down; right?

A.   Correct.

Q.   Okay.  And if it didn't have this outer enclosure -- this metal-lined outer enclosure, the bulb would fail; correct?

A.   Correct.

Q.   And, Dr. Curran, you know -- I know we've discussed heat sinks, but you do know that heat sinks can contain plastic; correct?

A.   I'm sorry.  Can you repeat the question?

Q.   Heat sinks can contain plastic; correct?

A.   The heat sink -- the heat sink in the '320 patent is described as a metal.

Q.   Okay.  If we want to talk about heat sinks with the '320 patent, let's just do that, then.

        MR. SWAIN:  Could we have figure -- claim 1 up here, please, Mr. Cliff.  All right.  Mr. Cliff, if we could just zoom in on the heat sink comprising of metal limitation.

BY MR. SWAIN:

Q.   Okay.  Now, Dr. Curran, you've got a few patents; correct?

A.   Yes.

Q.   Okay.  And you understand as someone who has patents yourself the word "comprising"; right?

A.   Yes.

Q.   And the comprising word here means including; correct?

A.   Yes.

Q.   So it's a heat sink including a metal; right?

A.   Yes.

Q.   Okay.  And so a heat sink that has some plastic coating can meet the limitation of a heat sink comprising of metal;

correct, Dr. Curran?

A.   The description of a heat sink is a metal that dissipates the heat through convection.

Q.   Would you like to ask -- I can ask the question -- may I ask the question again, Dr. Curran?

A.   Sure.

Q.   My question is:  The '320 patent allows for a heat sink that can be made of metal and some plastic; correct?

A.   I have never seen a heat sink coated in plastic.

Q.   I'm just going to ask one more time, sir, to -- I'm -- we'll know your testimony on what you've seen and what you haven't seen, and we'll discuss that in a little bit.

But, Dr. Curran, I just want to know:  The claim of the patent here says a heat sink comprising of metal, including a metal; correct?

A.   Yes.

Q.   Okay.  And there's nothing in the claim language that says it cannot also contain some plastic; correct?

A.   Correct.

Q.   Because, Dr. Curran, the '320 patent tells us as much; right?  We have '320 patent at column two, 42 through 48.

Dr. Curran, do you recognize this passage from the '320 patent?

A.   Yes.

Q.   And it says here, consistent with claim 1, does it not,

the heat sink can be made of a material including a substantial amount of metal; right?

A.   Yes.

Q.   And it goes on to tell us --

MR. SWAIN:   If we could go to the next section, Mr. Cliff.

BY MR. SWAIN:

Q.   It goes on to tell us, alternatively, the heat sink may be made of a polymeric material with a conductive filling material, serving to provide the mentioned electrical resistivity.  Do you see that, Dr. Curran?

A.   Yes.

Q.   And I'm going to offend my chemistry teacher mother here, but I'm going to try and remember.  Aren't polymers -- aren't all plastics polymers?

A.   I'm sorry --

Q.   Well, it mentions polymeric material here, does it not, Dr. Curran?

A.   Yes.

Q.   And plastics can be a polymeric material; correct?

A.   Yes.

Q.   Okay.  So the '320 patent does tell us, Dr. Curran, that you can have plastic as part of your heat sink; correct?

A.   That showing -- that alternative is a -- it says: Alternatively, the heat sink may be made by a

*John Curran - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

polymetric [sic] -- polymeric material with a conductive filling material.  So that's a totally different heat sink.  It's not describing a heat sink that's partially metal and partially this polymetric material.

Q.   Sir, is it -- is it your testimony that the '320 patent does not disclose a heat sink that can have plastic in it?  Is that your testimony?

A.   What you have up on the screen is showing two types of heat sinks.

Q.   Do you have an answer to my question, Dr. Curran?

A.   I'm sorry.  Could you repeat the question?

Q.   My question is simply:  Do you agree the '320 patent discloses heat sinks may be made partially of plastic?

A.   I'm sorry.  I don't read that the same way.

Q.   Okay.  We can move on, Dr. Curran.

But... and because you didn't examine the accused products, sir, you didn't even look to see if the plastic coating in the accused products contained carbon or metal or something else that might help with heat transfer; right?

A.   If it had carbon, it would be a different color.

Q.   Oh, Dr. Curran, I'm going to ask that question one more time, see if we can be consistent with your deposition.

A.   I'm sorry.

Q.   Sure.  Did you examine to see if the plastic of the accused products had carbon or metal or something else that

would aid in heat transfer?

A.   No.

Q.   Okay.  Because you didn't examine the plastic at all, did you, Dr. Curran?

A.   Correct.

Q.   Now, were you here for openings, Dr. Curran?  I think you were.

A.   Yes.

Q.   And did you hear lead counsel, Mr. Brown, told the jury that when you cover a metal lining with a plastic that acts as a heat insulator, you don't have a heat sink anymore.  Do you remember that statement?

A.   Yes.

Q.   Okay.  But to know if something is an insulator, right, a wise man once told me we got to first know what that substance is; right?

A.   Yes.

Q.   Okay.  That is to know that -- you would want to know -- if it's an insulator, you would want to know what the thermal connectivity is and the thermal resistivity is of that material; right?

A.   Yes.

Q.   And, sir, beyond maybe an observation that there's some plastic coating, you don't know what type of plastic is on the metal caller of the accused Lepro bulbs, do you, Dr. Curran?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

**A.**   No.

**Q.**   You didn't even try to find out what that plastic was made out of, did you, Dr. Curran?

**A.**   No.

**Q.**   And sitting here today providing sworn testimony to the jury, you have no idea why that plastic covering is on the metal lining of the accused products, do you, Dr. Curran?

**A.**   No.

**Q.**   Didn't bother asking anyone at Lepro about why that plastic's there?

**A.**   No.  I never spoke to anyone from Lepro.

**Q.**   Another thing a wise man once told -- a very smart person once told is that in order to know if something's an insulator, you not only got to know what it is, but you got to know how thick or thin it is.  Right, Dr. Curran?

**A.**   It's an -- the thickness tells you how much it blocks heat.

**Q.**   Right.  So the thicker something is, that will impact maybe how much of an insulator it is; right?

**A.**   Yes.

**Q.**   The heavy winter jacket's keeping heat in, whereas maybe a breathable running jacket just lets the air in and out; right?

**A.**   Yes.

**Q.**   Okay.  And you did not -- not only do you not know the

*John Curran - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

substance of the plastic coating or alleged plastic coating, you don't even know the thickness of that coating, do you, Dr. Curran?

**A.**    No.

**Q.**    No.

You didn't bother to measure it?

**A.**    I didn't have the bulb.

**Q.**    And, Dr. Curran, your testimony earlier about never seeing a plastic-coated heat sink, you've seen a lot of LED A19 bulbs like this in your day; right (indicating)?  Like this one here?  Can you see it, Dr. Curran?

**A.**    Yes.

**Q.**    Would -- okay.

And just to -- because I've read your articles on this -- on this front, and I agree with you.  The heat in an A19 bulb, it's not going to exit out this top lens; right?  This is -- this is pure plastic.  The heat doesn't really go in that direction; right?

**A.**    Correct.

**Q.**    Okay.  And the heat -- likewise, this bottom base, this screw base, the heat doesn't go out this way.  That's negligible; right?

**A.**    Correct.

**Q.**    So when the heat in the LEDs needs to get out to avoid breaking down, melting down, or whatever terminology you want

*John Curran - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

to make for a light bulb -- just does not work anymore -- it goes out this collar; correct (indicating)?

A.    Correct.

Q.    It has to; right?

A.    Correct.

Q.    And in the Lepro bulbs, when you turn them on, the heat has one place to go and only one place to go:  Out the plastic of the collar (indicating); correct?

A.    Correct.

Q.    And, Dr. Curran, if this was an insulating plastic on this bulb, it would melt down, wouldn't it?

A.    I'm not claiming it's a perfect insulator.

Q.    Anyway, Dr. Curran, I don't think these are the first bulbs you've seen that had a plastic coating.  Are you sure about that testimony?

A.    I was talking about basic heat sinks.  If you go in a catalog and look for heat sinks, you don't see heat sinks covered in plastic.

Q.    Okay.  We're not talking about these heat sinks.  You're talking about just a catalog where you can just buy heat sinks for other things; right?

A.    Yeah, standard heat sinks.

Q.    Okay.  Thank you for clarifying that.

      But, again, you've seen bulbs that have a nonmetal heat sink, correct, or at least partially nonmetal heat sink?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

**A.**   I've seen bulbs that do not show the metal on the outside surface.

Q.   Dr. Curran, when did you get your Ph.D.?

**A.**   1979.

Q.   Okay.  You know, one of the many things I like about you Dr. Curran is you're funny, your presentations are engaging, you've done a lot of different things in your life.  But I think what I like the most is you -- is you keep up with the times; right?

**A.**   Yes.  I try to.

Q.   You do.  In fact, you work now at a company or have worked at a company called LED Transformations; is that right?

**A.**   Yes.

Q.   Okay.  LED Transformations has a website.  It's -- I believe it's LEDtransformations.com; is that right?

**A.**   Correct.

Q.   Okay.  And I notice here you also have a Facebook account, do you not?

**A.**   Personal or --

Q.   Do you have a Facebook account that you can log in to, Dr. Curran?

**A.**   Yes.

Q.   Okay.  If I could have -- you have a cross binder in front of you.  I'd like you to turn to -- I believe it's tab 8.  And if you'd like someone to help you, I'm happy to

*John Curran - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

come help or have --

(Reporter instruction.)

**THE WITNESS:**  No, it's okay.

**BY MR. SWAIN:**

Q.   Take a look at Exhibit 490 there, Dr. Curran.  And on the first page there, is that you, Dr. Curran?

**A.**   Yes.

Q.   Okay.  That's you with the friends, the 69 friends?

**A.**   I guess.  I don't pay attention to that.

Q.   Okay.  Just turn to the next page.  I want to be sure this is your Facebook account before I ask about it, Dr. Curran.  That's you on the next page, and I included this slide because it says LEDtransformations.com is the link.  Do you see that?

**A.**   Yes.

Q.   Okay.  And then I believe on the -- the flip side of that page -- on page 2 of it, it says you joined Facebook in September 2009, and your profile was updated about three weeks ago.  Do you see that?  It's page 2.  It's the one before.

**A.**   I'm sorry, I'm missing what you're saying about updating.

Q.   Sure.  I'll ask again.  There should be -- the second page of 490, which is on the flip side of the first page.  It says Jack Curran joined Facebook September 27th, 2009, profile updated three weeks ago.  Do you see that?

**MR. SWAIN:**  Your Honor, would it be --

BY MR. SWAIN:

Q.   Oh, do you see it, Dr. Curran?

A.   Yes.

Q.   Oh, you found it.  Great.  Great.

All right.  So looking at these three slides here, and on the fourth slides, it's -- there's a couple quotes here.  It says about Jack:  "I will never be able to speak a second language.  I have enough trouble with the first one."  Do you see that?

A.   Where is that?

Q.   It's -- it's on the fourth page.  There's numbers at the bottom of the page.  This is 490-4.

A.   Oh.  Yeah.

Q.   Okay.  It sounds like something you would say.  Is that -- is that you?

A.   Yeah.  That was me.

Q.   Okay.  Any doubt in your mind that this is an accurate copy of your Facebook profile?

A.   I assume so.  I mean, what you're showing the update, I think I -- I changed a phone number or something like that, so...

Q.   Okay.  Sure.

Yeah, but you use the Facebook account.  You log in to it at least three weeks ago; right?

A.   Yeah.

Q.   Okay.  And you have access to that Facebook account?

A.   Yes.

MR. SWAIN:  Okay.  Your Honor, I move for the admission of Exhibit 490 based on Mr. Curran's foundational testimony about his Facebook account.

(Exhibit No. 490, offered.)

MR. BROWN:  Your Honor, I have no problem with the pages that he's laid a foundation for.  There's an additional piece which doesn't appear to be -- hasn't been discussed yet.  It's the last page of the exhibit.  It seems separate to me.  I have no problem with admitting the first five pages.  And/or if he lays foundation for the sixth page, I have no problem -- we'll see what happens.

MR. SWAIN:  I intend on laying foundation for that page.

THE COURT:  Why don't we go there first.

MR. SWAIN:  All right.

BY MR. SWAIN:

Q.   So, Dr. Curran, if you could go to page 490-0005.

A.   Yes.

Q.   Okay.  In the intro, it says Jack Curran is a member of the, quote, "I take pictures of electronic parts."  Do you see that?

A.   Yes.

Q.   And you've been a member of that group since

November 25th, 2023; is that correct?

A.   I guess so, if that's what the Facebook page says.

Q.   Okay.  And -- and you recognize that as legitimate Facebook group you're part of?

A.   I -- yeah, I think so.

Q.   Okay.  And you've posted on this group page before, have you not, Dr. Curran?

A.   Probably.

Q.   Okay.

MR. SWAIN:  Your Honor, I move that the remainder of Exhibit 490 be admitted.

*(Exhibit No. 490, offered.)*

MR. BROWN:  I think we're almost there.  We just have to get to the last page and agree that he -- that was his post, which should be easy.

MR. SWAIN:  Well, let's find out.

BY MR. SWAIN:

Q.   Dr. Curran, page 6, you'll see a group thread from the aforementioned "I take pictures of electronic parts."  Do you see that?

A.   Yes.

Q.   Okay.  And there's a comment here from a Jack Curran at the bottom.  Do you see that?

A.   Yes.

Q.   That's you, isn't it?

A.   Yes.

Q.   That's your comment?

A.   Yes.

Q.   Okay.  Let's see what you -- you had to say here.

MR. SWAIN:  Before I do, I move for admission of Exhibit 490 in its entirety.

*(Exhibit No. 490, offered.)*

MR. BROWN:  No objection.

THE COURT:  It will come in.

*(Exhibit No. 490, received.)*

MR. SWAIN:  Great.

BY MR. SWAIN:

Q.   Let's take a look at 490-6 and what you said on this post in March of 2025.

You see there's a picture here, Dr. Curran.  Do you see that?  There's some light bulbs, one with a date on it here and then a few on the ground that are yellowing -- probably plastic; right?

A.   Yes.

Q.   Okay.  Here we have some light bulbs with some plastic collars; right?

A.   That's what I would assume, based on the yellowing of the plastic.

Q.   Right.  And your comment here, you say:  The gray area -- about the bulb here in Exhibit 490 -- the gray area where the

date is written acts as the heat sink.  Is that true,
Dr. Curran?

A.   Yes, that's where the heat comes out.

Q.   Okay.

          MR. SWAIN:  You can take that down.

BY MR. SWAIN:

Q.   Thank you, Dr. Curran.

          I want to move on now, Dr. Curran, to... so many
exhibits, Dr. Curran.

          Okay.  I'd like to move on to the '604 patent,
actually the last patent where you -- where we have a dispute.

          Let's -- you remember this is the pressed sandwich
patent we've been talking about?

A.   Yes.

Q.   And you remember Dr. Krames testified earlier this week
as well?  I believe it was mostly Wednesday.

A.   Yes.

Q.   And Dr. Krames, he has an electrical engineering degree,
a Ph.D. in electrical engineering?

A.   I think so.

Q.   Okay.

A.   I mean, I'm -- I'm not saying I think so that -- I
just...

Q.   Okay.  And let's take -- let's -- again, let's just make
things easy for the jury.  Okay?  Let's put claim 1 on the

board.

Do you recognize this as claim 1 of the pressed sandwich '604 patent, Dr. Curran?

A.   Yes.

Q.   And, again, I want to just make things easy.  The only dispute you have, I believe, is on element C; correct?

A.   Yes.

Q.   Okay.  So to be clear, if we could put up the accused products from the juror notebook for the -- this time, for the '604 patent.  So I'm showing for the record the list of SKUs -- SKUs, stock keeping units -- the accused products of the '604 patent.

Are you there, Dr. Curran?

A.   Yes.

Q.   Great.  Great.  Okay.  Now, for all of these products, all of these SKU variations, you agree with me they all have -- we'll go back to claim 1.  For all of these in the juror notebook, going back to claim 1, all of them are a light-emitting module; correct?

A.   Yes.

Q.   And all of them have the claimed thermally conductive substrate of 1A?

A.   Yes.

Q.   Okay.  And all of them have the heat dissipation element of 1B?

*John Curran - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

A.   Yes.

Q.   Okay.  And just moving to 1C, let's narrow down what the dispute really is here.  All the accused products have a housing element that includes a transparent region that allows transmission of lights emitted by the LED.  That's that last part of claim 1C.  No dispute there, right, Dr. Curran?

A.   Correct.

Q.   Okay.  And even all of the accused products have a fastening means, don't they, Dr. Curran?

A.   I'm sorry, if you can repeat the question.

Q.   All of the accused products in the jurors' notebook for the '604 patent, they all have a fastening means, do they not, Dr. Curran?

A.   Yes.

Q.   Okay.  And no dispute that the fastening means, that functionality is for detachably coupling the housing element to the heat dissipation element; correct?

A.   The Court has defined a particular definition for the fastening means.

Q.   Sure.  I'm just reading what the fastening means needs to do; right?  So the fastening means -- I'm reading the claim language -- for detachably coupling the housing element to the heat dissipation element.  Do you see that?

A.   Yes.

Q.   Okay.  And no dispute that those -- that -- that the

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

accused products have a fastening means for performing that function; correct? For detachably coupling the housing element to the heat dissipation element?

**A.** Yes. That's what the claim says.

**Q.** Okay. And when we say detachably coupling here, in the real world, Dr. Curran, you and I know that means taking it apart and putting it back together again; correct?

**A.** In the --

**Q.** Let me ask you. To you, another way you look at detachably coupling the housing element to the heat dissipation element, that means to you that it can be taken apart and put back together again; right?

**A.** Yes. You can take it apart and you can put it back together again.

**Q.** That's the point of the fastening means, so you can open it up, replace an optic, and put it back together again; correct?

**A.** Yes.

**Q.** Okay. And your dispute as I understand is the accused products all use screws to accomplish that -- that functionality of, you know, compressing it down, and then you unscrew it you, you detachably couple it -- or you detach it, and then you couple it again with the screws; right? Your dispute is they use screws instead of tabs; correct?

**A.** Correct.

Q.    And that's the same for all of the accused products; correct?  That's the one infringement dispute?

A.    Yes.

Q.    Okay.  And so it doesn't matter if we're looking at a wall pack or a ceiling light or UFO light, if the -- the dispute is exactly the same:  If they use screws they're out; correct?

A.    Yes.

Q.    Okay.  And just to be -- make sure that we're clear on the record, you offer no reason for treating the different SKU variations in the list of the '604 products in the juror notebook to treat them differently for purpose of infringement; right?

A.    I'm sorry?

Q.    Sure.

      You don't have any reason why the SKUs in the '604 juror notebook, that the 19 or so different SKUs, should be treated differently for infringement; right?  They're all the same?

A.    Correct.  They all use screws.

Q.    Okay.  All right.  So I think you agree with me, sir, that screws are a fastening means that can detachably couple the housing element to the heat dissipation element in the accused products; right?

A.    Yes.

Q.   Okay.  And whether you use screws, you use tabs, the end result is the same.  You're detachably coupling that housing element to the heat dissipation element; correct?

A.   They stay together or come apart, but how you get there is different, for one thing.

Q.   Sure.  I'm talking about the overall function; right? The overall function of clamping it together and unclamping it or compressing and uncompressing.  They both do the same thing, screws and tabs; correct?

A.   Yes, when you put it together, it stays together.  When you take it apart, it's apart.

Q.   And your testimony, if I understood it correctly from Friday -- and I know it's been -- we've had a Super Bowl in between and hopefully a restful weekend some -- I want to make sure I understand your testimony.  Your -- your -- the lump-sum of it is because the accused products use screws and not tabs, they do not infringe; is that correct?

A.   Correct.

Q.   Okay.  I want to talk about your demonstrative that you used on Friday and just discuss a little -- explore this a little bit more.

THE COURT:  Would this be a good time to take our morning break --

MR. SWAIN:  Sure.

THE COURT:  -- before you get into that topic?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

John Curran - Cross
2:22-cv-02095-JAD-EJY - February 9, 2026

MR. SWAIN:  Absolutely.

THE COURT:  All right.  We're going to go ahead and take our ten-minute morning break.  I'm going to remind you of the rules since it's been a few days.  Please remember, don't talk about the case among yourselves or with anybody else.  Don't read, view, or listen to anything about the case.  Don't conduct any of your own research, and please wait to formulate your final opinions until we've heard all of the evidence and my instructions of law.

It is 10:15.  We'll see you at 10:25.

(Jury out at 10:15 a.m.)

THE COURT:  Ten-minute break.  You're welcome to step down, but just come right back up when you're done.

THE WITNESS:  Okay.  Thank you.

THE COURT:  Okay.

(Recess at 10:16 a.m., until 10:27 a.m.)

THE COURT:  Are we ready to bring the jury back?

MR. SWAIN:  Yes, Your Honor.

THE COURT:  All right.  Let's go get them.

Mr. Swain, how much longer do you have?

MR. SWAIN:  I'm willing -- 15 to 20 minutes.  I have people also that will come pull me off with a giant cane if I go longer than that.

(Pause in proceedings.)

COURTROOM ADMINISTRATOR:  All rise.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*John Curran - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

(Jury in at 10:27 a.m.)

THE COURT:  All seven of our jurors have returned from break.  Please have a seat.

Mr. Swain, continue.

MR. SWAIN:  Thank you, Your Honor.  Welcome back, everyone.

BY MR. SWAIN:

Q.   Dr. Curran, can you hear me okay?

A.   Yes.

Q.   Great.

When we broke for the morning break, we were talking about tabs and screws.  Do you remember that?

A.   Yes.

Q.   Now I want to go back to the date of the invention in and around 2004-2005 time frame.  Are you with me?

A.   Yes.

Q.   Okay.  And do you agree with me that, at least as of 2004, before the time of the invention of the '604 patent, screws were known as one way of attaching one component of a lighting device to another component of a lighting device; correct?

A.   Yes.

Q.   Okay.  And another way of knowing was tabs; correct?

A.   Yes.

Q.   Thank you.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

**A.** Wait, I'm sorry.

**Q.** I can ask the question again.

Another way of attaching one component of a lighting device to another component of a lighting device was tabs; correct?

**A.** I don't recall. I mean, screws definitely. Tabs, I can't -- off the top of my head, I can't think of an example.

**Q.** Okay. In your binder up there should be somewhere -- if someone could help Dr. Curran -- there's a copy of your deposition? Do you have it, Dr. Curran?

**A.** Yeah.

**Q.** Okay. And you understand that depositions, just like the court transcript we do today, has some page numbers and some line numbers? Are you with me?

**A.** Yes.

**Q.** Okay. I want you to go, please, to page 199, 7 through 18.

**A.** Oh. Okay.

**Q.** For the record, Dr. Curran, I'm -- I have to review with counsel your deposition before I publish it to the jury. So just bear with us one moment. Thank you.

Okay. So, again, we're going to go back to Savannah 2024, Dr. Curran. I'm going to have --

**MR. SWAIN:** If I could have Mr. Cliff bring up lines 7 through 18 of 199.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

**BY MR. SWAIN:**

Q.   And I asked you:  "Do you agree with me, at least as of 2004, screws were known as a way of attaching one component of a lighting device to another component of a lighting device?  Screws were known as one way of doing that?"

Your answer:  "Yes, screws are one way of attaching."

Do you see that testimony, Dr. Curran?

**A.**   Yes.

Q.   Did I ask that question and you gave that answer at your deposition?

**A.**   Yes.

Q.   Okay.  And then I asked:  "You another way are tabs; correct?"

And you answered, "Yes, again, depending upon what you're trying to do with it."

Did you -- did I ask you that question in your deposition?

**A.**   Yes, you did.

Q.   Okay.  And you gave that answer?

**A.**   Yes.

Q.   Okay.  Thank you.

**MR. SWAIN:**  You can take that down.

**BY MR. SWAIN:**

Q.   Now, I want to bring up tabs and screws again.

**MR. SWAIN:**  Could we have your demonstrative up?

Great.

**BY MR. SWAIN:**

Q.   And this -- here, you're -- what I understand is you're telling the jury is there's some differences between tabs and screws; correct?

A.   Correct.

Q.   Now what -- I want to ask you about these differences, but I want to focus on claim 1 of the '604 patent.  Okay?

A.   Okay.

Q.   Okay.  And claim 1 of the '604 patent is how we draw the bounds of the property of the patent, right, what's in and what's out?

A.   Okay.

Q.   I just want to make sure we're all -- have the same understanding of patent law, sir.  You have a claim of a patent, and with the claims, the words of the claims, you draw the -- you know, the borders of your property; right?

A.   Yes.

Q.   Okay.  Starting with tabs -- and this is only about claim 1 of the patent and the invention.  So tabs you say are part of the housing, but screws are not part of the housing; correct?

A.   Correct.

Q.   And by "housing" here, you mean the housing in claim 1; correct?

*John Curran - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

A.   Correct.

MR. SWAIN:   If I could have claim 1 back up.

BY MR. SWAIN:

Q.   And you're talking about here the housing element in claim C:  Housing element including a transparent region.  Do you see that?

A.   Yes.

Q.   And you know the Court did provide a definition of housing having a transparent region, did they not?

A.   Yes.

Q.   Okay.  And let's take a look at that definition.  Yeah.  All right.  As you see here, the Court gave a construction of plain and ordinary meaning.  Do you see that, Dr. Curran?

A.   Yes.

Q.   And your client, Lepro, proposed a construction that was a single structure having a transparent region; correct?

A.   Yes.

Q.   Okay.

MR. SWAIN:   We can take that down.

BY MR. SWAIN:

Q.   And there's nothing in claim 1 of the '604 patent that requires the housing to just be one single component; right?  It can be multiple components?

A.   Taking into account the -- the full claims construction

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

regarding tabs.

Q.   I'm asking about the claim construction regarding housing element, which is what you're saying in your testimony that the screws are not part of.  I'm asking about the housing element, not the fastening means.

So you agree with me that this Court rejected the notion that a housing element just had to be one single structure?

A.   Yes.

Q.   Okay.  The housing of the '604 -- of the accused products in the Lepro products are, right, your -- your clear lens with screws; right?

A.   Yes.

Q.   Okay.  Two parts; right?

A.   Yes.

Q.   And nothing in the patent says it can't be two parts; right?  Nothing in claim 1 says it can't be two parts; correct?

A.   Okay.  For the housing, yes.

Q.   Okay.  And you've just told this Court that -- you remember the Stimac reference, Dr. Curran?

A.   Yes.

MR. SWAIN:  Okay.  Just to be sure, could we have Stimac Exhibit 260 at 1 up, please.

///

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

**BY MR. SWAIN:**

Q.   Just a very brief detour on this.  Here you the housing circled in red, correct, on Stimac Exhibit 10, page 1.  These are your markings; correct?

**A.**   Correct.

Q.   And the housing is two parts circled in red; correct?

**A.**   Correct.

Q.   Okay.  And while we're on the topic of Stimac, the lawyers gave you this reference; correct?  You didn't go find the invention yourself.  The lawyers gave it to you; correct?

**A.**   Correct.

Q.   And about Stimac, Stimac doesn't say, Dr. Curran, anywhere that you could remove the housing; correct?

**A.**   I -- right at this minute, I don't recall.

Q.   Okay.  Do you remember -- we need to go back to your deposition, Dr. Curran.

So that housing -- what you're saying here is that zoom lens assembly; right?

**A.**   Yes.

Q.   Okay.  And I'm going to ask the question one more time.  Does Stimac say anywhere that you could remove the zoom lens assembly the housing?

**A.**   I don't think so.

Q.   You don't -- the answer is no, it does not?

**A.**   I'm sorry.  I'm really drawing a blank on that right now.

*John Curran - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

Q.   Okay.  Well, maybe I can help refresh your recollection. Can you take a -- we'll take a look at page -- if you go to your deposition, sir, and I'll review this with counsel in the meantime.  Page 332, line 15, to 333, line 2 of your deposition.  And I'll be right back.

All right.  Are you there, Dr. Curran?

A.   Yes.

Q.   Okay.  Now I want to show you page 332, line 22, through 333, line 2.

Let me try that again.  Could we have page 332, line 22, through page 333, line 2.

Do you see those questions I asked you at your deposition, Dr. Curran?

A.   Yes.

Q.   Now I asked you:  "Does Stimac say anywhere that you could remove?"  Your answer was, "No"; correct?

A.   "No."  Correct.

Q.   Okay.  And is that a true response about Stimac does not say you could remove the housing?

A.   Correct.

Q.   Okay.  And Stimac doesn't say anywhere that you should remove the housing; right?

A.   Correct.

Q.   And I asked you at your deposition:  "Does Stimac say anywhere that you should remove the housing?"  And your answer

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*Page 80*

was, "No"; correct?

A.   Correct.

Q.   Okay.  We can put that aside.

So you agree with me that there's nothing in claim 1 that requires -- just back to our tabs versus screws, there's nothing in claim 1 that requires the housing just be a single piece; correct?

A.   Correct.

Q.   All right.  So we're going to cross that one off.

I want to go to the next one here, no tools required. Back to claim 1, with tools in mind, let's just look at claim 1, Dr. Curran.  Does doctor -- or does claim 1 mention anything about tools being required for fastening or -- or detachably coupling?  The word "tool" does not appear in the claim, does it, Dr. Curran?

A.   I'm confused regarding the -- the construction of the claim, the -- the Court's definition of the detachable housing means.

Q.   Okay.  I wasn't asking about that.  I'm just asking simply, Dr. Curran -- and if your -- maybe this will alleviate some confusion.  Do the words "tool removable" or "tools required," anything like that -- do those words appear in claim 1 of the '604 patent?

A.   No, they don't.

Q.   Okay.  Let's go ahead and cross that one off.

*John Curran - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

The next one is you have tabs, snap on, snap off, screws, screw in, screw off.

Again, sir, there's nothing in the claim 1, the '604 patent, that says screws are out or in or that they must snap on or off?  Those words do not appear in claim 1, do they, Dr. Curran?

**A.**   No.

Q.   Okay.  Let's go ahead and cross that one off.

Flexible housing for tabs and rigid housing for screws.  And, Dr. Curran, I understand -- and when you apply your opinions as to whether a product infringes or doesn't infringe the '604 patent, you -- you assume that the housing had to be made of, at least in part, flexible material; correct?

**A.**   Correct.

Q.   Okay.  But the word -- back to claim 1, the word "flexible" doesn't appear anywhere in claim 1, does it?

**A.**   Not in the claim.

Q.   Okay.  And the word "rigid housing" does not appear either?  There's nothing about flexible or rigid housing in claim 1; correct?

**A.**   Correct.

Q.   And you didn't even examine how flexible that housing actually is, did you, Dr. Curran, in the accused products?

**A.**   I wasn't aware there was a sample of that product.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

Q.   Okay.  All right.  Let's go back to your comparison here.  We'll cross off flexible versus rigid.

The next is fixed versus user forces, Dr. Curran.  Again, claim 1 -- I know we keep jumping back and forth, but we'll have it back up.  Nothing in claim 1 talks about fixed or used -- user forces; correct?

A.   The fastening means in claim 1 has been defined as I understand it to mean tabs or their equivalent with some characteristics from the patent.

Q.   Sure.  I understand that.

My question is just a little simpler.  The words "fixed" or "user-dependent forces" do not appear in claim 1 of the '604 patent; correct?

A.   Not in the words of the -- the claim.

Q.   Right.  Right.

And they don't -- those words don't appear in the '604 patent at all, do they, Dr. Curran?

A.   I'm sorry?

Q.   Those words, "user dependent" or "fixed forces," they don't appear in the '604 patent at all; correct?

A.   Correct.

Q.   All right.  Let's go ahead and cross those off.

The next distinction is simpler to manufacture versus harder to manufacture.  Now, again, claim 1 -- we can put it back on, but, Dr. Curran, will you agree with me:  Claim 1

says nothing about how the product is manufactured or whether if it's simple or hard to manufacture; right?

**A.** That's dependent on how you're defining the fastening means.

Q. Again, just a little simpler of a question. There's nothing in claim 1 that says a light-emitting module comprising these elements and, by the way, it must also be simple to manufacture -- nothing like that; right?

**A.** Correct.

Q. Okay. And Mr. Brown showed you a UFO light before. Do you remember that? It really does look like a UFO. Do you remember that?

**A.** Yes.

Q. Okay. You've never designed one of those, have you?

**A.** No.

Q. No. And you didn't speak to any of the manufacturers of that UFO product or any of the accused products to know if it's simple or easy to manufacture versus hard; right?

**A.** No.

Q. And you didn't even take apart any of the accused products; correct?

**A.** No.

Q. Okay. You didn't talk to Lepro about what's easy or harder to manufacture, screws versus tabs; right? Didn't have any conversations like that?

**A.**   Wait, now we are talking screws versus tabs?

Q.   Yeah.  Well, you're saying that screws are harder to manufacture or it's harder to manufacture the product there, versus tabs are simpler.  And so my question to you:  Do the accused products use screws; correct?

**A.**   Correct.

Q.   And the screws are used during that manufacturing process; correct?

**A.**   Correct.

Q.   But you didn't speak to any of those manufacturers to figure out, "Hey, do you use screws because they're easier or harder?  Cheaper?  More expensive?  Look cool?"  Anything like that; right?

**A.**   I'd need to compare it to something.

Q.   Right.

But did you speak to the actual manufacturers of the accused products?

**A.**   No.

Q.   Okay.  Let's go ahead and cross that off.

Last one here is similar, Dr. Curran:  Assembly.  Tabs are simpler to assemble, and screws are harder to assemble.  Same question:  You didn't ask -- you didn't speak to any manufacturers of the components of the accused products, did you?

**A.**   No.

Q.   And the words "simple to assemble" or "harder to assemble" do not appear in claim 1 of the '604 patent, do they?

A.   No.

Q.   Let's go ahead and cross that off.

        MR. SWAIN:   I have no further questions.

        THE COURT:   Redirect, Mr. Brown?

        MR. BROWN:   Yes, Your Honor.

                    **REDIRECT EXAMINATION**

BY MR. BROWN:

Q.   Dr. Curran, Mr. Swain asked you some questions about what was and wasn't in the words of claim 1.  Do you remember that?

A.   Yes.

Q.   Did Mr. Swain show you the Court's construction of the fastening means in claim 1?

A.   No, he didn't.

Q.   All right.  I've put on the screen page 2 of the demonstratives -- of the Curran demonstratives.  Do you recognize what's shown here?

A.   Yes.

Q.   And what is it?

A.   It's the Court's construction with the word "fastening means" -- means.  Sorry about that.

Q.   And let's go through it.

        I'm going to skip the function, because I don't think

*John Curran - Redirect*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

there's any issue about it.  Let's talk about the structure.  Can you read this first part of the structure required by the Court to the jury?

**A.**    Yeah.  The structure, under the Court's construction, the tabs Number 450 shown in figure 4 and described at column seven, lines 42 to 51, and their structural equivalents.

Q.    All right.  Focusing first on the tabs 450 shown in figure 4, I want to put figure 4 on the screen.  Figure 4 of the '320 patent.  I'm sorry, the '604 patent, Exhibit 2.

And do you see figure 4?

**A.**    Yes.

Q.    Do you see tabs 450 in figure 4?

**A.**    Yes.

Q.    Are they -- well, do you also see what the claim refers to as the housing element in figure 4?

**A.**    Yes.

Q.    And are the tabs 450 part of the housing element in figure 4?

**A.**    Yes.

Q.    So if we go back to your demonstrative that Mr. Swain was asking questions about -- and this is now slide three of your demonstratives -- the first bullet here says part of housing versus not part of housing.  Were you referring to the words of the claim, or were you referring to the Court's construction with this first bullet?

**A.** The Court's construction.

**Q.** Going back to demonstrative slide two, the Court's construction, after it explains the tabs 450 shown in figure 4, do you see here it says, "And described at 7:42 to 51"?

**A.** Yes.

**Q.** Okay. I'm going to put column seven at lines 42 to 51 on the screen. This is from the '604 patent, Exhibit 2.

You see here we're in column seven?

**A.** Yes.

**Q.** We'll go look down to lines 42 to 51, and I'll zoom in.

Can you read it on the screen, Dr. Curran?

**A.** Yes.

**Q.** And here it states -- well, why don't you read the first few lines of this to the jury.

**A.** Yeah. It says: "In one embodiment, the housing may be made of a material which has a degree of flexibility such that under a controlled" --

**Q.** Can you stop there for a second?

**A.** Okay. Yeah. Sorry.

**Q.** Okay. So if we go back to -- I'm just too zoomed in here. If we go back to your slide three, here the fourth bullet where you mention the flexible housing, do you see that?

**A.** Yes.

Q.   Were you talking about the words of claim 1, or were you talking about the Court's construction?

A.   The Court's construction.

Q.   All right.  We're back on column seven, lines 42 to 51. Could you continue reading after the part that you read about the housing being made of a material which has a degree of flexibility?

A.   Yeah.  "Such that under a controlled applied mechanical force, the housing assumes a strained shape and its fastening means 450 can assume a position which enables the housing to be slid over the heat dissipation element."

Q.   And can you remind the jury of what it means to assume a strained shape?

A.   Strained shape means that you're going to put some force on it and basically force -- the tabs will swing out, and then that allows you to slide the housing over the heat sink.  You remove the force, and the tabs pop back.

Q.   Dr. Curran, when you put a phone case -- is there any analogy between that and putting a phone case on a phone?

A.   Yeah.  You're -- basically, when you're putting the phone in the phone case, you're pushing down on the phone, which is forcing the case edges to move out of the way, allow you to have the phone pop into the case, and then the edges come back again to -- to hold the phone in place.

Q.   Is there anything there that's assuming a strained shape?

**A.**   Yes.  When you're -- when you're bending it, you're straining it.  Strain just means you're moving something.  Stress is the force, and strain is the -- the position displacement.

Q.   If we go on -- I think you read up to here (indicating), the part about the housing to be slid over the heat dissipation element.  Can you continue reading from there?

**A.**   Sure.  "Upon removal of the force, the housing element can assume its unstrained shape, thereby causing -- thereby causing the fastening elements to clutch the heat dissipation element and secure a releasable connection between the housing element and the heat dissipation element."

Q.   All right.  Without -- let me go back to slide three that Mr. Swain questioned you about.

Without belaboring the point, Dr. Curran, were you talking about the words of the claim for any of these in the bullets that you listed, or were you talking about the Court's claim construction?

**A.**   The claims construction.

Q.   Now just to be clear, Dr. Curran, in your opinion, are tabs, as the Court has defined them in this case, a structural equivalent of screws?

**A.**   No.

Q.   As I recall, Mr. Swain asked you question about whether you had designed a UFO high bay light.  Do you remember that?

*John Curran - Redirect*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

**A.**   Yes.

          **MR. BROWN:**  For the record, I was holding up Exhibit 699.  I'm now going to pick up Exhibit 697.

**BY MR. BROWN:**

**Q.**   For the record, is -- do you recognize this as a wall pack?

**A.**   Correct.

**Q.**   Now, Dr. Curran, have you ever designed any lighting fixtures that are similar to Exhibit 697 or Exhibit 699?

**A.**   When I was at Dialight, we were designing a hazardous location area light.

**Q.**   All right.  I'm going to switch gears.  I'm going to show you a part of the '320 patent that Mr. Swain asked you about.  So for the record, I've put on the screen part of column two of the '320 patent, Exhibit 1.  And I'm going to zoom in on the portion that runs from roughly line 36 to line 51.

          Do you see the part that I'm indicating, Dr. Curran (indicating)?

**A.**   Yes.

**Q.**   And as I recall, Mr. Swain showed you a few sentences from that paragraph.  Could you please take the time to read the whole paragraph now and let me know when you're finished.

**A.**   Okay.

**Q.**   All right.  So let's start at the top.  Do you see here where it refers to the electrical resistivity of the heat

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

sink?

A.   Yes.

Q.   And it refers to less than .01 ohmmeters.  Do you see that?

A.   Yes.

Q.   Do you remember that's the same language that's in the claim about electrical resistivity?

A.   Yes.

Q.   And what does the patent tell us about why that matters?

A.   Because a material that has that type of resist -- resistivity or less is generally going to be a -- a metal.

Q.   And does that have any benefit thermally?

A.   Yes.

Q.   And what's the benefit thermally?

A.   Metals are great thermal conductors.

Q.   Now, down here at around line 45 is the description that Mr. Swain was asking you about.  Do you see that?

A.   Yes.

Q.   And I think you said to Mr. Swain that you don't read it the same way that he is.  Do you remember that?

A.   Yes.

Q.   Can you explain to the jury what you meant by that?

A.   When I read this, I see two descriptions.  One is a heat sink made basically, as it says, a substantial amount of metal, especially the heat sink -- maybe a metallic heat

sink -- in the form of a solid metal body.  For example, an aluminum body, which is generally what they are made of.

Then, alternatively, the heat sink may be made with a polymetric [sic] material.  So I viewed that as two different ways that the patent was suggesting to create that device.  One, using aluminum, and one using a polymetric material with some conductive filling.

Q.   Dr. Curran, can you make a polymeric material electrically conductive and, in particular, with the mentioned electrical resistivity referred to in the patent?

A.   I'm not sure how much you'd have to put in of the constructive filling material to reach those numbers.

Q.   I just had a broader question.

Could you put in enough conductive filling material to reach those numbers?

A.   I believe it would be pretty much -- you'd be getting close back to the aluminum that you were starting with.

Q.   And, Dr. Curran, is... I'll withdraw that.

Dr. Curran, you were asked some questions about whether you did any certain testing or measurements of the plastic in the accused products.  Do you remember that?

A.   Yes.

Q.   And you were here when Dr. Ricketts testified, weren't you?

A.   Yes.

Q.   Did Dr. Ricketts testify at all about any testing that he did of the plastic?

A.   I don't believe so.

Q.   Did Dr. Ricketts measure how thickness [sic] the plastic coating on the Lepro bulbs was?

A.   I don't remember him mentioning that.

Q.   Dr. Curran, I'm holding in my hand Exhibit 692, which for the record is a --

MR. SWAIN:   Your Honor, we object to this exhibit. They took it down from his disclosed exhibits, so I object to him using this exhibit with this witness.

MR. BROWN:   Your Honor, I'm happy to use the same bulb that Mr. Swain used with the witness, if that makes it better.  I think it's -- this one is a 901002.  I don't remember the model number of the bulb you used, Mr. Swain, but I'm happy to use that one instead.

MR. SWAIN:   You can show him the same bulb I did, sure.

BY MR. BROWN:

Q.   So I believe this bulb is not in evidence, but it will work.

(Reporter instruction.)

BY MR. BROWN:

Q.   Actually, I do have a B1 bulb in evidence.

MR. SWAIN:   Again, same objection.  You can use this

*John Curran - Redirect*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

bulb that I showed him if you're going to show him a bulb.  My objection would be this was taken down on something --

THE COURT:  I'm sorry.  The objection is that it was what?

MR. SWAIN:  It was not on the disclosed exhibits for this witness, Your Honor.

MR. BROWN:  It was just used in cross, Your Honor, and I was just thinking it would be cleaner for the record to use Exhibit 690, which is the same B1 bulb that Mr. Swain showed him.

MR. SWAIN:  Your Honor, I think it would be cleaner for cross if he used the exact same bulb I did use on cross, which I offered to him.

THE COURT:  Mr. Swain, why does it make a difference?

MR. SWAIN:  It shouldn't.  We can proceed.

THE COURT:  Okay.  Thank you.

BY MR. BROWN:

Q.   Dr. Curran, I'm holding up a B1 bulb, one of the accused products in this case.  Can you see it?

A.   Yes.

Q.   Dr. Curran, does the plastic that coats the metal lining in this light bulb help the heat get out?

A.   No, it doesn't.

MR. BROWN:  I pass the witness, Your Honor.

THE COURT:  Recross?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*Page 95*

MR. SWAIN:  Very brief cross.

**RECROSS-EXAMINATION**

**BY MR. SWAIN:**

Q.   Dr. Curran, I just have one question for you.  You just went through the claims of the '604 patent talking about structurally equivalent tabs versus screws.  Do you remember that?

A.   Yes.

Q.   And your testimony to this jury is that you believe that these screws of the accused products are not structurally equivalent of the tabs in the '604 patent; is that your testimony?

A.   Yes.

Q.   And you want the jury to believe that, even though you never undid the screws or redid the screws of any of the accused products to detach the housing means from the dissipation element; correct?

A.   I'm not sure if I understand the question.

Q.   Maybe I'll ask it more simply.

You never took apart any of the accused products, did you, Dr. Curran?

A.   I looked at how they came apart.

Q.   No, no.  I asked:  Did you take apart the accused products to see the way that the screws in the accused products actually worked?

**A.**   No.

Q.   Thank you.

**MR. SWAIN:**  No further questions.

**THE COURT:**  Anything else?

**MR. BROWN:**  No, Your Honor.

**THE COURT:**  Okay.  All right.  May I excuse this witness?

**MR. BROWN:**  Yes, Your Honor.

**MR. SWAIN:**  Yes.

**THE COURT:**  All right.  Thank you.  Dr. Curran, you can step down.  You are excused.

**THE WITNESS:**  Thank you, Your Honor.

**THE COURT:**  Watch your step, please.

**THE WITNESS:**  Yep.

**THE COURT:**  Next witness.  Are we going to return a witness?

**MS. HOUSINGER:**  Yes, Your Honor.  We will recall Mr. Zhikang Huang, and if we could do a little arranging of the furniture for the interpreter.

**THE COURT:**  That's right.  Yes.  I can have someone who wants to move a chair for me.

*(Pause in proceedings.)*

**THE COURT:**  All right.  You both understand you're still under oath; correct?

**THE INTERPRETER:**  Yes, Your Honor.

THE WITNESS:  (In English) Yes.

THE COURT:  All right.  Fantastic.  Thank you.

MS. HOUSINGER:  May I proceed?

THE COURT:  You -- let's see.  Yes, you may.

**FURTHER RECROSS-EXAMINATION**

BY MS. HOUSINGER:

Q.   Good morning, Mr. Huang.  How are you?

A.   (In English) Fine.  Thank you.

Q.   So during your testimony last Friday, Ms. Clayton asked you some questions about sales through retailers like Walmart, Lowe's, et cetera.  Do you recall that testimony?

A.   (In English) Yes.

Q.   And then, over the weekend, did you investigate whether there were any sales missing from your -- the data that you produced to Signify in this case?

A.   (In English) Yes.

Q.   Okay.  So I'm showing you Exhibit 461.

MS. HOUSINGER:  If I may have the -- oh, is it -- thank you.

BY MS. HOUSINGER:

Q.   Do you recall this document?

A.   (In English) Yes.

Q.   And this was previously admitted.

And if we look at the slide on the page that ends in 782, I believe Ms. Clayton showed you this doc -- this slide.

There's a list of retailers across the bottom of the page.  Do you see that?

**A.**    (In English) Yes.

Q.    Okay.  So through which of these retailers does Lepro make sales of the accused products in this case in the U.S.?

**A.**    (In English) Amazon, Walmart, Home Depot, Target Plus, and Best Buy.  Lowe's, Macy's, and we missing Wayfair.  Wayfair.

Q.    Are there any accused products sold in the U.S. through Costco?

**A.**    (In English) No.

Q.    What about Media Market?

**A.**    (In English) Media Market is a Germany retailer.  They have no sales in America.

Q.    And then what about B & Q?

**A.**    (In English) B & Q is a retailer in UK.  No sales in America.

Q.    So during the course of this case, were documents gathered by Lepro to produce to Signify?

**A.**    (In English) Yes.

Q.    For sales data?

**A.**    (In English) Yes.

Q.    Who -- who from Lepro was involved in collecting those documents?

**A.**    (In English) Before Q4 2025, my colleague was Mr. Zhou.

He helps to collect this data.  And for Q4 2025, I did it by myself.

Q.   Okay.  So from the beginning of this case through the third quarter of 2025, that was Mr. Zhou -- for the record, Z-h-o-u?

A.   (In English) Yes.

Q.   Is that correct?

A.   (In English) Yes.

Q.   And then for the last bit of data from the fourth quarter of 2025, so October, November, December, did I understand you correctly that you gathered that data?

A.   (In English) Yes.

Q.   To whom does Mr. Zhou report?

A.   (In English) To me.

Q.   Do you know whether any sales through Walmart.com were included in any of the collections Mr. Zhou did?

A.   (In English) No.

Q.   Were they included in the collections you completed?

A.   (In English) Yes.

Q.   Do you have an understanding as to why Mr. Zhou didn't capture those Walmart sales but you did?

A.   (In English) In -- can I speak in Chinese?

Q.   Sure.

A.   (Through Interpreter) So during the weekend, I made a phone call to my colleague, Mr. Zhou, to make some

reconfirmation.  So I asked him if he include the Walmart data in the data.  So after he verified it, he confirm he did not include those data.  Then I asked him why you did not include those information.

**MS. CLAYTON:**  Objection, Your Honor.

**THE COURT:**  Hold on.  Sorry.  Your objection?

**MS. CLAYTON:**  Hearsay.

**THE COURT:**  Ms. Housinger?

**MS. HOUSINGER:**  Your Honor --

**THE COURT:**  You can -- you can redirect this.  Let's try that.

**MS. HOUSINGER:**  That's what I was going to suggest.

**BY MS. HOUSINGER:**

Q.   Do you have an understanding as to why the data from Walmart sales before the fourth quarter of 2025 were not included in the data that was produced to Signify in this case?

A.   (In English) For my understanding; right?

Q.   Yes, sir.

A.   (Through Interpreter) So my understanding is, at a time, it was a very small data information related to the Walmart sales, so because it's very little, we didn't include it.

Q.   Did you intentionally exclude the Walmart sales?

A.   (In English) No.  Because no sense for us.  It --

Q.   Because I'm sorry?

**A.**    (In English) No sense for us.  It's very small amount for accused products.

**Q.**    You're saying it wouldn't make sense to intentionally exclude it?  Is that what you're saying?

            **MS. CLAYTON:**  Objection.  Leading.

            **THE COURT:**  Overruled.  I'll allow it.

        *(Reporter instruction.)*

            **THE WITNESS:**  (Through Interpreter) Because it is unnecessary for us to include this small data information in the report.

**BY MS. HOUSINGER:**

**Q.**    So is it your understanding that Mr. Zhou intentionally didn't capture the Walmart sales, or was it a mistake on his part?  I just want to make sure we're clear.

**A.**    (Through Interpreter) I believe he's not being very considerate about this part.

**Q.**    What do you mean by that?

**A.**    (Through Interpreter) So he didn't realize that -- he believed Walmart has nothing to do involving with the infringement -- accused products.  Walmart has no sales involved with the accused products, so he didn't realize that.

**Q.**    And then did you -- remind the jury, when did you join Lepro?

**A.**    (In English) In 2026 of June.

**Q.**    What year?

**A.**   (In English) Oh, sorry.  2023.  Sorry.

Q.   Okay.  So once you joined Lepro, did you have an opportunity to review the data that Mr. Zhou was gathering?

**A.**   (In English) Yes.

Q.   Did you notice that the Walmart sales were missing?

**A.**   (In English) I don't know, but after I confirmed with Mr. Zhou, I know this.

Q.   Did you know at the time?  When you were looking at the documents Mr. Zhou was gathering, did you realize that those sales were missing --

**A.**   (In English) No.

Q.   -- from the productions?

**A.**   (In English) No.

Q.   Why not?

**A.**   (In English) Because Walmart, the sales from Walmart for accused product is so small, I even didn't recognize this part.

Q.   They were so small that you didn't notice that they were missing?

**A.**   (In English) Yes.

Q.   Okay.  I just -- I'm sorry, I just want to make sure that I'm hearing you.

**A.**   (In English) Okay.

Q.   And then when it came to gathering the documents that you gathered personally for the fourth quarter of 2025, I believe

*Zhikang Huang - Further Recross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

your testimony was that you did include those sales; is that correct?

**A.** (In English) Yes.

Q. How is it that those sales ended up in the collection of documents that you gathered?

**A.** (Through Interpreter) So I have no own way to collect those data information, so I generated the information from the system and extract the information from the system.

Q. Okay. So now that the jury has an understanding of the Walmart sales and why those were mistakenly excluded from the productions, let's talk about the other retailers. We talked about Home Depot, Lowe's, et cetera.

**A.** (In English) Um-hum.

Q. When did Lepro begin making sales through those platforms?

**A.** (In English) In year 2025.

Q. And why were those sales not included in the documents that were collected and produced to Signify?

**A.** (Through Interpreter) So on those platform, they were using a SKU name with a slash symbol, and later on, they replaced the symbol with X. So when we -- when I was searching those information in the system, it didn't show in the system.

Q. So when you were searching for sales records, you were searching for a SKU that had a dash; is that correct?

**A.**    (In English) Yes.

**Q.**    And then, when you realized that you were missing some of the sales, did you realize that the -- the SKUs looked different?

**A.**    (In English) Yes.  And I think this SKU should be included.

**Q.**    Okay.  Have you now produced that documentation to Signify?

**A.**    (In English) Yes.

**Q.**    So all of the missing sales from Walmart and the other retailers we listed for -- Walmart from the beginning through the third quarter of 2025 and then all the 2025 sales for the other retailers, does Signify now have all of that data?

**A.**    (In English) Yes.

**Q.**    Okay.  And you -- did you mean for it to not be produced originally?

**A.**    (In English) No.

**Q.**    Okay.

          **MS. HOUSINGER:**  Pass the witness.

          **THE COURT:**  Cross on this issue?

          **MS. CLAYTON:**  Yes, Your Honor.

                    **FURTHER REDIRECT EXAMINATION**

**BY MS. CLAYTON:**

**Q.**    Hello, Mr. Huang.  Good to see you again.

**A.**    (In English) Yeah.

Q.   I just want to touch on a few things that you were mentioning just a minute ago.  And if I heard you, you said that -- and you don't need your binder right now.  We're not going to talk about that?

A.   (In English) Okay.

Q.   You can set that to the side?

A.   (In English) Okay.

Q.   You said that Lepro didn't collect the Walmart sales because it was unnecessary to include.  Did I hear you correctly?

A.   (In English) No.

Q.   It was not -- you thought it was not necessary to include those sales; is that correct?

A.   (In English) I don't think so because, from my point, I think they should be collected.

Q.   You thought they should be collected, but Mr. Zhou, the -- the accounting person who reports to you did not think they needed to be collected; is that correct?

A.   (Through Interpreter) I did ask him, and he assumed Walmart has -- there's no sales at Walmart involved accused product and that the amount is really little as well, so...

        **MS. CLAYTON:**  Could the interpreter speak up a little bit?  I'm having trouble hearing you when you answer.  Just when you -- when you interpret, if you could speak up.  I'm having a little trouble hearing you.  Thank you.  I appreciate

it.

THE INTERPRETER:  Yes.  Of course.

BY MS. CLAYTON:

Q.   Now I'm correct that you oversee the accounting for all of the defendants in this case; right?

A.   (In English) Yes.

Q.   And Mr. Zhou, who you say collected the first set of information, he reports to you; right, sir?

A.   (In English) Yes.

Q.   And you understand that in U.S. litigation all -- all -- all sides, plaintiffs and defendants, are required to search their documents and turn over relevant documents, all relevant documents in the case.  Do you understand that, sir?

A.   (In English) Yes.

Q.   And, in fact, do you know that Mr. Zhou, who reports to you, submitted a declaration under penalty of perjury in this matter about where Lepro sells its products?  Are you aware of that declaration, sir?

A.   (Through Interpreter) I have never read Mr. Zhou's declaration.

Q.   Okay.  Well, let's see if we can show you.

MS. CLAYTON:  If we could pull up Exhibit 485, and I'd move for its admission, Your Honor.

*(Exhibit No. 485, offered.)*

MS. HOUSINGER:  Your Honor, I would object to the use

of this exhibit with this witness who just testified he has no personal knowledge of it or its contents.

**THE COURT:** Yeah, and I think I have an instruction that's going to address a lot of this, so I think we're beyond what we need to be addressing with this witness.

**MS. CLAYTON:** Okay.

*(Exhibit No. 485, rejected.)*

**BY MS. CLAYTON:**

Q. Well, do you understand that, previously, the Lepro defendants told plaintiffs that the only places they were selling products was Amazon and Lepro's own website? That is what Lepro previously told the plaintiffs in this case; correct?

**MS. HOUSINGER:** Same objection, Judge.

**THE COURT:** I'm going to allow this last one.

**THE WITNESS:** (Through Interpreter) So I don't know it was occurred at what time.

**BY MS. CLAYTON:**

Q. Could I hear that answer back? Sorry.

A. (Through Interpreter) I don't know it was occurred at what time.

Q. Okay. Well, sir, I believe you said that you were in charge of the Q4 2025 sales collection; right?

A. (In English) Yes.

Q. And you said that you weren't involved in the prior sales

collection; is that your testimony?

THE INTERPRETER: Can you repeat your question? I'm sorry.

MS. CLAYTON: Sure.

BY MS. CLAYTON:

Q. And you were not involved in collecting the sales for 2024 and Q1, Q2, and Q3 of 2025; is that your testimony, sir?

A. (Through Interpreter) So I did ask my colleague to help me collect the information.

Q. But you were involved in the collection of that data, sir; right?

A. (Through Interpreter) So after they collect the information, I did double-check everything. So my apologize. I didn't realize this issue.

Q. Okay. And -- and the spreadsheet that Lepro gave defendants with the sales from 2024 and the sales through Q3 2025, that spreadsheet is actually authored by you, isn't it, sir?

A. (Through Interpreter) Yes. After I collect the spreadsheets, I forward to the attorney.

Q. Okay.

THE COURT: Let's move on from this discovery topic, please.

MS. CLAYTON: Okay. Yeah -- yes, Your Honor.

No further questions, Your Honor.

**THE COURT:** Nothing at all?

**MS. CLAYTON:** Nothing else.

**THE COURT:** Okay. Can I have a sidebar just briefly before we finish with this witness? I have a quick question.

*(At sidebar on the record.)*

**THE COURT:** Quick question about the instruction that I'm going to give. This is the question I have. So we were going to say the missing Walmart sales.

**MS. CLAYTON:** Yeah.

**THE COURT:** Do we have more entities than Walmart, then?

**MS. CLAYTON:** I believe so. I would need to go back and look at Exhibit 700 that you guys just produced to see what year all of those were in.

**THE COURT:** So -- because it seems that he also testified that they were selling in -- at other entities since 2025, and those weren't disclosed; is that right?

**MS. HOUSINGER:** Yes.

**THE COURT:** So in the proposed jury instruction that I'm going to give them right now, my thought would just be to remove the word "Walmart," so it would be the missing sales.

**MS. CLAYTON:** Um-hum. That's fine, Your Honor.

**MS. HOUSINGER:** We could do it that way, or the other would be to list Walmart and the various other, but if you want to keep it --

THE COURT: I would prefer to just make it really simple.

MS. HOUSINGER: Okay.

THE COURT: I just wanted to take Walmart out if, in fact, we have more than Walmart.

MS. HOUSINGER: Understood.

THE COURT: And we have more than Walmart; right?

MS. HOUSINGER: We do have more than Walmart.

THE COURT: Okay. Great. That was my only question.

MS. CLAYTON: Okay. Great. Thank you.

THE COURT: And then we're going to take our lunch break after this.

MS. CLAYTON: Okay. Great.

MS. HOUSINGER: Okay. I'm just going to pass. I'm going to pass him.

THE COURT: Great.

*(End of discussion at sidebar.)*

THE COURT: Thank you. Do we have any redirect on this?

MS. HOUSINGER: Nothing further, Your Honor.

THE COURT: All right. Thank you.

I do have a quick instruction for -- for the jury. I want to instruct the jury that the Court will handle any math related to the missing sales. So when deliberating and considering your verdict in this case, you should not

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

calculate any damages related to the missing sales.  The Court will handle that later, if necessary.

So please make a note of that, that the missing sales will be handled by the Court.  You won't need to be doing any calculations or assessment of that.  Okay?

All right.  So I think the question, then, is now that we've -- may I excuse this witness?

**MS. CLAYTON:**  From our perspective, yes, Your Honor.

**MS. HOUSINGER:**  Yes, Your Honor.

**THE COURT:**  All right.  Thank you so much.  You can all step down.

**THE WITNESS:**  (In English) Thank you.

**THE COURT:**  And while we're doing that, where are we with respect to the plaintiffs' case?  Does the plaintiff rest?

**MS. CLAYTON:**  I believe, yes, the plaintiff does rest, Your Honor.

**THE COURT:**  All right.  Thank you so much.

Oh, thank you so much for taking the chair down.  I appreciate that.  Thank you.

Okay.  We are then going to go ahead and take our lunch break.  It is conveniently 11:30 right now.  So we'll take our lunch break.  I am going to -- we're going to take a slightly longer break today because there are some things I need to handle also at the lunch break.  So we're going to ask

you to come back at 12:15.  It's 11:30 now.  So 12:15.

Please remember the rules.  Don't talk about the case.  Don't view or read anything about the case.  Don't do any of your own research.  And wait to formulate your final opinions.

We'll see you-all around 12:15.

*(Jury out at 11:31 a.m.)*

**THE COURT:**  Okay.  Have a seat.

With the plaintiff now having officially rested, does the defense have a motion?

**MR. BROWN:**  Yes, Your Honor.  We have a motion under Rule 50.

**THE COURT:**  I'll hear it.

**MR. BROWN:**  Your Honor, we move under Rule 50 for judgment as a matter of law on, first, noninfringement of the '320 patent; second, noninfringement on the '604 patent; third, noninfringement on the '336 patent.  We move for judgment as a matter of law on anticipation of...

**MR. MICHAEL:**  I don't think we can move on that.

**MR. BROWN:**  Fair enough.  Withdrawn as to the -- that anticipation part.

We move on the damages issues that have been discussed extensively, apportionment failures, methodology failures in the expert testimony provided by Signify.  And we move as a matter of law on the notice issues, the same ones

that were identified in our summary judgment motion, which we renew.

And finally, we move as a matter of law on the willfulness issue, Your Honor.

THE COURT:  Did you want to make any further argument on any of those points?

MR. BROWN:  I'm happy to, Your Honor.  I don't want to disrupt the trial schedule but...

THE COURT:  So I don't want to try to read your mind on what arguments you are making as to those issues.  So if you have an argument under Rule 50, I am ready to hear the factual basis based on the evidence that has been admitted at trial in the plaintiffs' case.

MR. BROWN:  Certainly, Your Honor.  All right.  I will...

THE COURT:  Why don't you go ahead and go to the podium, too, so that Amber doesn't yell at anyone.

MR. BROWN:  All right, Your Honor, I'm going to go one at a time.  I'm going to start with the '320 patent, and I will put on the screen claim 1 of the '320 patent.

Claim 1 of the '320 patent requires a heat sink comprising of metal with an electrical resistivity being less than 0.01 ohmmeters and configured for removing heat produced by the light source, the heat sink forming at least a portion of an outer enclosure.  Your Honor, the -- no reasonable jury

could find on the evidence presented by the plaintiff that this limitation was met.  And, in particular, it is undisputed that the outer enclosure is plastic, that it fully covers the metal lining, which was the basis of the allegation that this element was met.

**THE COURT:**  Okay.

**MR. BROWN:**  For the '604 patent, Your Honor, I won't even put up the claim.  I will just put up the Court's claim construction of the fastening means element.

**THE COURT:**  Don't need to.  I know it.  Go ahead.

**MR. BROWN:**  Okay.  Your Honor, our motion is that, under the evidence presented by the plaintiff, no reasonable jury could find that the structure in any of the accused products, specifically the screws going into screw holes, is structurally equivalent to what the Court ordered, specifically that the fastening means must have structure tabs 450 shown in figure 4 and described at 7:42 to 51.  There are many reasons for this, but perhaps the simplest is that Dr. Krames agrees that the way the force -- the way that the force is applied by a screw and a tab is different, and as a result, even under the testimony of plaintiffs' expert, there cannot be structural equivalence between the two.

**THE COURT:**  Okay.

**MR. BROWN:**  For the third motion on the '336 patent, there are two parts.  The first part is that the testing

provided by the plaintiff is insufficient for a reasonable jury to find infringement.  The testimony was that the fixtures were tested in a dark room with no other sources of light, which intentionally emitted all background noise as construed by the Court.  There was additionally testimony about one product only, that it was tested in a room.  There was an image of the room shown.  The testimony was that the shades were drawn, there was very limited sunlight, and I can point out to Your Honor that that testing is unreliable through basic math.

Just a moment, and I will put that up.

THE COURT:  Is this the spectrometer reading changes based on distance issue?

MR. BROWN:  Not that specifically, Your Honor.  Actually, this is a different problem.

So I don't have the exhibit numbers handy.  I can get them.  But the issue -- the problem here is that in the -- in the dark room, the light bulb was tested, and it had a total power output of roughly .76.  Then there was testing in the room with the shade drawn, and the -- first, this -- this one the one I'm pointing to, Number 2, was with the light off, and it had a total power -- this is now from the background noise -- of .54.  And then the light was turned on, and one would expect that the -- those two numbers should add up.  So that -- in other words, you should have .76 plus .54.  That

comes out to approximately 1.3.  But as you can see, the testing shows it came out to 1.65.

So there's something seriously wrong here, and as a result, our position is that no reasonable jury could find infringing based on testing where the testing itself shows that it's seriously flawed.

THE COURT:  Okay.  Next?

MR. BROWN:  Related to that, the alleged notice for the '320 patent -- I'm sorry, I misspoke.  The '336 patent. We're talking about the '336 patent.  The '336 patent, Exhibit 3 -- the alleged notice for the '336 patent, Exhibit 3, was the e-mail Exhibit 84.  That is the only alleged notice that comes prior to the expiration of the '336 patent.

I will put Exhibit 84 on the screen.  I will zoom in on the alleged notice.  The alleged notice is here.  That the -- I will read the line of the e-mail:  "LE Lighting Ever brand wireless ceiling light with Bluetooth speaker is read on at least the patents US701336 [sic]," and it goes on from there.

So the alleged notice prior to the filing of the complaint was for a product that is not accused in this case. No reasonable jury could find that notice was given of the alleged infringement in this case prior to the expiration of the patent.  And as a result, there cannot be any damages for

infringement of the '336 patent.

On damages generally, we have argued that issue extensively to Your Honor.  I don't -- I believe you've already made rulings on it for apportionment, for admissibility, et cetera.  We renew that argument.  I'm not going to go into it in any more detail unless you would like me to.

THE COURT:  So -- but that was all with respect to excluding the witness' -- the expert witness' testimony, so --

MR. BROWN:  Yes.

THE COURT:  -- explain to me why you get judgment as a matter of law --

MR. BROWN:  Sure.

THE COURT:  -- based on what was testified to.

MR. BROWN:  Sure.

So doctor -- or mister -- excuse me, Mr. Schoettelkotte testified that there are two main issues.  The first is the intentional discounting of the 1750 EnabLED licenses.  The testimony was that those are not comparable and should be ignored by the jury.  That -- no reasonable jury could find that these 1750 licenses are not comparable.  No reasonable jury could base a damages award on that testimony under the governing law and the instructions that we anticipate Your Honor giving.  That's first.

Second, there was not -- no reasonable jury could

find that Mr. Schoettelkotte had properly apportioned the value of the invention for any of these patents.  And I will go through those one at a time.  There are different issues on each.

There is a general issue which is that, for example, as described extensively, the EnabLED portfolio contends many, many patents in each of a whole variety of different technical areas.  And so I will refer to Exhibit 54, and I'm going to use as an example page 40 of Exhibit 64, which I'll put on the screen.

Your Honor may recall that from -- so Exhibit 564 is the April 2024 version of a PowerPoint presentation that is on the Signify website about the EnabLED licensing program.  It contains information about that program, and one of the things it includes is the diagram shown on page 16 which shows all the areas of technology, according to Signify, that go into LED lighting.

There are -- one, two, three, four, five, six -- seven areas identified by Signify in this diagram.  One of them, connectivity in purple, is identified as having four sub areas, one of which is antenna, one of which is smart control.

In the example I was going to show Your Honor from page -- oh, and then this document goes on after that page 16, in pages 17 through 42, to provide examples of patents in the EnabLED program relevant to various technical areas, all of

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

which include a designation of a portion of that diagram I was just mentioning.

In particular, the example I was going to use was... on page 40.  You can see that the '604 patent is identified as one of nine U.S. patents relevant to thermal management.  The figure from the '604 patent is shown on the slide.  And there was no effort to apportion the value of the '604 patent with any of the other patents mentioned in Exhibit 564, let alone the others that are shown on this specific slide.  That was intentionally ignored by Mr. Schoettelkotte.

So in light of the evidence -- that evidence, as well as other evidence, including all of the notice letters themselves which identify dozen -- at least a dozen -- I don't have a count at the moment, but at least a dozen patents not asserted in this case but nonetheless asserted to be infringed by the patents -- I'm sorry, by the products identified as infringing in this case, there was no apportionment made between the other patents that Signify has asserted and the evidence that it's put into in this case in the form of the notice letters.  So they're saying that those patents are infringed, and yet they don't apportion for the value of the technical contributions from any of those other patents identified by them in the notice letters.

So that's a -- based on just that, no reasonable jury could find that a proper apportionment analysis had been done

by Mr. Schoettelkotte.  And, therefore, his testimony cannot be the basis for a damages award.

In addition, the evidence showed that for the '320 patent the alleged invention was the placement of the antenna above the heat sink and above the metal components.  There's a live demonstration in the courtroom which shows that when you cover the bulb with tinfoil, the bulb still works.  It's not reasonable -- no reasonable jury could find that, as Mr. Schoettelkotte argued, 50 to 100 percent of the smart functionality value of a light bulb is attributable to the placement of the antenna when the evidence is that the smart functionality works just fine when the light bulb is covered in metal.

Additionally, it was undisputed that Signify was not involved at all in developing the Wi-Fi standards or the Bluetooth standards or Zigbee, which is the standards that are used for the smart functionality.

So the argument is merely that an antenna enables smart functionality, which is certainly true, along with a host of other components.  But the argument that 50 to 100 percent of the technical value of smart functionality is attributable to the '320 patent is absurd and is not a conclusion that any reasonable jury could reach.

Similarly, on the '604 patent, there is an argument that a substantial amount -- I don't recall the exact

numbers -- of the value of these accused light fixtures is attributable to the '604 patent.  That included the value of the housing, it included the value of the metal body, which is the heat dissipation element, et cetera, et cetera.  But our evidence has shown that those elements were all in the prior art.  The only -- so there's no reasonable basis to use the valuation that Signify has used.

Additionally, it was undisputed that they used cost as a proxy for technical value, and I would submit to Your Honor that that is legally inappropriate and that no reasonable jury could find that cost is a proxy for technical value.

Finally, on willfulness, Your Honor, no reasonable jury could find that the evidence here supports a finding of willful infringement.  The evidence shows that Lepro has repeatedly offered to pay Signify for its use and that Signify has repeatedly refused because Signify insists that Lepro pay for products that are not accused of infringement in this case and for patents that are not asserted in this case.  Lepro has -- so I think that says it all, Your Honor.  We have attempted -- and I think it's undisputed that, prior to the trial and going back some time, we have attempted to pay Signify everything that it wants, and they have said no.

Additionally, on the willfulness point, I would incorporate all the arguments I've made prior to now on our

good-faith defenses of noninfringement for each of the patents, with the exception of the '577, '139, '138.  On those, the damage -- total damages are less than $5,000.  As Your Honor may recall, we made an intentional decision not to incur the expense of putting in an expert report on those issues.  As a result, summary judgment was granted.  But I would submit to Your Honor that the fact that we elected not to incur the expense of defending a case where the damages claim was under $5,000 for three patents shows practicality and that no reasonable jury could find that that practical decision shows willful infringement.

If I could have a moment?

**THE COURT:**  You may.

*(Conferring amongst counsel.)*

**MR. BROWN:**  Yes.  I am reminded there was something I missed.  I apologize.  I will do it.

This is addressed in our summary judgment motion but I will renew the motion.  The notice prior to 2021 for the '604 patent is the issue I'm going to address.

This is -- I'm going to put on the screen Exhibit... 63.  No it's not -- excuse me.  I made a mistake.  That's the wrong exhibit.  Just a second, Your Honor.  I'm sorry.

I'm going to put on the screen Exhibit 60, Your Honor.  This letter alleges that ten different product

types, beginning with UFO LED high bays, used Philips-patented technologies in at least -- and it then lists 13 patents.  So that's 130 alleged infringements.  Of those 130 alleged infringements, there are three, and only three, at issue in this case.  Under the law, this is not a specific charge of infringement by a specific patent.  It is not sufficient to enable my client to be on notice.  No reasonable jury could find that it is.

I would cite the case law identified in our summary judgment motion, in particular, the *Gart v. Logitech* case.  I don't have a cite, but I know it's in our summary judgment motion on the record.  I do recall the facts of the *Gart v. Logitech* case, Your Honor.  In that case --

**THE COURT:**  I'm sorry, what are you saying?  Of the what case?

**MR. BROWN:**  *Gart*, G-a-r-t, *vs. Logitech*.

**THE COURT:**  L-o-g-i-t-e-c-h?

**MR. BROWN:**  Correct, Your Honor.

**THE COURT:**  Okay.  Sorry, I didn't -- I hadn't heard the first half of what you had said.

Go ahead.

**MR. BROWN:**  I think I might be speaking too fast.  I'm sorry.

In -- I don't recall the cite.  I know it's a Federal Circuit case, and I know it's in the docket, and I can provide

the cite later.  But I can -- I do recall specifically the facts and the result of that case.  And so *Logitech*, which, as you may know, makes pointing device products like a mouse, but in this case what was at issue was trackballs -- and there were -- and I'm not going to have the exact names of these products right.  I've been handed the case.  The cite is, Your Honor, 254 F.3d 1334.  The pincite here is 1339.  I'm sure that's generally correct, but I can't be sure it's entirely correct.

The general facts there were -- there were many different kinds of trackball products, Your Honor.  I believe one of them was the Vista.  I believe others had different names.  And the result in that case was that a notice as to one of those products -- and, again, I'm -- it may be in this brief.  Just a second.  But one of those products was found not to be notice of the others, even though they are all trackball products sold by the same company.

And I would submit to Your Honor that under that law and other laws submitted in our summary judgment motion that this disclosure in Exhibit 60 of 13 patents and ten products without any connection between any patent and any product is insufficient as a matter of law and no reasonable jury could find that we were on notice of the alleged infringement in this case, the accused products identified in the accused products list, when the only one -- the only product category

identified in this letter is UFO LED high lights [sic].  And there's no connection between -- I misspoke.  UFO LED high bays, and there is no connection between that product category and any of the 13 patents listed.

May I have a mom- -- I believe that it completes it, Your Honor, but I'm just going to have a moment to confer with my team.

THE COURT:  You may.

(Conferring amongst counsel.)

MR. BROWN:  I think that covers it, Your Honor.

THE COURT:  Thank you.

Response?

MR. SWAIN:  Your Honor, if I may, I will handle the technical issues, and my colleague Ravi Fernando will handle the damages issue.

THE COURT:  Sure.

MR. SWAIN:  Thank you.

I think Your Honor has seen the same case that's proceeded thus far, and what we just heard was a lot of attorney argument and little to no evidence.  Starting with the '320 patent, the outer enclosure is a plastic-wrapped metal collar.  It serves as the outer enclosure, and it serves as the heat sink.  The experts agree that the heat is transferred to the ambient air through that outer enclosure, and that includes metal.

Dr. Ricketts and Dr. Lankhorst testified at length as to why you would put plastic on the outside of metal and that the heat transfer can still occur, and in many instances, plastic does enhance heat transfer.  So there's a major, major factual dispute on that point, and a reasonable jury could actually find -- will actually find in our direction on that.

That's the only disputed point for the '320 patent.

For the '604 patent, our expert faithfully applied the law of the Doctrine of Equivalence to show that screws of the accused products that he, indeed, investigated, took apart himself, and put back together again are equivalent in the function, weight, and result in the way they achieve the detachably coupling element.

We did not get any actual rebuttal testimony to that. The expert did not apply the function, weight, result test. Those words were never spoken.  All we heard was that screws are just different than tabs.

There is no reasonable juror that could find that there is not infringement of the '604 patent.

On that front, the notice letter that Mr. Brown just showed us, I think he's misstating the law, but it wouldn't matter because --

If I could have Exhibit 60 up, actually.

We have not heard from a single witness from Lepro that they weren't on notice of infringement and that they did

not receive this letter and that this letter does not identify the UFO high bay products -- LED high bay products and the '604 patent as a charge of infringement.

Now the *Logitech* case Mr. Brown's talking about is when you have products that are truly different in the eyes of the patent, because if there's a different infringement theory for those products -- these trackball products than there are for the products in the letter.  But both experts in this case agreed that UFO LED high bay lights with their sandwich configuration and the screw as an attachment means infringe or don't infringe in exactly the same way.  And that's what the law provides.

It does not ask for what Mr. Brown is asking for, which is letter-perfect letters to identify every single product that might infringe this patent in any particular way. The point is notice.  They were on notice of the products. They were on notice of the charge of infringement.  They all infringe in the same way.

And you would think if there really was a dispute over this or someone didn't understand the letter, we would have gotten a response or maybe someone would have had the courtesy to come testify about it.  Didn't hear anything on that front.

'336 argument.  We're surprised they're continuing to fight this, Your Honor, considering they presented absolutely

no expert testimony on noninfringement.  We heard nothing but attorney argument.

Dr. Pattison's testing was unequivocal that the claim element -- claim limitations were met.  He tested them in a dark room, and he tested them in a light room, and they infringed under both circumstances.  In fact, they infringed under pretty much every circumstance.  What Mr. Brown is asking for is an illegally imperfect solution where it has to infringe in every single circumstance, and this is something Your Honor mentioned -- mentioned in granting the motion in limine from Dr. Curran coming to criticize the testing.

I do want to mention the notice case law that I discussed before that talks about a sufficient charge of infringement can be good for unidentified products if they are sufficient to put the accused infringer on notice of the theory of infringement.  If the product you identify is infringing in the same way as the unidentified products, then that notice is sufficient.  That is 616 F.3d 1357.  That's the *Funai/K-TEC* case.

THE COURT:  Sorry.  Say that slower.

MR. SWAIN:  I will do my best.  It's 616 F.3d 1357.

THE COURT:  And how do I spell the name of this case?

MR. SWAIN:  It's *Funai*, F-u-n-a-i.  *K-TEC*, K-t-e-c.

Your Honor, this is a textbook case of willfulness.  They received our letters, our charges of infringement, and

yet ignored them.  We got no response, no legal opinion, no scintilla of evidence that showed they had any good-faith belief of noninfringement or invalidity.  And as you've seen in this case so far, they have peeled off like an onion as the heat of trial bears on them.  The ones that remain are threadbare and barely stand the scrutiny, as their expert just admitted on the '320 and '604 patent.

They barely have any defenses left, and if they did have a defense, they would have presented it the right way, with an attorney opinion and giving us insight as to why they don't think their products infringe early on and often.  They never got one.  They would have introduced some way or changed their products to maybe avoid infringement to at least acknowledge our letters.  Didn't do it.

This is why there's trebling of damages, is because companies like this will continue to ignore letters and continue to ignore charges of infringement until they have to come to court, and now all they want to do is just pay, what we've been asking for for a long time, after putting this Court and my client through exorbitant time and expenses.

Did I miss anything?  Would you like to handle damages, Mr. Fernando?

**MR. FERNANDO:**  Absolutely.

**MR. SWAIN:**  Thank you.

**MR. FERNANDO:**  So, Your Honor, I'll try to keep this

brief so that everyone can take a break, and I'll try to focus and zero in on the biggest flaw in what Lepro's counsel raised.

So I think the problem here is that Lepro's counsel incorrectly assumes that the only way to calculate patent damages is to do a top-down approach. But that's not correct, Your Honor. You can also do what's called a bottom-up approach. And I can explain both very briefly for you.

So a top -- oh, go ahead.

**THE COURT:** I really hope this isn't the argument you're going to make to the jury if I let this go because --

**MR. FERNANDO:** No, no, Your Honor.

**THE COURT:** This is -- this is confusing, but go ahead.

**MR. FERNANDO:** Sure. So just as an example, a top-down approach is where you take a top line number, such as, you know, accused product revenue base or, most salient here, some sort of comparable royalty rate, such as what Lepro is saying is the EnabLED program, and you divide that out into values for each of the patents that are at issue. So, for example, what Lepro is saying is that because the three, four, five rate is an established rate, they're saying that that should be divided out to the 4,600 patents that are in that portfolio. They have not said whether each one has equal rates or different rates. They have given no testimony on how

that division would occur.  I'd note, Your Honor, that I think that, you know, our view is that this argument is -- is, in a sense, hypocritical given the *Daubert* challenge that they raised, which is sort of the opposite; right?

Our expert has not used EnabLED as a comparable rate and, in fact, testified very clearly that it is not a comparable rate.  What he did is something different.  He did a bottom-up approach.  He used testimony and evidence supplied by the technical experts to figure out the value of the functionality at issue in this case as used by Lepro.

And I'll note, Your Honor, that that testimony was not challenged by Dr. Curran, Lepro's technical expert, and it was not challenged by Lepro's own lawyers, either at the motion in limine stage or at summary judgment.

So we've got unchallenged expert testimony from Signify's technical experts saying that, you know, this is the value of these accused functionalities for each of the patents in this case as it pertains to Lepro.  And then taking those bottom line numbers, Mr. Schoettelkotte then worked up.  So a bottom-up approach to calculate the corresponding damages in this case.

Now, Federal Circuit case law is very clear:  Both top-down and bottom-up are acceptable approaches.  You're supposed to use the approach that complies with the facts at issue in this case.  Our belief is that Mr. Schoettelkotte did

exactly that, and we'd respectfully request that you deny the motion.

THE COURT:  How do you respond to the arguments that your witnesses have overly valued the contribution of the inventions to the elements in these products?

MR. FERNANDO:  So I think in two ways, Your Honor.  I first would say that if that were actually the case, then there would have been some sort of contravening expert testimony on the issue; right?  Dr. Curran didn't do that.  He didn't provide any technical analysis that contradicts the technical apportionment, the -- the assessment of how much benefit Lepro got out of these infringing functionalities.  You did not hear that from Dr. Curran, because he didn't do it.  So if it were overvalued, the check is that they would have given us rebuttal testimony or an expert report challenging that fact.  They didn't do that.

The second thing I'd say, Your Honor, is if they thought there was something wrong in the methodology that our technical experts used or in the facts that they relied on, any of that, they would have then filed a *Daubert*.  They did not do that because there's no real basis for it.

THE COURT:  All right.  Thank you.

MR. FERNANDO:  Thank you, Your Honor.

THE COURT:  Very briefly, if you want rebuttal, Mr. Brown.

MR. BROWN:  Your Honor, I would prefer lunch, and I rest on what I have already argued, which I --

THE COURT:  Thank you.

MR. BROWN:  -- I obviously do not agree.

MR. SWAIN:  Your Honor --

THE COURT:  Really, you don't just concede after all of that?

MR. BROWN:  No, Your Honor.

MR. SWAIN:  Your Honor, not a substantive --

THE COURT:  Joking.  Clearly joking.

Yes, Mr. Swain.

MR. SWAIN:  You asked for a case cite on the fly, which I need to get better at, obviously.  The two cases I mentioned on notice, it's *Funai vs. Daewoo*, D-a-e-w-o-o.  That is 616 F.3d 1357.  And the *K-TEC* case follows in line, actually quoting that *Funai* case.  That's *K-TEC vs. Vita-Mix*.  That's 696 F.3d 1364, Federal Circuit 2012.

THE COURT:  Thank you. Okay.  Yeah.  We definitely need a lunch break.  Otherwise, I will die up here for the rest of the afternoon.

What's next?

MS. HOUSINGER:  As far as after lunch is that we have Mr. Duski, who is our damages expert.

THE COURT:  Okay.  And he's the last for the noninfringement case?

**MS. HOUSINGER:**  Yes.

**THE COURT:**  And your responsive case?

**MR. BROWN:**  Correct.  We will rest after Mr. Duski, Your Honor.

**THE COURT:**  Okay.

**MR. BROWN:**  And I believe at that point, there will be one more witness from the rebuttal case:  Dr. Krames.  I don't want to speak for them, but that's my --

**THE COURT:**  Does that sound right?

**MS. CLAYTON:**  He'll be -- Dr. Krames to respond, but then we also discussed last week recalling Mr. Rugh.

**MR. BROWN:**  Ah.  I forgot.

**MS. CLAYTON:**  So it will be Dr. Krames and Mr. Rugh in our rebuttal case.

**THE COURT:**  How long will mister -- doctor? Mister? -- Duski go?

**MS. HOUSINGER:**  Mr. Duski.

**THE COURT:**  Thank you.

**MS. HOUSINGER:**  I'm hoping 30 minutes.

**THE COURT:**  Okay.  All right.  Unfortunately, it's now 12:10, so we have five minutes left in the period that I gave the jury, but that's clearly not going to work.

So let's -- let's plan on trying to get back in here at, oh, let's do -- let's do 12:30.  And we'll go from there. See you at 12:30.

MR. SWAIN:  Thank you, Your Honor.

MR. MICHAEL:  Thank you, Your Honor.

*(Lunch recess at 12:11 p.m., until 12:36 p.m.)*

THE COURT:  All right.  Have a seat.

For the record, I have taken the Rule 50 motion under advisement.  Obviously I will consider it as of the actual end of the plaintiffs' case-in-chief, even though we took some people out of order.  So I need to look at those cases and further examine the notices and the other exhibits that everybody talked about.  So I will have a ruling on that at some point but not right now.

All right.  Are we ready to go back on then and bring the jury back in?

MS. CLAYTON:  Plaintiffs are ready, Your Honor.

MR. BROWN:  Yes, Your Honor.

THE COURT:  Okay.  Let's bring them back.

*(Pause in proceedings.)*

COURTROOM ADMINISTRATOR:  All rise.

*(Jury in at 12:38 p.m.)*

THE COURT:  All right.  All seven of ours jurors are back.  Welcome back.  I apologize for the delay.  Please have a seat.

Next witness, Mr. Brown.

MS. HOUSINGER:  Your Honor --

THE COURT:  Oh.  Sorry.  Ms. Housinger.

**MS. HOUSINGER:**  Yes, ma'am.  Your Honor, Lepro calls Mr. David Duski.

**THE COURT:**  All right.  Head on up here, and Summer will meet you and swear you in.

**COURTROOM ADMINISTRATOR:**  Raise your right hand.

*(The witness is sworn.)*

**THE WITNESS:**  I do.

**COURTROOM ADMINISTRATOR:**  Go ahead and take a seat.  And then state and spell your first and last name.

**THE WITNESS:**  Sure.  My first name is David, D-a-v-i-d; last name Duski, D-u-s-k-i.

**MS. HOUSINGER:**  May I proceed, Your Honor?

**THE COURT:**  You may.

**DIRECT EXAMINATION**

BY MS. HOUSINGER:

Q.   Good afternoon, Mr. Duski.

A.   Good afternoon.

Q.   Would you please introduce yourself to the jury.

A.   Sure.  My name is David Duski.  I live and work in Chicago.

Q.   Where do you work?  Which company do you work?

A.   I work for a firm called Charles River Associates, also known as CRA.

Q.   Before we get to the expert opinions you intend to offer in this case, I'd like to discuss your background and what

qualifies you as an expert in the field of economic damages.

Have you prepared a demonstrative for the jury today?

A.   I have, yes.

**MS. HOUSINGER:**  Ms. Rivera, may I have the ELMO, please?  Thank you.

**BY MS. HOUSINGER:**

Q.   Can you tell the jury a little bit about Charles River or can we call it CRA?

A.   Yes.  So CRA is an international consulting firm that provides a wide variety of financial and economic consulting services to its clients, including the assessment of economic damages in commercial litigation matters such as the one that we're here to talk about today.

Q.   What is your position with CRA?

A.   I'm a principal in CRA's intellectual property practice.

Q.   And what type of work do you do?

A.   So over the last 20 years of my career, it's been focused on providing intellectual property valuation in damages assessment services for individuals and companies involved in intellectual property disputes, again, such as the one that we're here to talk about today.

Q.   Let's back up a little bit.  Where did you go to school?

A.   I went to DePaul University, and I earned a bachelor's degree in accounting and finance with high honors.

Q.   And where did you start your career?

**A.**   I started my career after receiving my undergraduate degree at a boutique litigation consulting firm that, in essence, provides clients very similar services to those that I do today at CRA.  And I spent about 12 and a half years there.

**Q.**   After those 12 and a half years, where did you go next?

**A.**   I next moved to a firm called BDO.  BDO is one of the world's largest public accounting advisory firms, and when I was there, I led its national intellectual property consulting practice.

**Q.**   And then how did you get to CRA?

**A.**   So approximately four years later I transitioned to CRA and joined in February of 2022.

**Q.**   Do you hold any professional licenses or certifications?

**A.**   Yes.  As you can see on the slide that I prepared, I'm a licensed certified public accountant, licensed in both Illinois and Wisconsin.  I'm a certified licensing professional and a certified fraud examiner.

**Q.**   Have you had the opportunity to lecture on the issue of intellectual property damages?

**A.**   I have.  Throughout my career I've lectured on IP damages several times.  Those organizations and schools include places like the John Marshall Law School, the Loyola University School of Law, the Chicago Bar Association, and, for example, the Allegheny County Bar Association, which is in Pittsburgh,

Pennsylvania.

Q.   How is it that you stayed current in developments in your line of work?

A.   Well, as a CPA, as CLP, and CFE, I'm required, in order to maintain those certifications, to engage in what they call continuing professional education.  And generally I'm required to spend 40 hours a year to achieve continuing professional education.  So I stay -- stay current on topics affecting the accounting, licensing, and fraud profession.

Q.   Have you ever been recognized for your work?

A.   Yes.  I've been honored to be recognized on several occasions for my professional work over the last 20 years.

Q.   Do you have some examples?

A.   Sure.  As you can see on the slide, I've been honored to be included in what they call the IAM patent 1,000 listing, which recognizes the leading patent professionals in the industry.  And I have been honored as a recommended expert witness.  Also by the same organization I was named to their strategy 300 listing, which identifies leading IP strategists in the United States.  I've received similar awards from another organization called the Lexology Index, and most recently I was named as the Number 1 intellectual property expert in the state of Illinois, and that came from nominations for industry participants.

Q.   Have you testified as a damages expert before?

*David Duski - Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

**A.**   I have, yes.

**Q.**   In those cases where you've testified involving assessment of damages, those are patent infringement cases?

**A.**   Patent infringement cases among others, yes.

**Q.**   And can you give the jury some examples of the other types of cases in which you've testified?

**A.**   Sure.  Other cases in which I've offered expert testimony on damages include cases such as trademark infringement, trade secret misappropriation, copyright infringement, breach of contract, among others.  But those are the ones that come to mind right now.

**Q.**   Is it fair to say that economic damages and assessment thereof has been your focus for the last, what, 20 years of your career?

**A.**   Yes, over 20 years.  That's correct.

**Q.**   When you've testified in cases like this, have you testified on behalf of both plaintiffs and defendants?

**A.**   That's correct, yes.

**Q.**   Is your firm, CRA, being compensated for your time that you've put into this case?

**A.**   My firm is being compensated, yes.

**Q.**   Is your firm's compensation tied in any way to the outcome of this case?

**A.**   No, it's not.

        **MS. HOUSINGER:**  Your Honor, at this time I move to

*David Duski - Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

qualify Mr. Duski as an expert in the field of economic damages, including the assessment of reasonable royalty damages.

          **MS. CLAYTON:**  No objection.

          **THE COURT:**  All right.  He may so testify.

          **MS. HOUSINGER:**  Thank you.

**BY MS. HOUSINGER:**

Q.   Mr. Duski, what were you asked to do in this case?

A.   In this case I was asked to review and respond to the expert -- expert opinions on damages presented by Signify's expert, Mr. Schoettelkotte, that we heard from last week.

Q.   Did you form any opinions regarding Mr. Schoettelkotte's damages analysis?

A.   Yes, I have.

Q.   So we'll talk about those in just a minute.  Before we get there, though, I want to talk about some underlying assumptions for your testimony.  Were you asked to make any assumptions in rendering -- in rendering your opinions, excuse me?

A.   Yes, I was.

Q.   What were those assumptions?

A.   I was asked, as all damages experts must, to assume that the six patents in this case are both valid and infringed by Lepro.

Q.   You said as all damages must.  What do you mean by that?

**A.** Well, all --

**Q.** Or damages experts must.  Excuse me.

**A.** All damages experts are asked to make that assumption because, if the Court or jury determines that a accused infringer doesn't infringe one or more valid patent, then there would be no damages.

**Q.** You wouldn't need to hear from you?

**A.** Presumably, yes.

**Q.** Okay.  Were you asked to provide any opinions regarding the validity or the infringement of the six patents that are asserted here?

**A.** No, I was not.

**Q.** Will you be providing the jury with any technical opinions?

**A.** No.

**Q.** Will you providing the jury -- be providing the jury with any legal opinions?

**A.** No.

**Q.** Were you present during Mr. Schoettelkotte's testimony last week?

**A.** I was.

**Q.** And you haven't been sitting in the courtroom every day of this trial; is that right?

**A.** No, I haven't.

**Q.** Have you been able to keep up with what's been -- what's

been going on and the evidence that has been presented?

A.   Yes, I have.

Q.   How have you done that?

A.   So to the extent that I haven't been actually sitting in the back of the courtroom listening to the live testimony, I've been reading the daily trial transcripts of the testimony that has come from witnesses before me.

Q.   All right.  Let's get to the bulk of it.  Tell the jury what your opinion is in this case.

A.   Generally speaking, I believe that Mr. Schoettelkotte's reasonable royalty opinions in this case are flawed and not the likely outcome of the hypothetical negotiation that we both agree would have taken place between Signify and Lepro as of the date of first alleged infringement.

Q.   Let's remind the jury of those opinion -- or of Mr. Schoettelkotte's opinions where you say that the -- the royalties are excessive and flawed.  So let's just start with some basic terminology.

Remind the jury, what is the royalty base?

A.   The royalty base is one part of the equation that's used in this matter to determine the total reasonable royalties that potentially could be due to Signify.  So it's -- it's one part of the equation.

Q.   And then what is the royalty rate?

A.   The royalty rate is the rate that I understand is up

the -- up to the jury to determine to apply to the royalty base in order to arrive at total reasonable royalty damages.

Q.   So just to kind of close the loop here, how do the royalty base and the royalty rate work together to determine a -- the royalties that are sought?

A.   One would take the royalty base, which in this case is expressed as -- or expressed in dollars, and multiply it by the royalty rate, which is a percentage, to arrive at total reasonable royalty damages.

Q.   And then, to be clear, this $410,544 number, what is that number on this slide?

A.   That is the total of the individual damages numbers above it which are by -- or presented by patent.

Q.   And is this a number that you are telling the jury should be awarded, or whose number is this?

A.   No, that is not my number.  That is what Mr. Schoettelkotte testified to last week.

Q.   Before we move off of this slide, just one more.  Explain to the jury, under royalty base, there's a total of about 6.865 -- or $6.865 million.  What explain what that number represents?

A.   Yes.  That's the totality of the Lepro products that are accused of infringing the six patents in this case, and those numbers are directly above that total.

Q.   Okay.  With that refresher in mind, let's get to some of

David Duski - Direct
2:22-cv-02095-JAD-EJY - February 9, 2026

your criticisms.

Did you hear Mr. Schoettelkotte testify that he does not believe that the EnabLED licenses are comparable to a license that would result in this case?

A.   Yes, I do remember that testimony.  And I recall when he was speaking of the EnabLED portfolio he was, of course, referring to the 1,700 licenses that have actually been entered into in the real world at rates for 3, 4, and 5 percent for patents, including the six in this matter, plus thousands of others.

Q.   And tell the jury generally why comparability matters.

A.   Well, any licensing expert or damages expert, to the extent they want to rely on in a real-world license agreement or license agreements to help them determine what a proper royalty would be in a patent infringement matter during a hypothetical negotiation, that real-world agreement has to both be technically comparable and economically comparable to the hypothetical license that would have taken place.

Q.   Do you have an understanding of whether there's technical comparability in this case?

A.   My understanding is that there is.  We heard testimony that all of the approximately 4,600 patents in the EnabLED portfolio all relate to LED technology.  Signify's the owner of all of those patents.  The accused products, as I understand them, all relate to LED technology.  And probably

*David Duski - Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

most importantly, the six specific patents in this case are inclusive of the patents included in the 1,700 real-world licenses that have been entered into among others.

Q.    What about economic comparability?  Do you believe there is -- that economic comparability exists in this case?

A.    Well, I analyzed carefully the differences that Mr. Schoettelkotte in his report identified as being different between the hypothetical negotiation and the seven -- 1,700 real-world licenses.  And after careful consideration of those differences, I determined that there's economic comparability.

Q.    Did you hear Mr. Schoettelkotte testify that he did not rely on the EnabLED licenses in his analysis?

A.    I seem to recall that testimony, yes.

Q.    Did you review Mr. Schoettelkotte's expert report in this case?

A.    I did, yes.

Q.    Do you agree that he didn't rely on the EnabLED licenses?

A.    It appears from my review of Mr. Schoettelkotte's report that he relied at least in part on the EnabLED program and the 1,700 real-world licenses in rendering his ultimate opinions.

Q.    Can you provide an example for the jury of such reliance?

A.    Sure.  One thing that comes to mind from my review of Mr. Schoettelkotte's report is he stated that Signify would enter the negotiation expecting to achieve royalty rates that are commensurate -- which, of course, means equal to, if not

greater than the 3, 4, and 5 percent royalty rates that are part of the EnabLED program.

So it appears that Mr. Schoettelkotte was suggesting that that was the mind-set of Signify just entering into the hypothetical negotiation with Lepro in this case.

Q.   In other words, just to kind of summarize what that is, he's saying that the EnabLED licenses are the floor; is that right?

A.   He didn't use those exact words, but to me that's what it appears he's arguing, is that the -- that's the minimum amount that they would be willing to accept right when they open the doors and enter the negotiation with Lepro.

Q.   Do you agree that the EnabLED licenses would be the floor?

A.   No, I don't.  In fact, I think that they would represent the ceiling or the max that Lepro in this case would be willing to pay.  Because let's remember the patents at issue in this case are just the six patents that we've heard extensively about.  And under the EnabLED program, the 1,700 licensees get access to not only the six patents in this case but they get access to approximately 4,000 other patents. Thereby, I feel that the EnabLED royalty rates would represent the maximum that Lepro would be willing to pay.

Q.   So if we talk about Mr. Schoettelkotte's belief that they would be the floor, to kind of contrast that, if they're the

maximum, is it your belief that the EnabLED license rates would be the ceiling?

**A.**   Yes.  After my analysis that I described in my expert report, I believe that to be the case.

Q.   All right.  Let's change gears a little bit.  Let's talk about notice.  You've heard testimony from Mr. Schoettelkotte that the earliest that the damages period could begin in this case would be June of 2017 and then it would continue through September of 2025; is that right?

**A.**   Yes, I do remember that.

Q.   All right.  And so explain to the jury generally why is notice relevant to the analysis that you've done?

**A.**   Generally my understanding for being involved in probably over 100 patent cases throughout my career is, generally speaking, a patent owner can't recover damages for a period any earlier than it first provides sufficient notice to the accused infringer of its alleged infringement.

Q.   Have you reviewed the testimony regarding notice that has been given in this case?

**A.**   I have, yes.

Q.   Okay.  From which witnesses did you see that testimony?

**A.**   My recollection is Mr. Rugh testified about the notice issue, and we also heard that testimony from the two Lepro witnesses that testified via video deposition that we saw on the screen last week.

Q.   And so what do you understand the dispute regarding notice to be?

A.   My understanding is there's a dispute between Signify and Lepro as to when first proper notice was given to Lepro regarding its alleged infringement of the patents.

Q.   So let's talk about notice for the '604 patent.  I'm going to show you two tables from Mr. Schoettelkotte's report, and hopefully I can get them both on the screen at the same time.  Well, we'll have to slide them around a little bit, but do you recognize these -- these tables from Mr. Schoettelkotte's report?

A.   Yes.  This is part of one of the exhibits included with Mr. Schoettelkotte's expert report.

Q.   And so we're looking at what is called Exhibit 7.3 to Mr. Schoettelkotte's report.  And if you look on the top, do you see the '604 patent royalty base (indicating)?

A.   Yes.  And just for clarification, this is Exhibit 7.3 from his supplemental expert report.

Q.   Thank you for that clarification.  I appreciate that.

So if we look on this -- these two demonstratives from Mr. Schoettelkotte's report, can you read the number in the bottom right corner, or do I need to zoom in a little bit?

A.   That number is $2,829,715.

Q.   And so if we go back to the demonstrative showing Mr. Schoettelkotte's calculation, if we look for the '604

patent, the royalty base, does that number match up?

A.    It does, yes.

Q.    Okay.  Based on the evidence that you have seen, what is the first date that Signify claims it gave notice to Lepro of the alleged infringement?

A.    For the '604 patent?

Q.    For the '604.  Thank you.  Yes.

A.    My understanding is that was in June of 2017.

Q.    If it is determined that that notice is sufficient, would there need to be any correction to this royalty base?

A.    No, there wouldn't.

Q.    Why not?

A.    Because Mr. Schoettelkotte begins his calculation of the royalty base for the '604 patent beginning in 2017.

Q.    If it is determined that the 2017 notice is not sufficient, what is the next date on which Signify claims to have given notice to Lepro of the alleged infringement?

A.    I understand that to be in April of 2021.

Q.    So if it is determined that the April 2021 notice is the first notice to Lepro, what adjustments would need to be made to this royalty base for the '604?

A.    My understanding is that any sales that occurred prior to April 2024 would need to be removed out of Mr. Schoettelkotte's royalty base for the '604 patent.

Q.    So this demonstrative from Mr. Schoettelkotte's report

shows sales -- net sales from 2017, '18 -- all the way through 2025.  So if you can direct me, which -- which sales would I need to remove?

**A.**  So you'd remove the net sales for 2017, 2018, 2019, and 2020.

Q.  Okay.

**MS. HOUSINGER:**  And, Your Honor, if I might be able to approach and give my witness a calculator?  I know he's a great accountant, but I don't want him to have to do mental math.

**THE COURT:**  You may.

**MS. HOUSINGER:**  Thank you.

**BY MS. HOUSINGER:**

Q.  So if we remove the sales from 2017 through 2020 for the '604 patent, what would be the new royalty base?

**A.**  As I do the math, I will try to explain what numbers I'm adding together --

Q.  Sure.  And if you --

**A.**  -- so it makes a little sense.

Q.  Sure.  And if you need me to slide things around --

**A.**  Oh, sure.  So you would first start with the net sale -- total net sales under the 2021 column.  So you would start with 576,791, and you would add to that net sales from 2022, which is 832,405.  And then you would add total 2023 net sales, which is 673,358.  And then you would add 2024 net

sales of 122,974.  And finally, you would add 2025 net sales of 10,166.

Q.   And so what's our total?

A.   That grand total is $2,215,694.

Q.   And, actually, maybe I'll update it here on this original demonstrative for the '604.  Is that correct?

A.   That's correct.

THE COURT:  Can you identify for the record what number you have swapped out?  Because --

MS. HOUSINGER:  Yes.

THE COURT:  -- all the record will show is, "is that correct?"

MS. HOUSINGER:  Thank you, Your Honor, for the reminder.

BY MS. HOUSINGER:

Q.   So for the royalty base for the '604 patent, we have updated that number to be $2,215,694; is that right, Mr. Duski?

A.   Yes.  And just to be clear, that's assuming that the jury finds that the first notice of alleged infringement to Lepro was given in April of 2021.  So I just want to make that distinction.

Q.   Thank you.

Let's also look for the '336 patent.

A.   Actually, Counselor, if I just may add one more point to

that last calculation?

Q.   Sure.

A.   I testified that my understanding is that notice was in April -- or potential notice was in April of 2021.  So my understanding is only sales beginning in April 2021 onward would be included in the royalty base.

     What I calculated just moments ago began with the total sales of 2021.  So, in other words, the actual sales are likely slightly less.  But Mr. Schoettelkotte, in his exhibit, didn't break down those accused sales by month.  So I conservatively included all of 2021 sales, recognizing that that number would be slightly overstated.

Q.   So to be conservative, you included sales from January, February, March of 2021 even though the notice -- excuse me -- occurred in April; is that correct?

A.   That's correct.

Q.   Okay.  All right.  Now let's look at the '336 patent.  Do you also recognize this demonstrative as Exhibit 7.1 to Mr. Schoettelkotte's supplemental report?

A.   I do, yes.

Q.   So looking at Mr. Shuttle's [sic] calculation for the royalty base for the '336, why does it stop in 2020?

A.   Well, my understanding is the '336 patent expired in November of 2020.

Q.   And what is the first date on which Signify claims to

have provided notice of infringement to the -- for the '336 patent to Lepro?

A.   My understanding was that was in November of 2018.

Q.   So based on your understanding of the notices provided to Lepro in this case, were any additional notices provided on the '336 patent before it expired?

A.   Not that I'm aware of, no.

Q.   If it is determined that the 2018 notice allegedly providing notice of the -- the infringement of '336 patent is not sufficient, what happens to this royalty base?

A.   The royalty base would go down to zero.

Q.   Why?

A.   Because I understand you can't -- or Signify in this matter can't recover damages prior to giving Lepro proper notice, and you also can't recover damages after a patent expires.  So that would be my rationale or my understanding for why no damages would be due for alleged infringement of the '336 patent under that scenario as you described it.

Q.   So I would just scratch through this entire calculation; is that right?

A.   Yes, the one contained on Exhibit 7.1 of Mr. Schoettelkotte's supplemental report.

Q.   So then if we go back to our original slide that has the royalty base for each asserted patent, if we look for the '336, this number becomes zero; is that correct?

**A.**   Yes.  But for the avoidance of doubt, that's in the very specific scenario that you just described, to the extent that notice was not provided -- or proper notice wasn't provided in November of 2018.

Q.   Do you agree with Mr. Schoettelkotte that in a hypothetical negotiation the parties are dealing with their cards dealt face up?

**A.**   Yes, I do agree with Mr. Schoettelkotte on that point.

Q.   As an expert in the field of economic damages, what assumptions do you make regarding the type of data that the parties would have on these face-up cards?

**A.**   It would include information from both parties, everything that they would need and that's available to be able to help calculate a reasonable royalty for the accused infringer's alleged infringement.

Q.   So, for example, in this case, what would the parties have been aware of?

**A.**   So among other things, they would have been aware of Signify's EnabLED licensing program that we heard Mr. Rugh discuss extensively during his testimony; the fact that there are 1,700 real-world licensees that have licensed not only the six patents here but thousands of others; they would be aware of the 3 percent, 4 percent, and 5 percent standard rates that are charged under the EnabLED program; they would be aware of Lepro's financial information of its accused products so they

would know all of their net sales; they would know all the profitability that Lepro has made on those products.

You know, so those are examples that come to mind, but of course there would be additional information that would be available to the parties.

Q.   Did you hear Mr. Schoettelkotte agree on cross that Lepro would have had an awareness of what others who took licenses from Signify did?

A.   Yes, I do recall that.

Q.   And so remind the jury of how Mr. Schoettelkotte's opinions -- or, excuse me, remind the jury of Mr. Schoettelkotte's opinions as to how the information about the EnabLED program would impact Signify's expectations walking into the hypothetical negotiation?

A.   So as we talked about just a little while ago, based on my review of Mr. Schoettelkotte's report, he believed that, you know, after discussing these agreements from the EnabLED program or a subset of them in his report -- he didn't discuss all 1,700 of them, of course.  In discussing the EnabLED program in general, he stated that the -- that the representatives of Signify would walk into the hypothetical negotiation seeking royalty rates for the six patents in this case that are commensurate with, if not greater than, those 3, 4, and 5 percent rates from the EnabLED program.

Q.   Did Mr. Schoettelkotte perform a similar analysis for

*David Duski - Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

Lepro's expectations walking into the hypothetical negotiation?

A. I don't recall that stated in his expert report, no.

Q. No. So let's talk about Mr. Schoettelkotte's ultimate conclusion.

He -- Mr. Schoettelkotte gave some suggested royalty rates in this case; is that right?

A. He did, yes.

Q. Did you investigate the appropriateness of those suggested rates?

A. Some of them, yes.

Q. For which?

A. I investigated his rates that he assigned to the '320 patent, the '604 patent, and the '336 patent.

Q. Why just those three?

A. Well, those three patents or the damages he's claiming from those three patents represent 99.9 percent of Signify's total damages claim.

Q. Wouldn't be economical for you to look into it, the others?

A. No. It likely would cost Lepro more in professional fees from my firm to investigate those rates than the total damages that Signify are seeking for those three other patents.

Q. What is your opinion on Mr. Schoettelkotte's proposed rates?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

**A.**   Again, I believe his ultimate conclusion is flawed and not the likely outcome under the hypothetical negotiation that we both agree would have taken place between the parties to this lawsuit.

**Q.**   And explain to the jury why.

**A.**   Well, in essence, Mr. Schoettelkotte is proposing that the defendant Lepro in this case should pay more in total royalties for licenses to just the six patents in this case compared to the rates that 1,700 other licensees and presumed competitors of Lepro have paid for not only the six patents in this case but for approximately 4,000 other patents.

**Q.**   Okay.  So let's -- just a little kind of comparison between Mr. Schoettelkotte's rates and the EnabLED portfolio rates.

So, under the EnabLED program, how many patents are licensed approximately?

**A.**   Currently my understanding is it's around 4,600 patents.

**Q.**   And for Mr. Schoettelkotte's proposed rates, how many patents would be licensed?

**A.**   Just the six patents in this case.

**Q.**   And for the EnabLED portfolio, what is the maximum rate that would be charged for a royalty rate?

**A.**   Again, it depends on the type of bulb or luminaire, but the maximum rate in its EnabLED program is 5 percent.

**Q.**   And what is the highest rate Mr. Schoettelkotte proposes

in this case?

A.   For any one of the six patents, it's 6.5 percent.

Q.   If an EnabLED licensee uses the technology from multiple patents, what is the maximum rate that an EnabLED licensee would pay?

A.   My understanding from Mr. Rugh's testimony is that would be at most 5 percent.

Q.   And why is that?

A.   My recollection from Mr. Rugh's testimony -- testimony is that that's again to prevent what's commonly referred to as royalty stacking.

Q.   And explain to the jury what is royalty stacking.

A.   So royalty stacking simply put is the total royalties that you need to pay, whether it be to one patent owner or multiple patent owners, in order to manufacture and sell the product.

Q.   Does Mr. Schoettelkotte's hypothetical license allow for royalty stacking?

A.   It does.  And not only does it allow for it, it actually does stack royalties.

Q.   Okay.  Explain to the jury why Mr. Schoettelkotte's proposed royalty -- or allows for the stacking of royalties.

A.   Sure.  So, for example, you know, I understand that all of the accused products that Lepro sells that's accused of the '577 patent are also accused of infringing the '604 patent.

*David Duski - Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

So under Mr. Schoettelkotte's proposed royalty approach, is he's saying Lepro, okay, we need you to pay a 1percent royalty for access to the '577 patent. And, okay, now that you use the technology of the '604 patent, you need -- you need to pay an additional 6 percent for access to that technology in your products.

So Mr. Schoettelkotte is suggesting that Lepro should pay a total of 7 percent of its net sales for the right to be able to use those two patents.

Q. So just make sure I have this straight. If -- if a product uses the '577 and the '604, the rate that Mr. Schoettelkotte is suggesting that would be paid is 7 percent; is that right?

A. The implied total royalty burden, yes, or royalties that would have to be paid, yes, is 7 percent.

Q. And how much would an EnabLED licensee who was also using the '604 and '577 have to pay?

A. In that scenario my understanding is it would be 3 percent, and the reason it would be 3 percent is I understand that the accused products of -- or the products accused of infringing those patents are single-color luminaires. And under the EnabLED licensing program, that's the rate that they charge its licensees in the real world, all 1,700 of them, for a single-color luminaires.

Q. So an EnabLED licensee using the same patents pays

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*Page 161*

*David Duski - Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

3 percent as Lepro would have to pay 7 percent?

A.    That's correct, yes.

Q.    What would be the impact of Lepro having to pay a higher royalty than all the other licensees?

A.    It would put them in a competitive disadvantage in the marketplace.

Q.    Why is that?

A.    Because Lepro would be reluctant to pay more for rights to just the six patents in this case than approximately 1,700 of its competitors and real-world licensees under the EnabLED program pay for not only access to these six patents but approximately 4,000 other patents.  So, in other words, they would only be willing to pay a fraction of that amount.

Q.    As an expert qualified in the field of intellectual property damages, what is your understanding regarding the type of royalty that must be awarded in a patent infringement lawsuit?

A.    We heard Mr. Schoettelkotte testify to this -- and I agree with him -- that it should reflect use of the invention made by the infringer.

Q.    Is that what we call a reasonable royalty?

A.    Yes, it is.

Q.    How, if at all, is a reasonable royalty designed to punish the accused infringer?

A.    My understanding is it's not intended to punish the

infringer.

Q.   A reasonable royalty is not intended to punish an accused infringer?

A.   That's correct.

Q.   Did you hear Mr. Schoettelkotte's testimony that the anger or frustration toward Lepro that Signify felt acts as a bridge for how you get to the hypothetical negotiation?

A.   I do remember that, yes.

Q.   In your experience, does the anger or frustration a party feels in litigation have any relevance to the economic analysis?

A.   As part of the hypothetical negotiation, no.

Q.   Why not?

A.   Because the hypothetical negotiation -- and I agree with Mr. Schoettelkotte on this -- assumes both a willing licensee and a willing licensor.  So the parties have to reach an agreement.  They can't walk away and say, you know, we have too many differences, we just -- let's agree to disagree and walk away.

And it's also key -- important to keep in mind the timing of the hypothetical negotiation.  In this case, the earliest hypothetical negotiation would have taken place in 2016, and I agree with Mr. Schoettelkotte on that point.  And it takes place on the eve of first alleged infringement.  In other words, at that time Lepro hasn't done anything wrong.

*David Duski - Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

They haven't allegedly infringed any patents.  Therefore, there wouldn't even be any potential anger presumably between the parties because Signify hadn't even sent its first alleged notice of infringement because that occurred, as I understand it, in 2017.

Q.   All right.  Let's wrap this up.  Just a couple last few questions.

You testified that the hypothetical license is only to six patents, but Signify has over 4,000 patents in its LED space; is that right?

A.   Yes.

Q.   If the license in this case covers only six patents, what options would Signify have regarding other patents if it believed Lepro was infringing?

A.   So my understanding is, if Signify believes that one or more of its additional 4,000 patents also read upon one or more of Lepro's products -- LED products, my understanding is they could sue Lepro again for infringement if they chose to.

Q.   And in that case, assuming maybe the same products are accused, could those royalties stack?

A.   So to the extent that Signify brings claims of patent infringement for different patents that it's -- that it owns -- and just for clarity, so patents that aren't the six asserted in the case -- but the same accused products in this case allegedly infringe those other patents, I understand that

Signify could seek an additional reasonable royalty for that separate infringement.

Q. Based on the evidence you've heard presented in this case, is it a concern for Lepro that Signify may come back again and again?

A. It is. I believe we heard Mr. Huang testify, who's a represent from Lepro, to that last week.

Q. All right. So just one last question. Based on all the information that you've shared with the jury today and all the evidence and testimony you've -- you've heard, from an economic perspective, tell the jury whether it would be reasonable for Lepro to agree to Mr. Schoettelkotte's proposed hypothetical license?

A. I believe Mr. Schoettelkotte's proposed reasonable royalty conclusion is flawed and not the outcome of the negotiation.

I believe that what makes it inherently unreasonable is that he's asking Lepro in this case to pay more in total royalty damages for a license to six patents compared to the EnabLED program in which you have 1,700 other real-world licensees and presumably competitors of Lepro that pay lower amounts for access to more patents. So, in other words, it appears Mr. Schoettelkotte is saying that Lepro should, in essence, pay more for less.

Q. Thank you, Mr. Duski.

*David Duski - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

MS. HOUSINGER:  Pass the witness.

THE COURT:  Cross-examination, Ms. Clayton?

MS. CLAYTON:  Yes, Your Honor.  One moment here to get organized and may I approach the witness with a binder, Your Honor, of his report and deposition transcript?

THE COURT:  You may.

THE WITNESS:  Thank you.

**CROSS-EXAMINATION**

BY MS. CLAYTON:

Q.   Good afternoon, Mr. Duski.  Good to see you.

A.   Good afternoon.  Good to be seen.

Q.   Now, I'm hoping we can start with some areas where hopefully we agree and discuss at a high level to know where I -- where you sit on the patent system and compensation for infringement.  Does that sound okay?

A.   Okay.  Yes.

Q.   Okay.  And so I presume that you agree that the patent system is important to protect businesses and the new technology that they invent.  Would you agree with that, sir?

A.   Generally, yes, I would agree.

Q.   And you agree that the patent system protects patent owners because it prevents others from using their patented technology without permission for about 20 years; is that right?

A.   Yes, that's true.  And the only caveat being the time

*David Duski - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

frame may differ if you're talking utility patents versus design patents.  But yes.

Q.   But you agree that the patent system does protect patent owners and their inventions, that's what it's designed to do; correct, sir?

A.   Yes.

Q.   Okay.  And patents are beneficial because they actually teach the public how to make and use these inventions; right, sir?

A.   Yes.  They provide disclosure.  Anybody could go and review any issued patent as I understand it.

Q.   And that's the trade-off between getting the patent for 20 years; right?  The patent owner gets the exclusive right to use it for 20 years, but then after that, it's known and free to the rest of the world; right, sir?

A.   I'm not providing any legal opinions.  My understanding of patent rights is it -- it gives the patent owner the right to exclude others from practicing its invention.  I don't necessarily know if it allows inherently the patent owner to practice its own inventions because perhaps the patent owner may need access to additional patents in order to practice the invention.

Q.   And I wasn't trying to trip you up, sir.  I think my question is a little bit more simple.  After the patent expires, that technology is free for the world to use; right?

**A.**    That -- that's my understanding, so long as they don't need access to other patents to be able --

Q.    Okay.  And the patent owner has taught the world how to make and use those with the invention that's in their patent; right, sir?

**A.**    Yes, they've disclosed those to the public.

Q.    And we agree that patents help with innovation; would you agree with that, sir?

**A.**    Yes, I would agree with that.

Q.    Okay.  Now, let's talk about some of your opinions in this case.  I think you said you were -- you were hired to review and respond to Mr. Schoettelkotte's damages opinions; is that what I heard you say, sir?

**A.**    Yes.

Q.    Okay.  And your team spent several hundred hours engaging in that effort, you and your team members; right, sir?

**A.**    Yes.  I think I testified at my -- at my deposition that I maybe had spent around 70 hours and my colleagues probably spent a couple hundred hours each.  So that seems consistent.

Q.    Okay.  And in that time you never had any conversations with the defendants in this case; correct, sir?

**A.**    That's correct.

Q.    And you also didn't do your own independent analysis about the value that the technology of each patent brings to the table like Mr. Schoettelkotte did; correct, sir?

**A.**   Correct.  I didn't provide an alternative cost or income approach as Mr. Schoettelkotte had done for each of the patents.

**Q.**   And Mr. Schoettelkotte did that by working with many different technical experts in this case.  You would agree; right, sir?

**A.**   Yes, that was his testimony.

**Q.**   And you didn't work with Dr. Curran to do the same thing, did you, sir?

**A.**   That's correct.

**Q.**   And so you talked about notice a little bit in your direct testimony.  Do you recall that, sir?

**A.**   I do, yes.

**Q.**   And I just want to make sure, you are not offering any opinions on what the correct notice date is; right?

**A.**   That's correct.  I'm simply performing some math under different assumptions.

**Q.**   Okay.  Now, if I heard you correctly, I think that there are some areas where you and Mr. Schoettelkotte agree.  Would you say that there's some areas where you agree?

**A.**   Yes, absolutely.

**Q.**   And you agree that the *Georgia-Pacific* factors used by Mr. Schoettelkotte are a well accepted methodology; is that fair?

**A.**   Yes.

*David Duski - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

Q.   Okay.  And you agree that using the hypothetical negotiation is correct because you did that yourself, too; right, sir?

A.   Yes.  The hypothetical negotiation is *Georgia-Pacific* factor 15.

Q.   Okay.  And you agree that the income approach that Mr. Schoettelkotte used is a well-accepted method in your field; right, sir?

A.   Yes.

Q.   And you agree that the cost approach used by Mr. Schoettelkotte is also a well-accepted methodology in your field; right, sir?

A.   Absolutely, so long as it's performed correctly.

Q.   Okay.  And we saw the --

          MS. CLAYTON:  Actually, Mr. Cliff, if we could bring up Mr. Duski's slide three from earlier.

BY MS. CLAYTON:

Q.   And the royalty base that we see there from Mr. Schoettelkotte, that $6,865,415, you don't disagree that he did the math to arrive at that number correctly; right, sir?

A.   I'm sorry.  Could you say that one more time?

Q.   Sure.  I'm just making sure, you don't disagree that his math to get that to $6.8 million number was right.  He added the sales up correctly; right, sir?

**A.** Yes. I don't disagree with Mr. Schoettelkotte's math that he used to arrive at that approximate $6.9 million number.

Q. Okay. And you don't disagree that he correctly multiplied the royalty rate times that to get to his damages numbers; right, sir?

**A.** Correct. I don't disagree with the math on this particular demonstrative.

Q. Okay. And you -- I didn't hear you offer any response to the rates that Mr. Schoettelkotte used here for the '336, '577, '399 or '138 patents; correct, sir? You didn't offer any testimony on those rates today; is that fair?

**A.** No. My recollection is that I didn't disagree with Mr. Schoettelkotte's rates for the '577 and the one -- or, excuse me, '339 and '138 patents. I did discuss the '336.

Q. Okay. But you would agree to the '336 royalty rate that Mr. Schoettelkotte uses, that's within the range of the EnabLED program; right, sir?

**A.** Yes, for access to four -- 4,000 patents approximately.

Q. Okay. Now, sir, in your direct testimony you testified that the patents in the EnabLED program are economically comparable and technically comparable; right, sir? That's what you told us?

**A.** Well, I determined in my opinion that they are economically comparable. Technical comparability, I testified

*David Duski - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

that was my understanding, and I recall from Mr. Schoettelkotte's testimony last week that he also agreed to technical comparability if for no other reason the 1,700 approximate real-world licenses contained licenses to at least the six patents in this case.

Q.   Well, sir, I guess my point is, in your expert report there is no opinion on the technical comparability of the EnabLED program to the hypothetical negotiation here; right, sir?

A.   I'm not sure if those specific words were used.  What I had described extensively is that all of these 1,700 real-world licenses include licenses to at least the six patents in this case.

Q.   You testified that you're not a technical expert; correct, sir?

A.   That's correct.

Q.   And mister -- Dr. Curran gave no testimony on the technical comparability of the patents in this lawsuit as compared to the EnabLED program; correct, sir?  He did not give any such testimony?

A.   I don't recall such testimony, no.

Q.   And does it surprise you, sir, that in your expert report the word "comparable" appears nowhere?  Whether it's economically or technically comparable, the word "comparable" appears nowhere in your expert report.  Does that surprise

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*David Duski - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

you, sir?

**A.**   I don't know one way or the other without having an electronic copy of my report in front of me and searching for that term.

Q.   Well, I will represent to you that I did a control F right before I came up here, sir, and that word appeared nowhere.  And that's because your report doesn't include any opinions on technical comparability, does it, sir?

**A.**   Again, I'm not offering a technical opinion on technical comparability.  I'm responding to Mr. Schoettelkotte's report.

Q.   And let's talk about economic comparability.  You actually -- and, again, your expert report doesn't talk about economic comparability either; right?  The word comparability never appears anywhere in your reporter, does it, sir?

**A.**   I accept your representation that that word may not exist in my report, but I do discuss differences that Mr. Schoettelkotte identifies in his report between the hypothetical licenses and the 1,700 real-world licenses, and I respond to those differences, which are differences that relate to economic comparability.

Q.   Well, sir, you agree that there are different economic considerations between the EnabLED real-world licenses and the hypothetical licenses which would have occurred in this matter, you agree with that, sir; right?

**A.**   Yes, I agree that there's differences, but that by

definition doesn't mean that economic comparability cannot be established.  You just have to account for them properly.

Q.   Sir, at your deposition do you recall being asked if you can identify a single EnabLED license that is technically and economically comparable to the hypothetical license that you discuss in your report?  Do you recall that question?

A.   Yes, I recall the question, and I'm pretty sure I recall my answer.

Q.   And your answer was that -- you didn't identify a specific license, did you, sir?

A.   Well, I would stand by exactly what I said in -- which I don't think was those words as you put it.

Q.   Do you recall in response to that answer you said that: While I understand that of the 1,600 licenses that have been produced includes at least licenses to the asserted patents in this case, there are different economic considerations between those real-world licenses and the hypothetical licenses which would have occurred in this matter, and I've tried to discuss those differences in my report.  Do you recall that, sir?

A.   Absolutely, yes.

Q.   Now, in your direct testimony you talked about the fact that you believe Mr. Schoettelkotte did not take into account the value that other patents in the EnabLED program might bring; right, sir?  Do you recall that?  Is that a fair characterization of what you said in your direct?

*David Duski - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

A.   I'll stand by what I said.  My recollection is that --

Q.   Yeah.

A.   -- I believe his opinions are flawed because he's inherently saying that Lepro should pay more for access to the six patents in this case than 1,700 real-world licenses have paid for not only those six patents but thousands of others.

Q.   Okay.  And for the other patents that are part of the EnabLED program, sir, you have not analyzed whether Lepro infringes any of those other patents; correct, sir?

A.   That's true.

Q.   And you haven't been able to ascribe any value to any of those patents; right?

A.   That's true, yes.  I'm not a technical expert.

Q.   And let's switch topics just a little bit, Mr. Duski.

      I think I heard you say that Lepro is -- you presume that they are a direct competitor of some of the EnabLED licensees; right?

A.   Yes.  I believe Mr. Schoettelkotte testified to that as well.

Q.   And you have no reason to disagree with that, do you, sir?

A.   That Lepro is a competitor of some of the other real-world licensees?

Q.   Yes, sir.

A.   Yes.  I don't have any reason to dispute that.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*Page 175*

Q.   Okay.  And you agree that, if one company is paying no royalties for a patent and another company pays royalties, then the party who is not paying gets an advantage; right, sir?

A.   Only to the extent that they're found to have practice or are practicing those patents, I would agree with you, yes.

Q.   And so you understand that we are here today, sir, because we say that Lepro is, indeed, practicing six patents; right, sir?

A.   Yes, I understand that.

Q.   Okay.  Now, if I understood your testimony, you believe that at least for some of the patents the EnabLED program would act as a cap on the royalty rate; is that fair?

A.   I think, based on the totality of the evidence and my review and understanding of the EnabLED program, yes, I think that Lepro would be reluctant to pay more for access to an individual patent than the real-world licensees, those 1,700, would pay for not only that particular patent but for access to thousands of other patents.

Q.   So you think Mr. Schoettelkotte's reached his stop at the 5 percent level or the 3 percent level depending on the patent; is that your testimony?

A.   Well, I believe that the rates from the EnabLED program provide relative benchmarks and ceilings, if you will, in this particular case, yes.

David Duski - Cross
2:22-cv-02095-JAD-EJY - February 9, 2026

Q.   Okay.  And if I heard you earlier, when we're here in the hypothetical negotiation, we have to assume that the patents are valid and infringed; right, sir?  That's an assumption that we must make.  Do I have that right?

A.   Yes, you do.

Q.   Okay.  And you agree that, all else being equal, an -- the infringing party, in that hypothetical negotiation, would pay more in a situation where they know the patent is valid and infringed as opposed to a situation where that isn't the case; right, sir?

A.   Yes.  If you analyze that fact or that hypothetical in a vacuum, I would agree with you.  However, as I explained in my expert report, that the uncertainty regarding validity and infringement of a patent varies as you license more patents.

     So, for example, the real-world 1,700 licensees are license -- are licensing approximately 4,600 patents.  So as you begin to license more patents, the uncertainty that there's not a single valid claim of one of those patents that your products practices goes down, and then I think that's an important distinction in this case.

     THE COURT:  Ms. Clayton, how much longer do you think you have here?

     MS. CLAYTON:  Five minutes, Your Honor.

     THE COURT:  All right.  I'll let you keep going.

     MS. CLAYTON:  Okay.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

**BY MS. CLAYTON:**

Q.   And let me ask my question again.  I would love you to just focus on the question that I'm asking.

Would you agree that, all else equal, if the two parties to the hypothetical negotiation assume that a patent that they're negotiating over is valid and infringed, it would increase the rate that the parties are looking at?

A.   When compared to a license where there is no such certainty of validity and infringement, yes.

Q.   And with the EnabLED licensees, there is no certainty regarding infringement and validity in the EnabLED program; right, sir?

A.   Well, my understanding is that isn't explicitly written in the agreements I reviewed.  But as I just explained to the jury, the likelihood of -- or the potential that a single patent won't be found -- or the parties don't think that there's a single valid claim of a patent when you're licensing 4,000 patents, that reduces that uncertainty.

Q.   And, sir, you agree that you've seen no evidence in this case of an explicit acknowledgment by the EnabLED licensees that the patents are valid and infringed; correct, sir?

A.   That's correct.

MS. CLAYTON:  I pass the witness, Your Honor.

THE COURT:  Thank you.

MS. HOUSINGER:  Nothing further, Your Honor.

*David Duski - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

THE COURT:  All right.  May I excuse this witness?

MS. HOUSINGER:  Yes.

THE COURT:  Fantastic.  Thank you, sir.  You can --

THE WITNESS:  Should I take the binder, do you know?

THE COURT:  Sure.  You can hand it back to counsel.  And you are excused.  Thank you.  Watch your step.

That brings us to a perfect time for an afternoon break.  We'll take about ten minutes.  It's 1:40.  We'll see you back here at 1:50.  Same rules still apply.  See you around 1:50.

*(Jury out at 1:39 p.m.)*

THE COURT:  All right.  What do we have after this?

MR. BROWN:  We'll rest.

THE COURT:  Okay.  So when they come back, you can rest.  And then we'll hear from?

MS. CLAYTON:  We will hear from Mr. Krames, but we will have a motion -- a Rule 50 motion as well, Your Honor.  But if we -- if you want to take that up at the end of the day, we could certainly do that.

THE COURT:  Okay.  Yes.  I would prefer to do that and work through with the jury.

So are you going to renew your motion at the end of the close of your case?  Do that right now, and you will reserve your --

MR. BROWN:  I renew my motion again, Your Honor, for

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*Page 179*

all the bases I've already stated on the record.

THE COURT:  Okay.  Anything else to add to the bases?

MR. BROWN:  Your Honor, at this point we will add the motion that I started down before on invalidity based on the Stimac reference in the '604 patent, Your Honor.

THE COURT:  Okay.  And then back to the plaintiffs. So assume that they have rested for purposes -- so you would make a motion, is that what you're saying, you would make a motion?

MR. SWAIN:  Yes, we would.

THE COURT:  Okay.  And I will -- so I'll let you reserve that.  We will act for the purposes of the record as if both sides have made timely motions.  I'll let you argue them after we finish with the jury today so that we don't interrupt the flow that we have with the jury.

MR. SWAIN:  Thank you, Your Honor.  We have written motions on the way on this front, too.

THE COURT:  Oh, how fantastic.

MS. CLAYTON:  I apologize, Your Honor.  It is a recommendation that has been made to all of us by our insuring carrier.

MR. SWAIN:  So would you prefer for the sake of brevity that we just do this all on the papers?

THE COURT:  So you're filing one?

MR. SWAIN:  Yes.

*David Duski - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

THE COURT:  That's fine.  Then you can -- you don't -- I don't have to hear your argument later.  We can just -- on the papers.  I assume you don't have one that is being filed?

MR. BROWN:  That is correct, Your Honor.

THE COURT:  So I'll have to hear any additional argument you would make after.

So let's go ahead and take the break.  We'll come back at 1:50 at which point you will performatively rest, and we'll hear rebuttal case.

Do we think we're going to finish with witnesses today?

MR. SWAIN:  (Indicating.)

THE COURT:  Fingers crossed?  Okay.

MR. SWAIN:  Quick question for Your Honor.  Is it -- we'll probably file that Rule 50 motion tonight.

THE COURT:  Right.

MR. SWAIN:  Is that -- is that timely enough?

THE COURT:  Sure.

MR. SWAIN:  Thank you.

THE COURT:  We'll do that.

All right.  See you at 1:50.

*(Recess at 1:42 p.m., until 1:54 p.m.)*

THE COURT:  Are we ready to go back on and bring the jury back in?

*David Duski - Cross*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

MR. FERNANDO:  Yes, Your Honor.  Plaintiffs are ready.

THE COURT:  Okay.  Great.  We'll bring them back in.

(Pause in proceedings.)

THE COURT:  Let's try to get through everybody tonight, and then we will do the charge conference.  And thankfully it looks like you guys did a lot of work, and we really just have four disputed instructions to talk about. But we'll figure that out after we finish with the witnesses tonight.

(Pause in proceedings.)

COURTROOM ADMINISTRATOR:  All rise.

(Jury in at 1:55 p.m.)

THE COURT:  All right.  All seven of our jurors have returned.

Before we move on to our next witness, do we have some record to make by the defense?

MR. BROWN:  Yes, Your Honor.  The defense --

THE COURT:  You can have a seat.  I'm so sorry. Please sit.

Mr. Brown.

MR. BROWN:  Yes, Your Honor.  The defense rests.

THE COURT:  Thank you very much.

So then we head back over to the plaintiffs for rebuttal case.  And who is your witness?

MR. FERNANDO: Your Honor, plaintiffs would call Dr. Mike Krames to the stand.

THE COURT: All right. Mister -- mister -- doctor; right?

MR. FERNANDO: Doctor.

THE COURT: Dr. Krames, head on back up. Welcome. And you are still under oath. Do you understand that?

THE WITNESS: Yes.

THE COURT: All right. Fantastic. Have a seat.

**DIRECT EXAMINATION**

BY MR. FERNANDO:

Q. Good afternoon, Dr. Krames.

A. Good afternoon.

Q. And let me apologize for the "mister."

A. No problem.

THE COURT: Oh. It was my fault. It's okay. Go ahead.

BY MR. FERNANDO:

Q. Can you please reintroduce yourself to the jury, Dr. Krames.

A. Oh, sure. My name is Mike Krames. You may remember me from last week. It's good to see you again. Good afternoon.

Q. And which patent did you talk about last week, Dr. Krames?

A. I talked a lot about the '604 patent or the pressed

sandwich patent, and I'll talk more about that today and answer more questions about that today.

Q.    And just to help the jury remember a little bit, which patent was that?

A.    This is the one by George Matheson that talks about the detachable lighting architecture where you have a housing element -- excuse me -- and a heat dissipation element, and these are coupled together in a detachable way with the LED substrate enclosed in between.

Q.    Now, were you here earlier today and back on Friday when Lepro's expert, Dr. Curran, was on the stand talking about how the '604 patent is invalid based on the Stimac prior art reference?

A.    Yes, I was.

Q.    Now, let's take a time-out here.  Can you please explain in plain English what Dr. Curran meant when he was saying that the '604 patent is invalid?

A.    Yes.  He was saying that there's than an inventor by the name of Stimac that invented a patent that taught all the aspects of the '604 patent before the '604 patent was issued or --

Q.    And -- and if a patent is invalid, what does that mean?

A.    If it's invalid, it means it's -- it will be taken away, its rights will be taken away.

Q.    Taken away?

**A.**   Yeah.

**Q.**   That's a very serious issue.  Well, if a patent is going to be taken away, if that property is going to be taken away, what's your understanding of how much evidence Dr. Curran and Lepro are supposed to show?

**A.**   You may remember the movie that we watched last week on Monday about the patent process and the fact that, if a patent is going to be made invalid, which is the equivalent of property being taken away from you, that it needs to be clear and convincing evidence, which is a fairly high bar.

**Q.**   And based on your understanding, how high?

**A.**   Well, my understanding is that's just below what would be called beyond a reasonable doubt.

**Q.**   And you just referenced the video from last week.  Based on your understanding of that video, why is the standard so high for Lepro to try to invalidate or take away one of Signify's patents?

**A.**   The -- this was also in the video.  The process to get a patent is a quite involved one.  We have institutions in the United States, like the Patent and Trademark Office.  They have professional patent examiners, and they review the prior art, they review the would-be invention, they listen to arguments from the inventors.  It's a very long process.  It can take two to three years before you get granted a patent.  So it's -- it's kind of a big deal.  If you're going to

second-guess that process, you have to have a really good reason. And that's why it's clear and convincing evidence is required.

Q. Well, you heard Dr. Curran's testimony. Did you hear clear and convincing evidence that Mr. Stimac invented the same thing as the '604 patent in claims 1 and 12?

A. No.

Q. Did Mr. Stimac invent something that would have made those claims obvious?

A. No.

Q. Why not?

A. There is -- basically they're two completely different inventions. The Stimac invention is around a screw-in light bulb with a zoomable lens, and we'll get into it a little bit more later. It's very different than the detachable modular architecture for many light fixtures.

Q. Were Mr. Stimac and the inventors of the '604 patent even trying to solve the same problems?

A. No.

Q. Okay. What about Stimac, what problem was Stimac working on?

A. So primarily Stimac was interested -- because it was a screw-in light socket -- you have a lot of different kind of light sockets depending on the voltage. You know, low voltage, high voltage, Europe, and the U.S.

And his idea was to have a single optical module, or a front end, but then have a lot of different sockets on the back that you could change so that you could just have one optical module.  But then, if you were selling your product in Europe, you might have one base or, you know, in the U.S., a different base, or low voltage, another base.

So it was all around modularity about the electronics in the socket end, again, for a screw-in light bulb.

Q.   Well, what about Mr. Matheson, the inventor of the '604 patent?  I think you talked about it last week, but what problem was he working on?

**A.**   So this is completely different.  His focus was on integrated lighting fixtures that are wired in, so there's no socket.  And his focus was on the modularity to be able to have a high-volume manufacturing platform where you can have different housings, different kinds, different substrates, different heat sinks, all put together in a detachable way so that it's easy to rework them and manufacture and repair them if you need to.

Q.   So thank you, Dr. Krames.  That's very helpful.  But the law does require that we walk through the claim language of the patent and explain how it's different from the Stimac prior art reference.  So can we do that now?

**A.**   We can.

Q.   Thank you.  And we'll try to be efficient with everyone's

time on this.  But do you have a slide that compares the Stimac prior art reference with the claim language of the '604 patent?

A.   I do.

Q.   Okay.  If we can please turn to Exhibit 454, what's been marked as slide 27.  And there's a lot on here at once, so let's walk through this bit by bit.

So, Dr. Krames, what is shown on the left side of this slide?

A.   So the left-hand side is a figure from the Stimac reference.

Q.   And which figure is that?

A.   It's figure one.

Q.   And in addition to figure one, did you review the rest of the Stimac reference when you formed your opinions, too?

A.   Yes.

Q.   All right.  And what's on the right side of this slide?

A.   The right-hand side is the claim language of claim 1 of the '604 patent or the pressed sandwich patent.

Q.   Does that define the legal invention of this patent?

A.   Yes.

Q.   And did Stimac teach or make obvious -- excuse me.  Can you please read the blue language, the highlighted blue language first?

A.   Sure.  It's from claim element 1C.  It reads:  Fastening

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

means for detachably coupling the housing element to a heat dissipation element.

Q.   Did Mr. Stimac make obvious the blue highlighted language, the -- the detachable fastening means?

A.   No, he did not.

Q.   Okay.  Let's walk through that and talk about why that is.

So, in Stimac, what did Dr. Curran, Lepro's expert, point to as that detachable fastening means?

A.   So he pointed to what's colored in yellow at the left. It's a -- it's a retaining ring for this zoom lens thing on the right.  That's what that is.

Q.   And is that the part you've highlighted in yellow?

A.   Yes.

Q.   And can we call that part Number 36?  Because I see a little arrow at the top.

A.   We can.

Q.   Okay.  Now, is Dr. Curran right about this component, this part 36, being a detachable fastening means?

A.   I believe not.

Q.   Why not?

A.   Because this is a retaining ring for the lens element that Stimac describes in detail as being secured to the heat sink to hold the lens element as you zoom the lens in and out. So it has to be secured.  It also needs to be secured to the

lens assembly.

Q.   And do you have kind of an analogy to explain how the parts of Stimac move around each other?

A.   Yeah, you can -- the way I kind of think about it is with a -- if you link about a ChapStick or lipstick, you know, thing that you work, you know, you can push the ChapStick or lipstick up and out but -- and can retract it, but it doesn't break off; right?  It's not detachable.  It's meant to have limits to which it can go.  And Stimac even talks about the limits of travel of the zoom lens related to the clips on that yellow retaining ring.

Q.   So the structure in Stimac, it twists but does not detach; correct?

A.   It either twists or push but does not detach.

Q.   Okay.  Now, were you here earlier when Dr. Curran was -- was asked on the cross-exam about Stimac?

A.   Yes.

Q.   Did you hear Dr. Curran say that nothing in Stimac says that you could remove the housing that's in Stimac?

A.   I did hear that.

Q.   Did you hear Dr. Curran say that there's nothing in Stimac saying that you should remove that housing?

A.   That's right.  I heard that.

Q.   Do you guys agree on that?

A.   We do.

*Michael Krames - Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

Q.   Okay.  And so then is Stimac's part Number 36 a detachable fastening means?

A.   No.

Q.   All right.  Is that it, or is there any more claim language that Stimac did not invent?

A.   No.  There's another aspect I'd like to talk about as well.

Q.   Okay.

         MR. FERNANDO:  If we could please go to slide Number 28.

BY MR. FERNANDO:

Q.   Can you please read out the language that's now highlighted in green?

A.   Yeah, so the other aspect that's in green here where it says:  Said substrate, which is the LED substrate, being enclosed.

Q.   And, again, did Mr. Stimac teach or make obvious that that part of the '604 invention?

A.   No.

Q.   And, again, let's talk about why that is.  So, first off, what does Dr. Curran -- again, Lepro's expert -- point to as the substrate?

A.   It's the element colored in yellow in figure one there.

Q.   And can we call that part 20?  Because I see an arrow at the top of 20.

**A.**    Yes, we can.

Q.    Okay.  So is Dr. Curran right about part Number 20 being enclosed?

**A.**    No.

Q.    Why not?

**A.**    I don't think part Number 20 is enclosed.

Q.    And --

**A.**    He --

Q.    Sorry.  Go ahead, sir.

**A.**    Well, go ahead and ask a question.  I think you --

Q.    I was going to ask you probably what you thought, which is why not?

**A.**    Why not, yeah.  So you can imagine this thing being put together.  So the yellow LED substrate will be on the heat sink.  The clips on that retaining ring clip to the heat sink, but you can see there's quite some distance from the clips up to the end of the retaining ring.  And then the zoom lens goes on top of that and is designed to kind of push in and out; right?

So you can imagine that there has to be clearance for that, and you can certainly imagine that, when it's in its out position, the substrate's not enclosed.  there's a gap all around or maybe even above.  So this is not enclosed in the way that the '604 talks about this almost clamshell enclosure for environmental protection.

Q.   So if part Number 20, when this device is assembled, if it's not enclosed, is it fair to say that it is exposed?

A.   Yes.

Q.   And in the context of what Mr. Stimac was working on, why did it make sense there for this component Number 20, this part 20, to be exposed?

A.   Well, most of the specifications around, again, screw-in light sockets, which are often indoor -- and I think it even mentions many indoor lamps.  And in that case, worrying about enclosure of the LEDs is not such a big deal because you don't have to worry about water, wind, extreme, you know, weather conditions so much.

Q.   So, so far, Dr. Krames, we've talked about two differences between the claims of the '604 -- claim 1 of the '604 patent and Mr. Stimac's reference; correct?

A.   Yes.

Q.   Why do those two differences matter?

A.   Because if those are not taught in the Stimac reference, then you cannot use Stimac to invalidate the '604 patent, claim 1.

Q.   So then, in your view, is claim 1 of the '604 patent invalid of the Stimac reference?

A.   No.

Q.   Okay.  Is claim 1 the only one that you analyzed for invalidity?

*Michael Krames - Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

**A.**   No.  I also looked at claim 12.

**Q.**   And do you have a demonstrative of that, sir?

**A.**   Yes.

       **MR. FERNANDO:**  So if we could please go to slide Number 29.

**BY MR. FERNANDO:**

**Q.**   And what is the claim language that's now been highlighted in yellow?

**A.**   Yeah.  So this is claim 12, the other claim we talked about last week.  This is a dependent claim to claim 1, and it has an additional element, which is a sealant.

**Q.**   Okay.  And there you're talking about in the '604 patent; correct?

**A.**   That's right.

**Q.**   On the left in Stimac, of the things that are labeled here, what did Dr. Curran point to as a sealant substance?

**A.**   He did not point to anything.

**Q.**   Nothing?

**A.**   Nothing.

**Q.**   Okay.  Well, would it have been obvious to add a sealant to the optical structure in Stimac?

**A.**   Not in my opinion, no.

**Q.**   Okay.  Why not?

**A.**   Well, again, we can talk again about the function of the lens.  You have this lens arrangement at the top of the lamp

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

that's designed to go in and out.  It's not clear how that sealant would be put there.  If there was a sealant, it's not clear how the lens would work anymore.  And Stimac doesn't talk about that at all.  So it's complete conjecture how you would put a sealant into that part of the optical module, and Stimac doesn't talk about it and Dr. Curran didn't point to it.

Q.   Now, Dr. Curran did talk about some text in Stimac that mentioned a sealant.  Do you remember that, sir?

A.   Yes, I do.

Q.   Now, does that text at all change your opinion?

A.   No, not at all.

Q.   And so why not?

A.   So there is a passage in a paragraph in Stimac where he mentions a sealant, and it's specifically towards the base of the electronics where if you were -- if you wanted to have an outdoor version of this lamp that he has, you might consider putting a sealant between the socket base, which is on the left, and the heat sink.  But that's not between the housing element and the heat dissipation element as taught by '604. So these are totally different locations.

Q.   So then, Dr. Krames, is claim 12 of the '604 patent invalid in view of Stimac?

A.   No.

Q.   And do you have a slide summarizing your opinions here

today?

A.   I do.

MR. FERNANDO:  If we could go to slide 30.

BY MR. FERNANDO:

Q.   Dr. Krames, if you were to summarize your opinions here today so that the jury could write them down, what would you say?

A.   Yeah, so it's right there.  So my summary would be the claims 1 and 12 of the '604 patent are not invalid.

Q.   And is that because Dr. Curran failed to show clear and convincing evidence that the '604 patent is invalid?

A.   That's right.

Q.   Thank you, Dr. Krames.

MR. FERNANDO:  Pass the witness, Your Honor.

MR. BROWN:  No questions, Your Honor.

THE COURT:  Thank you.

All right.  May I excuse this witness then?

MR. FERNANDO:  You may, Your Honor.

THE COURT:  All right.  Thank you, Dr. Krames.  You can step down.

Any more witnesses from Signify?

MS. CLAYTON:  Yes, Your Honor.  Signify recalls Mr. Rugh to the stand.

THE COURT:  Sir, you understand you're still under oath?

*Aaron Rugh - Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

**THE WITNESS:** Yes, Your Honor.

**THE COURT:** You can inquire.

**DIRECT EXAMINATION**

**BY MS. CLAYTON:**

Q.  Mr. Rugh, I'm hoping that this will be very short for everyone's sake, so I just want to hit a few points with you.

Now, we heard Mr. Huang testify on Friday about Lepro's efforts to resolve this case.  Do you recall that?

A.  Yes, I do.

Q.  And let's talk about that for a minute.  Mr. Rugh, did Lepro ever offer to resolve this litigation with Signify?

A.  Only partially.

Q.  What do you mean by partially?

A.  Well, Lepro offered to compensate Signify for the use of the six patents in this lawsuit but only with respect to their past use.

Q.  And when did -- and when was that offer made, Mr. Rugh?

A.  That was a little over four months ago.  It was on September 29th of 2025.

Q.  Okay.  And was that offer acceptable to Signify?

A.  No, it was not.

Q.  And why not?

A.  Well, Lepro utilizes Signify's technologies in the past. We've seen that we've identified those technologies and those products in past letters starting in 2017.  And they continue

*Aaron Rugh - Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

to utilize the unexpired patents from this lawsuit, and Signify needs to be compensated for that future use as well as the past use.

Q.   Okay.  And what about other patents, were there issues surrounding other patents with Lepro?

A.   Yes.  As we saw in my letters starting in 2017 -- I talked about these last week -- there were numerous patents in those correspondence.  We talked about the ones from this lawsuit.  We typically highlighted those in yellow.  But there were other patents in that correspondence, and Signify wanted to discuss Lepro's use of those patents as well.

Q.   And what was Lepro's response to that discussion?

A.   They were unwilling to have any conversation with respect to those other patents.

Q.   Okay.  And so could you summarize for the jury why Signify didn't accept the deal that Lepro offered last September?

A.   Well, it didn't fully compensate for their use of Signify's technologies either with respect to this lawsuit or with respect to other patents that we identified.  Only -- only offering to pay for their past use obviously doesn't address any of their future use of the same patents from this lawsuit.

Q.   Let's switch topics here for a moment.  And did you hear Mr. Huang also say that he thought that Signify would require

them to pay on their global sales?  Did you hear that?

**A.**    Yes, I did.  I think Mr. Huang is confused as to how Signify licenses its patents under its EnabLED program.

Q.    Okay.  And what do you mean by that?

**A.**    Well, Signify only -- that we've heard -- we've talked about the 3, 4, and 5 royalty rates, but those rates only apply to products that are actually utilizing Signify's patented technologies.  We don't charge that rate to products that are not.

Q.    Okay.  One other topic that I'm hoping we can clear up, Mr. Rugh.  Do you recall Mr. Huang testifying about some issues with Amazon taking down Lepro products?  Do you recall that testimony?

**A.**    Yes, I do.

Q.    Okay.  Now, does Amazon have a program that allows companies like Signify to alert Amazon if they believe their patented technology is being used?

**A.**    Yes, they do.

Q.    Okay.  And has Signify alerted Amazon to Lepro products that Signify believes uses its patented technology?

**A.**    Yes, we have.

Q.    And have you been involved in those efforts?

**A.**    Yes, I was.

Q.    And what is your understanding of what Amazon does when they receive such an alert from a company like Signify?

*Aaron Rugh - Direct*
*2:22-cv-02095-JAD-EJY - February 9, 2026*

A.   Yes.   So Amazon will take a look at the Signify patent as well as the Lepro products that are identified.   It will see if there's merit to those concerns.   If Amazon believes there is merit, it will then push that concern to an attorney that's skilled in patent law to investigate it further to look further at Signify's patent as well as Lepro's products and determine if those products likely infringe Signify's patents.

Q.   Okay.   And what was the result when Amazon analyzed the LE products that Signify alerted them to?

A.   Amazon found that the Lepro products likely infringe the Signify patents.

Q.   Okay.   And were any of the patents that Signify alerted Amazon to at issue in this case?

A.   No.   They were other patents that -- such we've seen on my prior correspondence but not the ones in this case.

Q.   And is there any circumstance under which Amazon, to your knowledge, would allow Lepro to start selling these products again?

A.   Yes.   If the parties, both Signify and Lepro, were to take a license and show that to Amazon and show that Lepro had the right to utilize those technologies in their products, then Amazon would put those products right back up on their website.

Q.   And has Lepro ever reached out to say that they want to take a license to the patents that were before Amazon?

**A.**   No, they have not.

**Q.**   Okay.

MS. CLAYTON:  Pass the witness, Your Honor.

**CROSS-EXAMINATION**

**BY MR. BROWN:**

**Q.**   Mr. Rugh, did I hear you correctly that you believe that Lepro only offered to pay for past use when it offered to pay Signify for the patents involved in this case?

**A.**   That's correct.

**Q.**   That was what you heard?

**A.**   That is what I heard, yes.

MR. BROWN:  Nothing further.

MS. CLAYTON:  Nothing further here, Your Honor.

THE COURT:  May I excuse this witness?

MS. CLAYTON:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir.  You can step down again.

THE WITNESS:  Thank you.

MS. CLAYTON:  At this point, plaintiffs' rebuttal case rests, Your Honor.

THE COURT:  Okay.

MS. CLAYTON:  We also renew our motion.

THE COURT:  Right.  All right.  But that's the end of testimony and evidence presentation; correct?

MS. CLAYTON:  Correct, Your Honor.

MR. BROWN: Yes, Your Honor.

THE COURT: All right. So that means we're done with the majority of this trial. What we have left are jury instructions and closing arguments and then the jury's opportunity to deliberate. But all of that will happen tomorrow because I still have more work I need to do in order to get all of that ready for you guys. So we are going to end early this afternoon, and let you go home.

Something I want to talk about with the schedule tomorrow. There's something going on with the building tomorrow, and the building will not be open for you until a little later tomorrow morning. So the building will not be open I understand until about 9:15. So plan to get here at 9:15, no earlier, with the hope that we'll come in here at 9:30. I want to give you enough time to get through downstairs. There are a couple other juries going on, too. So you won't be the only one. But don't come to the building before 9:15 because you won't be able to get in or at least stay in. So 9:15 tomorrow morning if you can show up to the building. It may be a little bit of a delay. You might have to wait just a bit. I don't know. So this is my best estimate for you. But please come at 9:15 with the hope that we'll be in here at 9:30 and that we will resume then.

I believe that you will be deliberating in this case tomorrow. So just so you know, we're totally on track with

where we -- the schedule that we talked about when we brought you in here the first day, and I just wanted to let you know that that's where we are schedule wise.

So going to let you go tonight. Because you haven't started deliberations, the same rules still apply. You still can't talk about the case. Don't read, view, or listen to anything about the case. Don't conduct any of your own investigation. Don't Google anything. And please still wait to formulate your final opinions until you've heard my instructions of law, and there will be many.

So thank you, thank you, for your patience and your attention. And we will see you tomorrow morning hopefully at about 9:30, but please don't come before 9:15.

Thanks, everybody. We'll see you tomorrow.

*(Jury out at 2:21 p.m.)*

**THE COURT:** All right. Have a seat.

All right. Well, we have been using a lot of time today. So we are -- time wise, right now, plaintiff has about two hours and 25 minutes and defense has about an hour and four minutes. We'll talk about those in a minute. I think -- I'm not going to run the clock right now. So we'll work through some of these other issues without running the clock. I'll get back to motions in just a bit. I want to do things that I think we can work through a little more quickly, which would include jury instructions.

So if you want to take a minute to get your copies of the jury instructions, I'll give you a minute. I'm going to go backwards. I'm going to start with the verdict form. Got the changes from Lepro. I think -- essentially based on a abandoned arguments; right? Would that be the -- primarily why there were changes made?

**MR. BROWN:** Yes, Your Honor.

**THE COURT:** Do plaintiffs' counsel have any objections to Lepro's revised discussion draft?

**MR. FERNANDO:** So --

**THE COURT:** Can you get the microphone a little closer to you?

**MR. FERNANDO:** Yes, Your Honor.

**THE COURT:** Thanks. You guys can stay seated for this but just keep the microphones close, please.

**MR. FERNANDO:** Thank you.

So, Your Honor, I think there's maybe a couple issues. So the first I would say is I think on the issues that are now mooted, such as, for example, invalidity of the '577, '399, '138 patents, right, I think we are okay with Lepro's proposals for how to deal with those.

I think the biggest outstanding dispute for us is really on the damages section which we can take when -- when Your Honor's ready.

I will say -- I would like to just confirm, with the

latest version of Lepro's verdict form, that we're okay with basically questions one and two.  But based on the version I saw earlier yesterday afternoon, I think largely we are in agreement.

THE COURT:  Okay.  When I get to question three, damages, there's just a wording issue I want to note.  For example, question 3A:  On what date has Signify has proven.  So we got an extra "has" in each of those.  That might have been my fault.  So I think it should read:  On what date has Signify proven that damages should begin.  So we need to remove a "has."  I think we remove the second has.

Do you-all see where I'm talking about?

MR. FERNANDO:  I'm sorry, Your Honor.  Can you please repeat that?

MR. BROWN:  I'm lost, Your Honor.  I'm sorry.

THE COURT:  So let's look at 3A.

MR. BROWN:  Oh.  I do now see.  You're right, Your Honor.

THE COURT:  We've all read over it several times I think is what happened.

MR. BROWN:  I'm sorry.

THE COURT:  All right.  So my proposal would be to remove the second has.  Makes sense?

MR. FERNANDO:  Yes, Your Honor.

MR. BROWN:  Yes.

**THE COURT:** All right. So that's true for one -- so it's 3A, 3C, 3E, and 3G, and 3J would have that same edit.

All right. So let's back up. So question one. I'm looking at Document 271 is what I'm looking at right now, which was -- which is the Lepro's discussion draft verdict form as filed.

Question one is direct infringement. Do I understand no objections on question one from Signify?

**MR. FERNANDO:** So, Your Honor, I believe there's no dispute on the '320 patent. There's no dispute on the '604 patent. The issue with the '336 patent is that we don't believe that that they've put forward any testimony or evidence or noninfringement. And so I suppose it's a question for Lepro, Your Honor, whether noninfringement is still an issue in the case. We don't believe that there was any expert testimony on that issue that adduced today through Dr. Curran either today or on Friday.

**THE COURT:** Which I assume is going to be a topic of the motion that I'm going to see get filed here shortly?

**MR. FERNANDO:** Yes, Your Honor.

**THE COURT:** Okay. Well, I guess the question is: Do we short -- can -- so turning to Mr. Brown, what is Lepro's position on infringement?

**MR. BROWN:** Our position is that they have failed to meet their burden, Your Honor, as I argued earlier today.

THE COURT:  Okay.

MR. FERNANDO:  Understood, Your Honor.  In that case, I think we are agreed -- you know, I think for purposes of the verdict form, we can leave it as is.

THE COURT:  Yes.  Okay.  Obviously, if something different happens -- and by different, I mean that I receive and read and rule on this motion that I have yet to see or have filed -- by tomorrow morning when we give these to the jury, then we would address it.  But, otherwise, it goes this way.  It goes to the jury as is.

Question two, invalidity.  Any objections to question two from Signify?

MR. FERNANDO:  No objections from Signify, Your Honor.

THE COURT:  Great.

MR. BROWN:  Your Honor, if it's useful, can I just state that, if you rule as a matter of law that there's infringement of the '336 patent, then we would agree that we would remove that part from question one.

THE COURT:  Thank you.

All right.  So we're on question three.  What is your first objection, Mr. Fernando?

MR. FERNANDO:  So, Your Honor, our first objection is to breaking out question three on a per-patent basis, and then it's also on breaking out each patent issue to two additional

questions.  So the date on which Signify's proven damages should begin and then what sum of money for each patent.

And so, in our view, there's a number of examples -- and I'm happy to hand any up to Your Honor -- of situations where patent damages are just kept as a single determination of what the total number is with the understanding -- and I'm happy to find and provide Your Honor a cite.  But the understanding is that these predicate questions of fact are resolved in the overall determination of what the damages number would be.

And that's the reason, for example, the Northern District of California model patent jury instructions, which I'm happy to hand up, list a single question:  What is the damages total?  With the assumption that it's simpler to have the jury choose that number and resolve the predicate factual determinations that are otherwise broken out on Lepro's proposal.

I also have some examples in practice from Northern California from a recent case.  I have some examples from other patent cases here in Nevada as well where multiple patents were at issue, but the question that was submitted to the jury on damages was a single question:  What is the damages total?

THE COURT:  Mr. Brown.

MR. BROWN:  Your Honor, I agree the Courts have done

it both ways.  I believe that in this case it's important to break it out, and there are several reasons.  First is there's essentially no dispute on three of the six patents.  There's a small dispute on a notice date as to one of those patents, but the damages number for three of the six patents is under $5,000.

Second is, with the '336 patent in particular, there is an issue where, if notice was not given through this one e-mail, then the damages should be zero.  The result of these issues is that, if you combine it into a single form and you don't have an answer notice by notice, we believe it is going to create much more significant headache for post-trial briefing and motions and that, as a result, in this specific case it makes sense to do it this way.

MR. FERNANDO:  I'm happy to provide a response if Your Honor would like.

THE COURT:  I'm ready.

MR. FERNANDO:  So, Your Honor, I think, you know, you have to sort of in your -- in your position, Your Honor, weigh the considerations of what is simplest and best for the jury with what is going to happen post-trial.  I think post-trial, depending on what the number is, the parties will be able to determine how those predicate factual findings were resolved. But I think the way that the current verdict form is structured with 12 questions, right, six patents times two for

each one, it creates significant burden, makes it harder for the jurors to agree, I think it introduces a whole bunch more issues for the jury to have to address, as opposed to what is typically done, which is just have a single -- a single damages line.

THE COURT:  All right.  Thank you.

I understand both positions.  I do.  But I am going to do my future self a favor and keep it broken out because I'm under no fantasy that this is the last of this -- the last of the disputes that I have to decide in this case.  I expect that there will be plenty of post-trial briefing and motions, and I think that we will be doing ourselves a favor if we have these issues broken out in this more specialized verdict way so that we have more information about what the jury was thinking.  So I am going to break it out as we currently have it, and I'm going to delete the second "has" in each of those first questions.  So that's how I'm going to resolve the questions in -- in -- through 3J.

MR. FERNANDO:  Thank you, Your Honor.  And then we do want to raise one issue on 3K.  It sounds like --

THE COURT:  I'm there.

MR. FERNANDO:  -- you might be there.

So I think the issue with 3K is that now that is not broken out by patent.  What I would suggest might be a simpler way to address this, I don't think that past versus future

damages is in dispute here.  You know, our expert, Mr. Schoettelkotte, presented a past damages number.  Their expert has not disputed the award of past damages.

So what I might suggest is that for the -- the actual damages questions earlier -- for example, 3J, right -- we insert the word "past" before "damages" in sort of the middle of the sentence.  So, by a preponderance of the evidence, would compensate Signify for the past damages resulting from Lepro's infringement.

**THE COURT:**  Here's a question I have.  What evidence of future damages do we have that a jury could even think about future damages?  Why is future damages even on this verdict form right now?

**MR. FERNANDO:**  So I think, you know, it has been done in the past, Your Honor, because there are future prospective relief that you can ask for post-trial.  But to your point, there has not been evidence of -- of future damages in this case.  And so that's the reason I think it makes sense to add that word "past" in -- in the question itself.

**MR. BROWN:**  Your Honor, if you were to instruct the jury not to consider future damages, that would be acceptable to us if it was clear.  Mr. Rugh just testified 30 seconds -- well, not 30 seconds -- ten minutes ago that they were entitled to future damages.  He gave the impression that future damages are at issue in the case.  That's why we're

here.  So I think on the current record, without some sort of instruction that the jury shouldn't consider it, we need this sort of question.  I don't think there's a legal basis to award past damages in this case, let alone future, but I do agree with Your Honor that the testimony has been focused on past damages until what just happened ten minutes ago.

**THE COURT:**  Well, I think that Mr. Rugh testified to that based on -- I think that was in response to a question of why was -- why were the negotiations or why was Lepro's position not acceptable, not in the attempt to put on a future damages case.

**MR. BROWN:**  Agreed, Your Honor.  I just think it was just -- the concern I have is future damages was just raised with the jury ten minutes ago.  So --

**THE COURT:**  Assume that; right?  But no one has provided a method by which future damages would be calculated in this case by a jury.  Do we agree?

**MR. FERNANDO:**  Yes, Your Honor.

**THE COURT:**  So wouldn't it just be really confusing and create some massive issue in -- on appeal if I keep 3K in based on the state of the record right now?  What do we want to do?  What is Signify's position with respect to future damages?

**MR. FERNANDO:**  So -- so, Your Honor, I agree with you it would create confusion the way it's currently structured.

So we would propose striking 3K so long as the word "past" could appear in each of the damages questions.

The reason is this, right, it matters for the appellate record for us. Because when looking back, it needs to be clear for the appellate record that the damages award was for past damages to the extent any future damages were given; right? So basically we're just looking for that to be clear for the appellate record.

So I don't think we necessarily need this -- this question 3K. We are okay with striking it so long as the -- the other questions, you know, what sum of money questions, include the word -- just the word past inside of there; right? So by a preponderance of the evidence would compensate Signify for the past damages resulting from Lepro's infringement. If we did that for each of questions 3B... there might be a numbering issue. There's two 3Bs in I think the Court discussion draft I'm looking at but --

THE COURT: Okay.

MR. BROWN: I think I fixed that.

MR. FERNANDO: Okay. Thank you.

So looking at Lepro's version, Your Honor, if we added the word "past" in each of questions 3B, 3D, 3F, 3H, and 3J, I think that would resolve the issue and allow us to strike question 3K.

THE COURT: Also, Margaret, can you just do a quick

search and see in jury instructions if there's anything about future damages in there?  I just want to flag that so we can come back to that.  Thank you.

Mr. Brown, your position with respect to inserting the word "past."

MR. BROWN:  Your Honor, we -- that's fine with us. I'll just note that 3K was in here at Signify's request, and we left it alone.  So -- but I'm fine with this alternative approach.

THE COURT:  I suspect that things -- you know, things change during trial.  Okay.  So the past damages resulting from Lepro's infringement of the patent.  And 3K is leaving.

I will insert "past" into each of those related questions and delete 3K.

MR. FERNANDO:  Thank you, Your Honor.

THE COURT:  I'm on four, willful infringement.  And are we not calling these patents-in-suit anymore?  Are we calling them --

MR. BROWN:  That was a mistake.  I missed that.

THE COURT:  -- asserted patents?

MR. BROWN:  I missed that, Your Honor.  I apologize.

THE COURT:  That's okay.  Okay.  For each asserted patent, did Signify prove by a preponderance of the evidence that Lepro's infringement of any of the asserted claims was willful?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

What objections, if any, to question four?

MR. FERNANDO:  I don't think Signify has any objections, Your Honor.  I think we're okay with question four as it's currently written.

THE COURT:  Great.  And final page of the verdict form, any objections or changes we need to make there?

MR. FERNANDO:  No changes for Signify, Your Honor.

THE COURT:  Okay.  Anything else, Mr. Brown, while we have this in front of us?

MR. BROWN:  No, Your Honor.

THE COURT:  Okay.  All right.  That is the verdict form.

Let's go to jury instructions.  What I'm showing as disputed are 3, 11, 24, and 43.  So what I have is Signify's discussion draft.  That is what I am looking at.

So let me just understand what -- how this process works.  So I'm -- I have -- it's a redline draft essentially is what Signify has provided.  What was the process that happened to get to this draft?

MR. FERNANDO:  Yep.  So let me try to recall the exact chain, Your Honor.  There have been a couple on this.

So we had added edits to the Court's discussion draft over the weekend.  We circulated that to Lepro.  I think they sent us some counter edits yesterday evening and then filed their version of the counter edits, after which I think we

submitted via e-mail another version that attempted to consolidate the edits into one document and just note the disputes in different colors. So, Nick, feel free to correct me if -- I'm sorry. Correct me if I'm wrong, but I think that that's the chain of events here.

So basically there are a lot of differences, Your Honor, between, you know, the Court's discussion draft from Friday and this version, but many of those changes are agreed to.

THE COURT: That's what I understood. So these colors (indicating), this is your -- yes, what I'm showing you, the blue and the green, those highlights, those are the various conflicting positions on the language that the parties -- on the instructions on which the parties have disagreement?

MR. FERNANDO: Yes, Your Honor.

THE COURT: Okay. So let me just quickly go through the others so that I make sure that we don't have disputes. Instruction 1 -- and so I think -- am I -- am I going through the most recent version, is that what this is, the one that Signify e-mailed this morning? Okay.

Instruction 1, no dispute; right?

MR. FERNANDO: None for Signify, Your Honor.

THE COURT: Okay.

MR. FERNANDO: Excuse me.

THE COURT:  No dispute?

MR. BROWN:  So, Your Honor, I apologize.  I -- we have not run a compare of what we received with the blue and green version.  So I can't -- I will take Signify's word for it, and assuming that it matches what we submitted, then there's no dispute.  If I run a compare and I notice a problem, I'd like to be able to raise that with you tonight or tomorrow morning.  So based on assuming that that is correct, there's no dispute.

THE COURT:  Okay.  We'll go with that assumption.  I will resolve the disputes tonight.  If there are any issues, we deal with those tomorrow.

MR. BROWN:  Understood.

THE COURT:  Okay.  Instruction 2, summary of patent issues.  There's the blue and the red showing the changes.  It looks like instruction 2 is edited but everyone agrees; correct?

MR. FERNANDO:  That was Signify's intent, Your Honor.

THE COURT:  Yes.

MR. BROWN:  May I confer with Mr. Fernando for just a second?

THE COURT:  Please.  Yes.

*(Conferring amongst counsel.)*

THE COURT:  We're going to get you the redline, Mr. Brown.

**MR. BROWN:** Okay. I'm sorry, Your Honor. I have our redline.

**THE COURT:** That's okay. Let's go ahead -- let's take a break, and we'll get -- Margaret, you want to help me get a copy of the one I'm looking at specifically, maybe get -- will you just print two? Yeah.

*(Recess at 2:47 p.m., until 2:54 p.m.)*

**THE COURT:** All right. Everyone now has a redline copy of Signify's discussion draft 1. So no objection to instruction 1. Just stock anyway.

Instruction Number 2, summary of patent issues.

**MR. BROWN:** No objection, Your Honor.

**THE COURT:** Thank you.

Three, stipulated facts. Now, we get down to 18, 19, and 20, and it seems there's some discussion that needs to be had for stipulated facts 18, 19, and 20.

Mr. Brown, do you want to tell me what's going on with those?

**MR. FERNANDO:** So I'm -- actually, Your Honor, if you don't mind, I'm happy to take this because we had proposed striking these. So the concern was that -- they were previously stipulated facts that were entered in the pretrial order. Our concern was that they seemed to conflict with some of the testimony that came out during the trial. However, looking at it more closely, I think we'd be okay with 18 and

19.  But the issue is really Number 20 about Lepro Innovation, Inc. currently selling through lepro.com.  I think the issue there is the testimony that's come out about Lepro Innovation, Inc. also selling through other channels as well.

So we would propose removing the blue -- Signify would propose removing the blue language or, in the alternative, we could add a sentence that addresses those other channels.

THE COURT:  Mr. Brown?

MR. BROWN:  Your Honor, I don't think they're incorrect as written.  But the simplest -- I mean, I understand the concern.  The simplest thing is just to remove the through language.  So in both 19 and -- I guess it's just 20 they're concerned about.  We could remove through the WW [sic] Lepro com -- dot com --

THE COURT:  Why do we even need the "and currently sells products" piece?  Isn't that kind of the whole point of the last six days that we've been here?

MR. BROWN:  I agree, Your Honor.  We can take that whole part out, Your Honor.  That's fine.

THE COURT:  Let me ask Signify, why do we even need -- oh.  Wait.  I see "and previously sold versus and currently sells."

MR. FERNANDO:  Yeah.  So I think the concern is that these could contradict some of the testimony, Your Honor.  I

think to the extent we're going to remove the blue language from 20, we think it would be consistent and safer to do it also from 18 and 19. We don't want to be in a situation where, you know, it's suggested that we stipulated to these facts when possibly these facts are not true.

MR. BROWN: I don't think there's any dispute that they're true. It's just that there are other additional facts, Your Honor. But I don't think this matters very much.

THE COURT: Can we just delete the blue?

MR. BROWN: That's fine.

THE COURT: Okay. So all -- 18, 19, and 20 will advise and stipulate to are the incorporation dates for these three entities?

MR. FERNANDO: Thank you, Your Honor.

MR. BROWN: If we do that, can we make it the same in 17, just delete what -- everything after 2010?

MR. FERNANDO: We're okay with that also, Your Honor.

THE COURT: Great. Margaret, did that make sense?

MS. HAZUKA: Yep.

THE COURT: Okay. Any other objections or discussion on the stipulated facts, instruction 3?

MR. FERNANDO: Nothing further from Signify, Your Honor.

MR. BROWN: No, Your Honor.

THE COURT: Instruction 4. These are the burdens.

**MR. BROWN:** It looks to me like we're agreed, Your Honor.

**THE COURT:** I think so. Great.

Five seems to be agreed, although I just have a quick change to the blue language which says: I will refer to these as the asserted claims or the asserted patent claims in this case. I would say "in these instructions," which is the point of this, instead of "in this case." Any objections to that?

**MR. FERNANDO:** None here, Your Honor.

**MR. BROWN:** No, Your Honor.

**THE COURT:** Okay. Instruction 6, claim construction for the case. Looks like there's no changes there; correct?

**MR. BROWN:** Correct.

**MR. FERNANDO:** Correct.

**THE COURT:** Instruction 7, no changes, no objections?

**MR. BROWN:** Correct.

**MR. FERNANDO:** Correct.

**THE COURT:** Eight, no changes, no... or, sorry, there's a small change. No objections; correct?

**MR. FERNANDO:** No objections, Your Honor.

**MR. BROWN:** Small change. Seems like we're agreed.

**THE COURT:** Great. Nine? And --

**MR. BROWN:** Same thing. Small change; seems we're agreed.

**THE COURT:** Ten?

**MR. BROWN:**  Looks like no changes, Your Honor.

**THE COURT:**  Okay.  Eleven, literal infringement of means-plus-function claims.

Mr. Fernando, do you want to tell me what happened here?

**MR. FERNANDO:**  So, Your Honor, I think what happened is that Lepro proposed alternative language.  It's a little bit unclear to me why.  I think we are aligned with the Court's approach.  So what we put in green is Court's discussion draft and Signify's proposal, meaning that we would agree with the Court on the language that should go here, which I think is -- is consistent with the AIPLA.

**THE COURT:**  Mr. Brown?

**MR. BROWN:**  Your Honor, I think it's a little difficult to read in the version that you just handed out, but I can explain what we were concerned about.

**THE COURT:**  Please.

**MR. BROWN:**  So the -- in my copy, which is -- I'm looking at the redline of our discussion draft versus the Court's.  Is that a document that you have?  I believe I have another copy if you do not.

**THE COURT:**  I have a -- I have -- I have various copies.  So I have the one that we just handed out that has the blue and green, and then I have a clean one that I can see through, I think, so...

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

**MR. BROWN:** Okay. So --

**THE COURT:** Oh, wait. This is Lepro's discussion draft one. So I'm on Lepro's discussion draft is what I have.

*(Conferring amongst counsel.)*

**THE COURT:** So, Mr. Brown, I do have the version that was your redlines.

**MR. BROWN:** The -- our version redline against your original instruction?

**THE COURT:** Yes.

**MR. BROWN:** Okay. That's what I was referring to --

**THE COURT:** I'm there. Go ahead.

**MR. BROWN:** Okay. So in your first paragraph, in paragraph 11, you identify -- after the number two is identical or equivalent to the structure described in the patent specification and drawings. And that language is important, for performing [indiscernible] namely, the tabs 450 shown in figure 4 and described as 7:42 to 51.

When we get down to in my -- what I'm looking at as line 17, it says: You must decide whether the structure in Lepro's product is the same as or equivalent to the structure recited in the specification. It doesn't say drawings.

And so what we thought was simplest there and in several other places is to eliminate the references to the specification and instead refer to the structure that you identified.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

So at that line 17 we replaced "recited in the specification" with "I just identified."  And then in the -- two lines down we just added the word "that," whether the structure of Lepro's product is equivalent to that structure. In other words, the structure that you just identified.

THE COURT:  Okay.

MR. BROWN:  And then we say, again, structure identified down on the next page, four lines from the bottom. So we thought -- we thought that was the simplest and shortest way to avoid confusion.  It tracks the paragraph that runs in my copy from 11 to 14 where you refer to, for example, I just described to you, for example, in line 13.

THE COURT:  Got it.  Mr. Fernando?

MR. FERNANDO:  So, Your Honor, I think -- first of all, I'm not sure -- I mean, I think the language was clear to begin with.  I think the specification includes the drawings that are in the specification.  I think the original instructions referred to specification without saying necessarily figures or written description.  Specification includes both.  And so I...

MR. BROWN:  An alternative way to get to the same place, Your Honor, is we could remove the "and drawings."  I mean, the concern stems from line 9 where it says --

THE COURT:  The concern stems from the difference between "specification" and "specification and drawings."

MR. BROWN:  Correct, Your Honor.

MR. FERNANDO:  Yeah.  So in an effort to reach agreement, Your Honor, I think if we just put that in and said "specification and drawings," that that might resolve the issue.  Yeah, I think we should take out the "that I identified."  But if we just say "specification and drawings," that should resolve the issue.  In other words, we would propose still using Your Honor's original discussion draft language but just adding the words "and drawings" after the word "specification."

MR. BROWN:  That I don't agree with, Your Honor, because at that point it's confusing.  So you have instructed the jury as to what the structure is for this limitation.  So it is accurate to say the structure you just identified.  There's a whole host of structures in the specification, and that was the subject of bitter argument at claim construction.

So to just say specification drawings over and over again is misleading.  What must be equivalent -- structure, it must be equivalent to the specific structure that you identified.

MR. FERNANDO:  I think, Your Honor, a huge part of our concern is the "I just identified" is separated by several sentences from the early description.  So what I just identified is unclear under Lepro's proposal.  That's the reason we would prefer to use the Court's original proposal,

and we're okay modifying it to add specification and figures.

THE COURT:  Okay.  I'm going to take that one under advisement.

Twelve, infringement of dependent claims.  Doesn't look like there's any disagreement on that one; correct?

MR. BROWN:  Correct, Your Honor.

MR. FERNANDO:  Correct, Your Honor.

THE COURT:  Thirteen, infringement of comprising claims.  Agreement?

MR. FERNANDO:  Yes, Your Honor.

MR. BROWN:  Yes, Your Honor.

THE COURT:  Fourteen's going away.

MR. FERNANDO:  We agree, Your Honor.

THE COURT:  Right, Mr. Brown, 14's going away?

MR. BROWN:  Yes, Your Honor.  Sorry.

THE COURT:  No worries.

Fifteen, looks like there have been edits but they're agreed on; is that right?

MR. BROWN:  That's what it looks like to me, Your Honor.

MR. FERNANDO:  Same for Signify, Your Honor.

MR. BROWN:  Can I ask something clarifying about 14 going away?  Which is, are we changing the numbers or are we going --

THE COURT:  They will change.  But for discussion

right now, I'm using the numbers on these pages.

MR. BROWN:  Okay.  Thank you, Your Honor.

THE COURT:  Sixteen, invalidity of independent and dependent claims.  It looks like changes, but they're agreed to; correct?

MR. FERNANDO:  Yes, Your Honor.

MR. BROWN:  Yes, Your Honor.

THE COURT:  Seventeen, POSITA, no changes; correct?

MR. BROWN:  Yes.

MR. FERNANDO:  Correct, Your Honor.

THE COURT:  Eighteen, anticipation, changes but they're agreed on; correct?

MR. FERNANDO:  Yes, Your Honor.

MR. BROWN:  Yes, Your Honor.

THE COURT:  Nineteen, obviousness, changes but they're agreed on; correct?

MR. FERNANDO:  Yes, Your Honor.

MR. BROWN:  Are we on 19, Your Honor?

THE COURT:  Yes.

MR. BROWN:  Okay.  Changes but they're agreed on, Your Honor.

THE COURT:  Twenty, the first factor, scope and content of the prior art.  Changes made primarily because we've whittled it down to the Stimac patent?

MR. BROWN:  Correct, Your Honor.

**MR. FERNANDO:**  Correct, Your Honor.

**MR. BROWN:**  It looks like we're agreed.

**THE COURT:**  Great.  Twenty-one, second factor, differences between the claimed invention and the prior art.  Small changes agreed upon?

**MR. BROWN:**  Yes.

**MR. FERNANDO:**  Yes, Your Honor.

**THE COURT:**  Third factor, instruction 22, level of ordinary skill?

**MR. BROWN:**  Same thing.  Small changes, agreed.

**MR. FERNANDO:**  Same, Your Honor.

**THE COURT:**  Twenty-three, the fourth factor, other considerations, agreed upon?

**MR. FERNANDO:**  Yes, Your Honor.

**MR. BROWN:**  Yes.

**THE COURT:**  Twenty-four, what's our dispute?

**MR. FERNANDO:**  So the dispute that we had noted, Your Honor, is just the legal conclusion.  So we had tried to track I believe was the original language which says that Lepro contends that the following items are prior art, and then it just identifies the Stimac reference.

I think the difference is Lepro's proposal on 20 -- on page 24 that I'm looking at, the redline version, that one, it actually says the prior art includes the Stimac prior art reference.  So it's really just the difference between a

contention and the legal conclusion.

MR. BROWN:  I'm reasonably certain, Your Honor, that earlier the conclusion was agreed to.  I'm looking.

MR. FERNANDO:  If that's so, then I think we can probably agree.

MR. BROWN:  So in 18, which I believe we had agreed, it says there is no dispute that Stimac predates the '604 patent.

MR. FERNANDO:  So, Your Honor, there's a difference between necessarily predating and the legal conclusion of it being prior art.  So that's the reason we intended for instruction Number 24 to just be a contention.

MR. BROWN:  Well, if that's an issue, we're happy to -- and it sounds like maybe it's disputed, so...

MR. FERNANDO:  I think, Your Honor, in the interest of moving things along, I think we can accept Lepro's proposal for instruction 24.

THE COURT:  In this case, the prior art includes United States Patent Number blah, blah, which has been referred to as Stimac and is Exhibit 504?

MR. FERNANDO:  Yes, Your Honor.  We can -- we'll -- we're happy to just make that change and move on.

THE COURT:  Thank you.

Twenty-five, damages generally.  I'm just taking a look at this to see if there's anything about future damages.

Did we find any, Margaret, when we searched?  No word "future."  Okay.

So it looks like no changes except to swap "asserted patents" for "patents-in-suit"?

**MR. FERNANDO:**  Yes, Your Honor.  We're agreed.

**MR. BROWN:**  I'm sorry.  I think I missed a question from Your Honor.

**THE COURT:**  I'm just waiting to hear from you on whether you are in agreement with Number 25, damages generally.

**MR. BROWN:**  Yes, Your Honor.

**THE COURT:**  Then we're on 26, date damages begin. Let me just raise a quick wording change.  So on the blue insertions in the middle of page 26, Lepro contends that before Signify filed this suit, it was put on notice as follows.  For the '320 patent Lepro contends -- I just don't think we need "Lepro contends" in any of these bullets because we just said Lepro contends in the sentence above it.

**MR. BROWN:**  I assure you, Your Honor, that we were imitating the language that you had proposed for Signify contends where it does exactly that.

**THE COURT:**  Oh.  Touché.  I'll mirror it.  I'll leave it.

**MR. BROWN:**  Okay.  I think it's simpler at this point to just do it that way.

THE COURT:  Yep, I'm going to leave it.

MR. BROWN:  That's why we did it that way.

THE COURT:  I appreciate that.  Thank you for letting me know why.

Otherwise, are we in agreement then on 26?

MR. FERNANDO:  So, Your Honor, we just noticed a mismatch between the contention that Lepro inserted yesterday.  So I think the notice dates in the contention say April 6th, 2021.  But then at the end of instruction 26 it says the --

THE COURT:  December 19th?

MR. FERNANDO:  Yeah, a different date.

MR. BROWN:  Well, so hang on --

THE COURT:  That's the filing date.

MR. BROWN:  Right.  And our contention is that before -- it begins:  Lepro contends that before Signify filed this notice, it was put on notice as follows.  But that doesn't include all of the patents.  So there are -- or all of the products.  So it's -- that last piece is important because that is our contention for many product categories.

THE COURT:  Right.  That's a separate...

MR. BROWN:  To take a simple example, there is -- in the '604 patent, there are two product categories identified there, but that is only two of the four or five, depending on how you count it, product categories that are accused.

MR. FERNANDO:  So, Your Honor, I'm not sure I fully

followed that, but I think from what I got, it sounds like there's still a gap because there would be some products that would be subject to the April 6th date, but then there would be others subject to the December 19th date. And I think that that could be very confusing.

THE COURT: Okay. Here's what I'm going to do on that one. I'm going to give you guys an opportunity to work that language out between yourselves, and we'll finalize it first thing in the morning before we print these out for the jury.

MR. BROWN: Your Honor, if I could just frame the issue? If we're going to do it for each product category, our contention, it's going to be much longer.

THE COURT: I understand that. I'm hoping you-all can find a way. So I'm going to ask you to just get together on this one.

MR. BROWN: Okay. Yes, Your Honor.

THE COURT: You did such a nice job of -- of coming to agreement on so many of them that I am -- I am -- I have great faith in this ability.

Twenty-seven, reasonable royalty?

MR. BROWN: No issue.

MR. FERNANDO: None here, Your Honor.

THE COURT: Twenty-eight, reasonable royalty definition using the hypothetical negotiation method?

**MR. BROWN:** No issues.

**MR. FERNANDO:** Same here, Your Honor.

**THE COURT:** Twenty-nine, looks like a few changes but in agreement?

**MR. BROWN:** Yes.

**MR. FERNANDO:** Yes, Your Honor.

**THE COURT:** Which reminds me. When we first identified the term "asserted patents" in instructions -- instruction two -- oh, wait.

**MR. BROWN:** Line 5. Or four.

**THE COURT:** Yeah. Hold on one sec. For a second I was thinking that it was not capitalized, but it...

**MR. BROWN:** For some reason asserted patents is capitalized and asserted claims is not. I think that's fairly consistent throughout the document. I don't know why we did it that way, but that's how it is.

**THE COURT:** Okay. I think we'll just make sure that they're consistent. So I'm just going to make a note.

**MR. BROWN:** If you're suggesting that you would make asserted claims and asserted patents consistent, Your Honor, we'd request that you make them both capitalized because it's clear that they're defined terms.

**THE COURT:** That's what I would do. I just feel like, at least once I saw them uncapitalized, I saw them in lower case, I can't identify it right now, but we'll just

search and replace.

Twenty-nine was the last one we did.  Thirty, reasonable royalty attribution apportionment.

**MR. BROWN:**  Looks like no changes from either of us.

**MR. FERNANDO:**  Correct, Your Honor.

**THE COURT:**  Also looks like no changes to 31 and 32.  Agreed?

**MR. BROWN:**  Yes.

**MR. FERNANDO:**  Agreed, Your Honor.

**THE COURT:**  Thirty-three, small changes.  Okay.  Sorry.  Thirty-three, no changes?

**MR. BROWN:**  No changes.

**MR. FERNANDO:**  Yes, Your Honor.

**THE COURT:**  Thirty-four, reasonable royalty use of comparable license agreements, small change.  Agreed?

**MR. BROWN:**  Yes.

**MR. FERNANDO:**  Agreed.

**THE COURT:**  Thirty-five, no changes?

**MR. BROWN:**  Yes.

**MR. FERNANDO:**  Agreed.

**THE COURT:**  Thirty-six, small changes, agreed; correct?

**MR. BROWN:**  Yes.

**MR. FERNANDO:**  Correct.  Although, there might be a tiny typo at the end of 36 that I'm seeing in redline.  Just a

little G.

THE COURT:  I see that.

MR. BROWN:  We agree that should be removed.

THE COURT:  We'll take that out.

Thirty-seven is one of those instructions where you have options depending on the state of the evidence, and it seems we've chosen the second option and we're agreed on that; correct?

MR. FERNANDO:  Yes, Your Honor.  We chose to agree on this one.

MR. BROWN:  Yes.

THE COURT:  Thirty-eight, some change -- paragraph 5 is added but agreed; correct?

MR. FERNANDO:  Yes, Your Honor.

MR. BROWN:  That's my -- it's possible that we don't need this anymore, Your Honor, and that we could agreed to remove it given your ruling earlier today.  I think there are no redacted documents.

MR. FERNANDO:  There is at least one redacted document.

MR. BROWN:  Okay.  Well, then we should leave it in.

THE COURT:  Thirty-nine, no changes?

MR. FERNANDO:  Yes, Your Honor.

THE COURT:  40dforty, 41, 42, no changes; correct?

MR. FERNANDO:  Yes, Your Honor.

THE COURT: Forty-three, no changes?

MR. BROWN: Correct, except we added between 43 and 44 --

THE COURT: A proposed 408 limiting instruction.

MR. BROWN: Correct.

THE COURT: So that's Lepro's proposal. Let me hear Signify's position. And just for the record, this is a limiting instruction about the evidence that we heard about offer to settle.

MR. FERNANDO: So, Your Honor, I think this is Lepro's proposal.

THE COURT: Yes.

MR. FERNANDO: We don't think it's necessary.

THE COURT: Why don't you think it's necessary?

MR. FERNANDO: So I think -- my understanding was that Lepro had intended to introduce this if Exhibit 695 was coming in, but -- oh. Sorry.

MS. CLAYTON: Your Honor --

THE COURT: We did hear --

MS. CLAYTON: Yeah --

THE COURT: -- testimony about it.

MS. CLAYTON: -- we do. Yeah. So, Your Honor, on this one, they're the ones who elected -- we tried to keep that testimony out; right? They were the ones who elected to have Mr. Huang testify to that. And so given that they were

the ones who put that in evidence, I don't think that it's necessary to have a limiting instruction.

THE COURT: Okay. Mr. Brown?

MR. BROWN: Your Honor, I think this issue was raised because of Mr. Rugh's testimony about what had happened in the past, which we needed to rebut. But, regardless, I think Rule 408 is clear on this point, which is you can admit this type of evidence for certain purposes and not for others. I don't think Rule 408 specifies any distinction between who admits it or why. Rule 408 imposes a limitation, and we think it's appropriate to have an instruction either way.

THE COURT: All right. I agree with Mr. Brown. I'm going to include it.

Forty-four, no edits. And then 45, 46, 47, 48, 49, no disputes?

MR. BROWN: Yes, Your Honor.

MR. FERNANDO: Yes, Your Honor.

THE COURT: All right. So that leaves me just one that I need to resolve overnight, and that is --

MR. BROWN: Eleven.

THE COURT: Eleven.

MR. BROWN: And one that we need to resolve overnight, Your Honor.

THE COURT: And one that you need to resolve overnight. That's right. Okay.

**MR. BROWN:** Which I believe is 24 -- 26, excuse me, which will be 25.

**THE COURT:** Right.

Okay. Okay. I am -- I have not yet had -- sorry. It's getting late. Has Signify filed its Rule 50 motion yet?

**MR. SWAIN:** Not yet, Your Honor. The plan is to do it in the coming hours.

**THE COURT:** Okay. So I haven't had a chance to review those yet -- that yet, but I have had a chance to, while listening to other testimony today, address and look at the bases for Lepro's motion and renewed motion.

So I'm going to go ahead and put a ruling on the record with respect to that. So I have notes all over the place. So give me just -- so please be patient with me while I work through this.

So this is a motion for judgment as a matter of law under FRCP 50(a). A District Court can grant a Rule 50(a) motion for judgment as a matter of law only if there's no legally sufficient basis for a reasonable jury to find for that party on that issue.

In entertaining a motion for judgment as a matter of law, the Court may not make credibility determinations or weigh evidence, and the Court should review all of the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party and it may not make, as I

said, credibility determinations or weigh the evidence.  The Court also may not substitute its view of the evidence for that of the jury.

In applying these standards, I deny Lepro's motions.

I'm going to start specifically on the notice issue, and then I'll address more broadly the other arguments.

So I had an opportunity to review the cases that everybody cited during that argument.  If a patentee's initial notice is sufficiently specific to accuse one product of infringement, ensuing discovery of other models and related products may bring those products within the scope of the notice.  That quote comes from the *K-TEC, Inc. versus Vita-Mix Corp*. case.  The cite is 696 F.3d 1364.  Its pincite is 1379.  And it's partially quoting the *Funai* case, F-u-n-a-i, *Electronic Company versus Daewoo*, D-a-e-w-o-o, *Electronics Corp*., 616 F.3d 1357.

Exhibit 84 provides the notice that the, quote, LE Lighting Ever brand wireless ceiling light with Bluetooth speaker, end quote, may infringe the '336 patent.  That's the tunable white patent.  Dr. Pattison testified about that patent, and he explained that the two accused products and the product that was identified in the notice infringe in the same way.

Based on the Federal Circuit's acknowledgment that notice of one product can provide notice for other models and

related products and after considering Dr. Pattison's testimony, I find that a jury could reasonably conclude that the November 23rd, 2018, e-mail marked as Exhibit 84 gave sufficient actual notice that the accused products infringe.

Exhibit 60 provides notice that several categories of lighting, including the UFO LED high bay lights, use technologies in several Signify patents, including the '604 patent.  It was Dr. Michael Krames who testified that there were no differences between the LED UFO high bay lights referenced in the letter and any of the accused products in the juror notebook.  Again, based on the case law that I have reviewed and the evidence submitted in this case, I find that there's sufficient evidence to permit a jury to conclude that Lepro was on notice of Signify's alleged infringement of all of the accused products based on the June 1st, 2017, letter marked as Exhibit 60.

I find that all of the other arguments that the defendant has raised in its motions are the subject of disputed evidence, and to find for Lepro and grant the motion for judgment as a matter of law on any of those remaining arguments, I would need to make a credibility or weight determination, which Rule 50 does not permit me to do.  So I deny the motion as to all of those other arguments as well.

So those are the Lepro motions.  I will address as soon as I possibly can, once I have it, Signify's.

What else do I need to do tonight before we bring the jury back in tomorrow hopefully at about 9:30?  I'm going to start with Signify.

**MR. FERNANDO:**  I don't think that there's anything else for Signify, Your Honor.

**THE COURT:**  Mr. Brown?

**MR. BROWN:**  Your Honor, nothing other than just a -- we want to be sure about the time remaining for each side.

**THE COURT:**  Yeah.  Let's talk about time.  Yeah.  So what I have is two hours, 25 for plaintiff.  I've got one hour, four minutes for defense.

Tell me honestly, how long do you think, Mr. Brown, your closing will go?  How long do you need for closing?

**MR. BROWN:**  I would like 90 minutes, Your Honor, but I can do it in an hour and four if that is what you find.

**THE COURT:**  And can the plaintiff do their closing and rebuttal in two hours, 25?

**MR. SWAIN:**  Hopefully in an hour, Your Honor.

**THE COURT:**  Hopefully in an hour?

**MR. SWAIN:**  Yes.

**THE COURT:**  All right.  So what I'm going to tell you, Mr. Brown, is try real hard to get yourself down to the hour mark.  But if you go a little bit over that, I'm not going to say anything about that.  If you are -- if you get to about the hour and 20 mark and you're still going and you

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

don't seem to be winding up, you'll probably hear from me --

**MR. BROWN:** Understood.

**THE COURT:** -- with a "please wrap it up."

All right. So my... I'm hoping it doesn't take me an entire hour to read these jury instructions. I think it might take less. But what I'd like to do is jury instructions, closings, and then let the jury go to lunch and work on their deliberations.

So I'll probably give them a snack break between opening arguments -- between the two opening arguments, the two main ones -- yes. So after Signify we'll do, like, a 15-minute snack break. I'll let them know that we're going to order lunch and -- but we want to get through things. So time wise, that's my intention.

So I am hopeful that we will be able to move very quickly through things tomorrow morning. And, again, with the building complication that we have, please plan on being at the building at 9:15 with the hope that we can go back on the record shortly after that.

Anything else before we adjourn tonight?

**MR. BROWN:** I had one more question I forgot to ask, which is, did I understand correctly the jury will have a copy of the jury instructions?

**THE COURT:** Of course.

**MR. BROWN:** Thank you.

THE COURT:  They will each have their own copy.

MR. BROWN:  They will each have their own copy. Thank you, Your Honor.

THE COURT:  Yes.  There will be one verdict form, but they will each have their own copy of the jury instructions, which brings me to another point that I want to make.

Jury deliberations go more smoothly for both sides if during closing argument someone shows the jury what the verdict form looks like and how it should be filled out.  The ELMO is such great technology for this.  So I would just recommend that you incorporate the verdict form in your closing argument and you make some check marks and walk through them and show them what you think it should look like when they're done.  It really is easier than if the first time they're ever seeing this document is when they go back into the jury room.  So that's -- that's my trial practice tip for you-all today.

MR. BROWN:  Your Honor, may I request that the Court --

THE COURT:  Give you a copy?

MR. BROWN:  Yes.

THE COURT:  Yeah.  I'll do that.

MR. BROWN:  Thank you, Your Honor.

THE COURT:  You'll have that tomorrow morning.  Both side will have a copy.  And if you agree on the language from

the one remaining that I've asked you to -- to talk about...

MR. BROWN:  I think it's 26 and will become 25.

THE COURT:  Twenty-six, date damages begin.  If you do agree on language, if you could e-mail that to Summer tonight or, you know, very early in the wee hours of the morning so that we can just have that ready to go.  And over the evening, I, too, will make a decision on instruction 11 and just include that in there.

All right.  I will see everyone tomorrow morning.

*(Proceedings adjourned at 3:38 p.m.)*

--o0o--

COURT REPORTER'S CERTIFICATE

I, AMBER McCLANE, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, do hereby certify that pursuant to 28 U.S.C. § 753 the foregoing is a true, complete, and correct transcript of the proceedings had in connection with the above-entitled matter.

DATED:  2/10/2026

/s/_____
        AMBER McCLANE

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR